# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Case No.: 26-764

SARAH K. WESTALL, an individual,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA,
GOOGLE, LLC, YOUTUBE, LLC, JOHN DOE 1,
JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and
JOHN DOE 5,

    *Defendants*.

_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Sarah K. Westall ("Westall"), by and through undersigned counsel, sues Defendants, United States of America ("Government"), Google, LLC ("Google"), YouTube, LLC ("YouTube") (collectively, the "Defendants"),[1] John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5, as follows:[2]

---

[1] Throughout this Complaint, the collective group of Big Tech companies such as Facebook / Meta, Twitter / X, Google, and YouTube are often generally referred to as "Big Tech," "Social Media," "Platform," or "Tech."

[2] Plaintiff reserves the right to amend this Complaint to, among other things, expound on the universe of Defendants, depending on what discovery might show as to involvement with / responsibility for the wrongdoing complained of herein. Part and parcel with this reservation, Plaintiff reserves the right to amend this Complaint to name additional Defendants (hence, John Doe placeholders) because the corrupted scheme at play here (discussed below) is so clandestine and so deep, we simply will not know where the rabbit hole ends until discovery.

## NATURE OF ACTION

1.      This action challenges a coordinated censorship and deplatforming campaign in which federal agencies and officials coerced, colluded with, and/or jointly participated with Google/YouTube to suppress Westall's lawful speech and eradicate her presence and monetization on YouTube, while deliberately allowing (and potentially facilitating) impersonation channels to proliferate and dominate search results (including defamatory and derogatory material flowing from such impersonators entitled "Pornstar Confessions"), causing severe financial and reputational harm.

2.      The "common allegations" section below pleads a range of facts regarding censorship, Government/Tech collusion, viewpoint discrimination, suppression of speech, Platform manipulation, algorithmic suppression, impersonator channels, algorithmic elevation of defamatory/explicit material, product design vulnerabilities, economic harm, loss of business opportunities, psychological harm, denial of due process/discovery, retroactive rulemaking, selectivity in enforcement, and *et cetera*.

3.      The "causes of action" section below is categorized as follows: **(a)** Platform algorithmic manipulation and search manipulation are addressed under negligent design, negligence, tortious interference, and misrepresentation; **(b)** suppression or amplification of explicit/defamatory material by impersonator channels are addressed under right of publicity, defamation, copyright, negligence, and negligent design; **(c)** failure to respond adequately to impersonation complaints are addressed as negligence, tortious interference, right of publicity; **(d)** emotional and psychological harm are incorporated into tort damages claims; **(e)** denial of due process/discovery/litigation barriers are linked to Administrative Procedure Act ("APA") and First Amendment counts; **(f)** retroactive rulemaking and

2

shifting justifications are tied to fraud, negligent misrepresentation, negligent design, and other common law claims; **(g)** claims related to lack of transparency and judicial/litigation misconduct are raised in the context of constitutional, APA, and equitable theories; **(h)** economic loss, business interruption, and loss of professional opportunities are addressed under damages for the existing torts.

4.       Westall seeks damages against the private Defendants and injunctive and declaratory relief against all Defendants to halt the ongoing abridgment of speech and press rights and to remedy the continuing effects of the Government-led censorship enterprise.

## **PARTIES, JURISDICTION & VENUE**

5.       Westall is a Minnesota citizen residing in Dakota County, Minnesota. Westall is a business professional and systems engineer who built a substantial journalism and media presence, including top rankings on Apple Podcasts (Business News) and Substack News.

6.       As for Defendant, United States of America, at all material times the highest bodies of the federal Government were / are headquartered in the District of Columbia; *i.e.*, at all material times, the United States of America maintained its nerve center / "principle place of business" in Washington, D.C.

7.       At all material times, Google was / is a Big Tech Delaware limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Santa Clara County, California. Google's members / authorized persons consist of Sundar Pichai (CEO), Ruth Porat (CFO), Kent Walker (Secretary), Kenneth Yi (Assistant Secretary), and

XXVI Holdings, Inc. (Authorized Member), all of whom, in corporate filings, set forth Mountain View, California (Santa Clara County) with respect to domicile / residence.[3]

8.    At all material times, YouTube was / is a Big Tech subsidiary of Google, with its citizenship (*i.e.*, principal place of business / "nerve center") in San Mateo County, California. YouTube, as a subsidiary of Google, operates under Google's corporate structure/framework.

9.    This Court has federal question jurisdiction under Title 28, United States Code, Section 1331 (Westall asserts, *inter alia*, claims arising under the First Amendment and the APA) and supplemental jurisdiction over related claims.

10.    Diversity jurisdiction under Title 28, United States Code, Section 1332 is also satisfied as the parties are completely diverse and the amount in controversy exceeds $75,000.00 exclusive of fees, costs, interest, or otherwise.

11.    Venue is proper in this District pursuant to Title 28, United States Code, Section 1391(b), since a key Defendant (if not the must culpable Defendant), United States of America (the "Government"), "resides" in this District and a substantial part of the events or omissions giving rise to the claims occurred here, including the initial pushes for deplatforming and suppression, which continue through present. Moreover, this Court has personal jurisdiction over all Defendants based on their indisputable minimum contacts with this jurisdiction and the crux of the harms alleged herein emanating from within this District.

---

[3] The parent company of Google (and YouTube) is Alphabet, Inc., which was / is a Tech conglomerate holding company. Of Alphabet's collection of businesses, the largest is Google. Alphabet is incorporated in the State of California, with its citizenship (*i.e.*, principal place of business / "nerve center") in Santa Clara County, California.

12.     All conditions precedent to the institution of this action have occurred, been performed, been waived, or were futile.

**<u>BRIEF INTRODUCTION</u>**

13.     Westall brings this action to redress and halt a coordinated censorship and deplatforming campaign in which federal agencies and officials coerced, colluded with, and/or jointly participated with Google/YouTube to suppress her lawful speech and eradicate her presence and monetization on YouTube, while allowing impersonation channels to proliferate and dominate search results, causing severe financial and reputational harm. This Complaint seeks damages against the private Defendants and injunctive and declaratory relief against all Defendants to stop the ongoing abridgment of speech and press rights and to remedy the continuing effects of the Government-led censorship enterprise.

14.     Westall is a Minnesota citizen and media professional whose online journalism reached an audience of approximately 130,000 subscribers and generated monthly revenues of roughly $45,000.00 before the challenged conduct, with cumulative economic harm since 2020 conservatively estimated at least $7,000,000.00. The United States (acting through senior officials and agencies headquartered in this District) pressed Platforms, including Google/YouTube, to remove non-violative user content, entangling the Government in private moderation decisions through coercion and significant encouragement, constituting impermissible State action under the First Amendment.

15.     YouTube terminated Westall's primary channel on October 15, 2020, for purported guideline violations, despite content featuring board-certified medical doctors

and PhD scientists and despite her successful growth and monetization; appeals were denied.

16.    After litigation threats and public revelations of Government pressure on Platforms, YouTube reinstated Westall on August 12, 2024, expressly stating that "your channel does not violate our Community Guidelines," only to remove her again two days later for "repeated violations of our harassment policy," later issuing a "final" denial dated July 25, 2025, and ultimately reinstating the channel again on October 30, 2025, demonstrating arbitrary and pretextual enforcement intertwined with Government.

17.    Throughout, backup channels were also removed, and impersonation channels using Westall's name and content were elevated in search while her legitimate channel was suppressed, even yielding salacious "Pornstar Confessions" results when searching her name, compounding reputational and economic injury.

18.    These actions arise under the Constitution and federal law, including the First Amendment and the APA, with jurisdiction anchored in 28 U.S.C. §1331, supplemental jurisdiction over related claims, and diversity jurisdiction under 28 U.S.C. §1332; venue is proper under 28 U.S.C. §1391(b).

19.    The legal issues include whether Government coercion and significant encouragement converted Platform enforcement into State action that abridges speech and press, whether agency conduct was ultra vires and unlawful under the APA, and whether Google/YouTube's conduct gave rise to state-law tort and statutory liability notwithstanding claimed immunity under 47 U.S.C. §230 and related authorities.

20.    The stakes extend beyond Westall: the Government/Platform censorship architecture at play (the Censorship Industrial Complex, "CIC") targets core political,

scientific, and cultural discourse on health, elections, climate, and other matters of public concern, posing one of the most significant attacks (if not the most significant attack) on free speech and free press in modern American life.

21.     Westall accordingly asks this Court to declare the censorship scheme unlawful, enjoin its continuation, require reinstatement and transparency remedies to prevent further violations, and award damages against the private Defendants commensurate with the harms suffered.

## COMMON ALLEGATIONS

### *Westall's Background and Business*

22.     Westall is a distinguished business professional and systems engineer, recognized for her contributions to business journalism. Her work has consistently achieved top rankings on major media platforms, including Apple Podcasts (Business News) and Substack News.

23.     Prior to termination, Westall's media business generated monthly revenues reaching approximately $45,000.00. The resulting economic harm since 2020 is conservatively estimated to total at least $7,000,000.00.

24.     Westall possessed exceptional market potential. Her distinctive background (as an early leader in the development of the Internet, a former adjunct instructor at the University of Minnesota's Carlson School of Management, and a successful entrepreneur and business consultant) positioned her as a unique and authoritative voice within both independent and mainstream media.

25.     Westall's potential to become a prominent force in the media industry was widely recognized and evidenced by her rapid audience growth and broad appeal. By 2020,

her YouTube channel had amassed approximately 130,000 engaged subscribers, which was a substantial audience for that period. This figure exceeded the subscriber counts of many major media personalities who later experienced accelerated growth / development during the post-2020 media boom and who now maintain audiences exceeding 500,000 subscribers.

### Government Pressure on Platforms and YouTube's Role

26.     Senior Biden Administration officials, including White House officials and Intelligence Community officials, engaged in repeated and sustained outreach to YouTube, hard-pressing for removal of user-generated content related to COVID-19, vaccines, politics, elections, and *et cetera* that admittedly did not violate YouTube's internal policies, and continued to hard-press for removal of non-violative content; Alphabet companies (inclusive of Google and YouTube) purportedly quarreled with such efforts, but, in actuality, ultimately capitulated.

27.     The House Judiciary Committee has stated that the Executive Branch coerced or colluded with companies under the Alphabet umbrella (*e.g.*, YouTube) to censor lawful speech and to target specific individuals, such as Westall.

28.     Alphabet (inclusive of Google and YouTube), in recognition of its wrongful conduct in tandem with the Government, publicly represented that users whose channels were terminated under certain COVID-19 and election-related policies would be afforded an opportunity to rejoin the platform after policy changes. *See, e.g.,* King & Spalding Sept. 23, 2025, letter attached hereto as **Exhibit A** and incorporated fully herein by reference.

29.     The U.S. Government's involvement in censorship during the COVID-19 pandemic reflects a concerted, preplanned, and multi-faceted conspiracy to suppress

dissenting or critical voices who spoke to power, especially those challenging the official narratives on public health and political matters – Westall was blacklisted by Defendants as part of Defendants' campaign against critics / dissenters of the Government's narratives.

30.    This censorship regime, CIC, was characterized by a close partnership between federal agencies (the Government), NGOs, and major Tech companies (*e.g.*, Google/YouTube, Meta, and X).

31.    The purpose of these collaborations was to monitor, identify, and censor what the Government deemed "misinformation," "disinformation," or "malinformation," particularly competitive or critical information regarding COVID-19, vaccines, and elections.

32.    The Government's enlisted censorship NGOs (*e.g.*, Media Matters) played a role in deliberately developing and promoting censorship analyses and related hit lists. This Government tool / instrument (NGOs) was used to identify and blacklist disfavored media outlets and individuals, including Westall. The manufactured NGO "misinformation," "disinformation," or "malinformation" data led to the Government's targeted suppression of Westall on several Platforms (here, Google/YouTube).

33.    In a tweet referencing the "Facebook files," Congressman Jim Jordan simplified how this censorship regime operated:

> … activists at [NGOs] feed false info to the Biden White House. The Biden Administration [and the Establishment Party] then uses the full weight of the federal government to coerce [Social Media companies] to censor Americans, Biden's critics and political opponents, and the truth.

This joint collaboration (*i.e.,* pervasive entwinement), fueled by NGOs (some of which were foreign) and facilitated by Governmental coercion, targeted not only specific individuals but also fundamental civil liberties.

34.    The overall suppression was not limited to independent, voluntary, and good faith moderation actions by Big Tech companies; Government agencies actively exerted both public and private pressure (overtly and covertly, and extremely) on Big Tech (here, Google/YouTube). Meetings, emails, and public threats to "scrutinize," "amend," or "repeal" Title 47, United States Code, Section 230 (the Communications Decency Act, "CDA"), a Social Media company's limited civil liability protection (its "Good Samaritan" affirmative defense), were used by the Government as coercive tactics to ensure Big Tech compliance, for example. The Platforms, in turn, adopted increasingly anti-competitive and strict censorship policies (knowingly shielded by judicially fabricated unconstitutional Section 230 "immunity," discussed later), removing or downranking content, applying false and defamatory warning labels (all of which such conduct amounts to a form of its own speech), and creating algorithmic barriers (product design changes) to the spread of disfavored content (such as that of Westall), in the competitive digital information market.[4] And, again, this Government conspiracy to suppress America's free speech has been flat admitted to by Alphabet. *See* Ex. A.

35.    This censorship regime extended beyond public health information. The 2016 U.S. election and the rise of populist figures like Donald Trump, for example, demonstrated the transformative power of Social Media in allowing political figures to directly connect with the electorate, bypassing traditional media gatekeepers. This widespread ability to communicate unfiltered messages directly to the public challenged

---

[4] Indeed, per Google's AI (Gemini), "the platform is engaging in predatory editorial curation under the guise of neutral algorithmic hosting." Google's algorithm serves as a "pay-to-play" gatekeeper; meaning, Google/YouTube is not a "neutral host," it is digital landlord charging an illegal "success tax."

the Establishment's control over political narratives.

36.    In response, Social Media companies were pressured (the Government exerted extreme liability exposure / pressure from multiple departments) into adopting tools and policies that curbed the influence of American voices seen as threats to the Establishment's control. This dynamic highlights a deeper issue where censorship not only suppresses misinformation but also limits political discourse and marginalizes dissenting/critical voices, restricting the ability of prominent figures, like Westall, to engage directly with voters, thereby ensuring the preservation of institutional / Administrative / Establishment power.

37.    At the core, the Government's CIC actions were premeditated and deliberate, constituting one of the most significant (and seditious / treasonous, we submit) attacks on free speech and the foundational rights of We The People in U.S. history. Like the plaintiffs in *Missouri v. Biden,* Westall asserts that the COVID-19 pandemic was not a reason to diminish civil liberties guaranteed by the Constitution. Citing to Justice Gorsuch's dissent in *Does 1-3 v. Mills*: "If human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Missouri, et al. v. Biden, et al*., No. 2:22-cv-01213 (W.D. La.), [D.E. 293] at 118 (citing *Does 1-3 v. Mills*, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting)). Along with Judge Doughty of *Missouri v. Biden*, we submit that the "grave risk" presented here is the most massive attack on free speech in U.S. history.

38.    This unprecedented campaign of suppression blurred the lines between public and private action, actively subverting the Constitution and undermining the fundamental protections guaranteed by the First Amendment. Westall contends that this

censorship apparatus is not merely an isolated issue but part of a broader, ongoing global agenda designed to maintain control over all public discourse and political outcomes worldwide. Again, this concerted effort poses a grave threat to the very foundation of democratic governance and individual freedoms, effectively eroding the Constitutional rights intended to safeguard free speech / press and open political participation.

39.    That which is discussed in this Complaint sounds very much like the Communist movement(s) of the 1950s, which the Internal Security Act of 1950 (McCarran Act) / Subversive Activities Control Act of 1950 addressed.

40.    The Council of Inspectors General on Integrity and Efficiency ("CIGIE"), commonly referred to in federal documents simply as "The Council," was established by Congress in 1978 to promote accountability, transparency, and oversight within the Executive Branch. In theory, the Council functions as a coordination body for all federal Inspectors General, ensuring independent audits, investigations, and uniform standards of integrity across federal agencies. Over the decades, however, this once-modest administrative body has quietly evolved into an expansive institutional structure that is both largely invisible to the public and insulated from meaningful oversight. While outwardly tasked with preventing abuse inside Government, its operational footprint has expanded into a quasi-regulatory network that influences many federal agencies, private contractors, intelligence partnerships, and, according to emerging evidence, the major Platforms that comprise portions of the CIC.

41.    The Council's modern incarnation is not merely a passive standards-setting entity. Through interagency working groups, classified liaisons, cross-Government trainings, investigative task forces, and data-sharing arrangements, CIGIE now occupies

an entrenched position within the architecture of federal power (*i.e.,* it became part of the Establishment). This position grants it practical influence over the DOJ, FBI, DHS, USAID, and other agencies that later became key drivers of the Government-directed censorship schemes exposed in *Missouri v. Biden*. Because CIGIE is largely shielded by statute and protected by the internal secrecy of the Inspector General system, it operates with almost no public scrutiny. Its actions, communications, and impact on agency policy are rarely litigated, FOIA requests often meet "privilege" or "exemption" barriers, and even Members of Congress have historically struggled to obtain transparent information. This structural opacity, and its strategic entwinement with agencies implicated in speech-suppression efforts, creates a fertile environment for covert influence, mission creep, and Governmental manipulation of private Platforms.

42.    In the context of censorship and the Government/Big Tech partnership, "The Council" merits special attention because it appears to serve as an institutional backbone behind several censorship-related federal programs. CIGIE helps coordinate training, investigative methodology, information-integrity initiatives, and interagency communications that flow down to DOJ, DHS, and the GEC for example, agencies now proven to have pressured or directed Platforms like Facebook, Google/YouTube, and X to suppress disfavored speech. While CIGIE's involvement is rarely explicit, its structural position (bridging communication channels between law enforcement, intelligence components, and oversight offices) enabled a *de facto* supervisory environment in which Platforms were encouraged, pressured, or guided into adopting federal censorship criteria while believing they were cooperating with legitimate Government "risk" or "safety" frameworks. Thus, while the Council presents itself publicly as a neutral guardian of ethics,

its deep integration into classified and interagency operations has allowed it, intentionally or not, to become a hidden facilitator of the censorship machinery now under federal and judicial scrutiny, and at issue here.

43.     This partnership between the CIGIE/Government and Big Tech reflects a broadening trend of technological control over all political discourse (or more accurately, all discourse / speech, period). Under the guise of fighting "misinformation," Social Media (rather than media outlets) has become the gatekeeper of almost all information delivery (indeed, Social Media is indisputably the modern-day public square), deciding what content is permissible and what must be suppressed (a form of their own speech). Section 230 of the CDA, which was initially meant to foster free speech online, has, instead, morphed into an impenetrable legal shield that grants Big Tech giants near-total immunity (at least in the beholden California judiciary, which consequently (mis)handles the majority of Social Media related Section 230 cases; again, discussed in greater detail below) and, with it, total affirmative editorial control, including when they act in concert with Government agencies to suppress speech.

44.     Through cases such as *Missouri v. Biden*, it is crystal clear that the Government has directly influenced Platforms to silence dissenting/critical voices, particularly during the COVID-19 pandemic. This influence is not just a violation of the First Amendment, it represents a broader assault on democratic freedoms. When the Government directs a private Platform to censor content (leveraging its own unconstitutional immunity protection), that Platform is acting as an arm / "Instrument" of the State, and Section 230 immunity should not apply at all.

45.    This joint participation partnership between the State and Big Tech companies not only distorts the democratic process but also intentionally misleads the public into believing they are merely making private choices when, in reality, the outcomes are predetermined by powerful institutions and Government actors. Indeed, litigants often cannot uncover the true underlying reasons for these "choices" (as was the case in Westall's prior case in California)[5] because courts (predominantly in California) have consistently misapplied Section 230 as an unfettered "immunity from suit" rather than what it actually is – a qualified affirmative defense. This systemic misapplication of law unconstitutionally denies plaintiffs access to the courts and to discovery, thereby shielding the true nature and extent of Government/Platform coordination from judicial scrutiny. Plaintiff submits that this denial of access to the courts and discovery is, at minimum, plausibly attributable to fraud on the courts, where certain politically captured judges or courts have themselves participated in the broader Government-driven effort to suppress free speech and deny due process.

46.    If there is any doubt as to what is being alleged with respect to the Government/Big Tech collaboration discussed herein, such doubt is eliminated *via* the recent admissions of Big Tech. As for Alphabet, Exhibit A speaks for itself. But we would be remiss if we did not also discuss Meta's admissions (below) concerning the exact same CIC at issue here because all of the major Big Tech players served as the Government's censorship army in the same way; *i.e.*, that which Meta / Facebook admitted to is the same backdrop/context relevant to Google/YouTube here.

---

[5] Because no court has ever adjudicated the substance/merits of the claims advanced herein, and because the constitutional harms remain ongoing, *res judicata* does not apply here.

47.     The legal landscape for Big Tech is undergoing a quiet (yet significant) transformation. Accountability, once elusive, is now becoming inevitable (barring behind the scenes interference from the Administrative State). Recent legal developments are driving dramatic changes within Big Tech, with ripple effects poised to soon impact the entire Social Media industry. These changes are being accompanied by striking public revelations from Mark Zuckerberg (Meta/Facebook), for example.

48.     As evidence mounts in cases like this case, Zuckerberg has begun to "spill the beans." Starting on January 7, 2025, he openly admitted that the Government had pressured Facebook / Meta into participating in censorship schemes, exactly as alleged here with respect to Google/YouTube. The Government's involvement is no longer speculation, it is a fact now acknowledged by Big Tech leadership. And even the current Administration (President Trump) admits as much. *See* Jan. 20, 2025, Exec. Order 14149, entitled *Restoring Freedom of Speech and Ending Federal Censorship* and attached hereto as **Exhibit B** and incorporated fully herein by reference.

49.     In 2016, Facebook, like other Big Tech companies (Google/YouTube), covertly assisted the Government and the Administrative State in its early censorship efforts by removing 800 so-called "Russian bot" accounts, ostensibly to combat 2016 election interference. In reality, this covert censorship operation (falsely attributed to "Russian collusion") was, in truth, aimed at preventing President Trump's rise to the presidency. At the time, the CIC operated largely under the radar, carefully avoiding public scrutiny. Despite these efforts, President Trump's unexpected victory exposed cracks in their strategy and set the stage for even more aggressive conduct, particularly because the

California courts were affirmatively and unconstitutionally blocking access to meaningful judicial review.

50.     In fact, the Ninth Circuit (a structurally infirm jurisdiction, at least as it pertains to Section 230 issues) itself openly admitted this agenda in stating (*en banc*): "[…] here – section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008). Nowhere in Section 230 does the statute even imply that Congress enacted it to protect Platforms from "having to fight costly and protracted legal battles." To the contrary, the text makes clear that its purpose was to prevent Platforms from being held liable for content they played no editorial role in providing, while simultaneously encouraging true Good Samaritan conduct; *i.e.,* voluntary and good faith efforts to restrict "*offensive*" material. Nothing in the statute immunizes of even authorizes unfettered or unjustified content moderation (again, a form of their own speech), and certainly not content moderation carried out on behalf of the Government.

51.     Over the next four years, the Big Tech companies significantly escalated their Government-led censorship efforts, shifting from covert operations to a more overt alignment with the political Establishment. Unlike in 2016, the goal leading up to the 2020 election was not only to influence its outcome but also to solidify Big Tech's future dominance over all online speech and secure their monopolistic market position. Ensuring a Biden victory was seen as a way to cement their role as the Government's gatekeepers of information and a way to shield themselves from future political and legal threats; *i.e.*, ensuring politically captured courts, like California's courts, stayed captured.

52.     By 2020, the CIC had taken hold. Big Tech began to operate with less concern about public perception, believing a Biden / Harris victory in 2024 would insulate their ongoing Government actions and potentially preserve their protections forever. Thankfully, the overt and aggressive nature of the CIC led to critical overreach. As Facebook itself warned the Biden White House, censoring too much risked exposing their "cover-up;" *i.e.,* conspiracy. The subsequent public backlash, fueled by mounting legal and political scrutiny, has proven their warnings prophetic.

53.     Combined, the recent legal and political shifts spell significant trouble for Big Tech, which is losing both the political cover it once relied upon and the unlimited legal protections it once enjoyed. Accountability now appears unavoidable, signaling the approaching end of an era defined by unchecked Government power over speech, and control over the free market.

54.     Meta's response, for example, to recent legal and political developments has been swift and calculated, with a clear focus on mitigating potential damages. And Alphabet's letter just a handful of months ago (Ex. A) can rightly be viewed the same way. Big Tech knows they have been caught red-handed in the Government Defendants' "cover-up" and is now pleading with the public for clemency. *See, e.g.,* Ex. A. After years of deception (outright lying to the American Public, Congress, Courts, and the world), Big Tech's narrative has now shifted from "we weren't censoring based on political or ideological bias" to an acknowledgment: "well, we did, but the Government made us do it. We're sorry, and we promise to do better."

55.     But, promises offer no real reassurance, especially when it comes to Big Tech with such demonstrated propensity for deceit / to cheat. We have heard them before,

and Big Tech never seems to honor its promises. For example, in his testimony before Congress on April 10, 2018, Zuckerberg stated: "We didn't take a broad enough view of our responsibility, and that was a big mistake. It was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here." Yet years later, Zuckerberg found himself repeating the same apology, albeit under even graver circumstances.

56.    Likewise, Alphabet (through its counsel at King & Spalding) has recently made similar admissions of failure and corresponding promises to improve its conduct going forward. Specifically, Alphabet represented to Congress:

> 23. The Company terminated channels for repeatedly violating its Community Guidelines on election integrity. Reflecting the Company's commitment to free expression, YouTube will provide an opportunity for all creators to rejoin the platform if the Company terminated their channels for repeated violation of COVID-19 and elections integrity policies that are no longer in effect.

> 24. YouTube values conservatives voices on its platform and recognizes that these creators have extensive reach and play an important role in civic discourse. The Company recognizes these creators are among those shaping today's online consummation, landing 'must-watch' interviews, giving viewers the chance to hear directly from politicians, celebrities, business leaders, and more.

Ex. A at 4.

57.    Alphabet's assurances, however, collapse under their own weight. The Company frames its policy changes as though it were merely retiring outdated COVID-19 and election-integrity rules. But paragraph 24 of its congressional letter inadvertently reveals the truth – Alphabet was not simply moderating "otherwise objectionable" content, it was targeting an *entire political class*. The Company's own admission that "conservative voices" were disproportionately affected exposes that its censorship machinery was not aimed at the actual "offensive[ness]" of any content (pursuant to Section 230's "Good

Samaritan" protections), but at the identity and dissenting viewpoint of the *speaker*. That is political discrimination, not "good faith" content moderation. And political-class targeting is not protected conduct under Section 230, is not entitled to judicial deference, and its joint participation with the Government is certainly not immune from constitutional scrutiny.

58.     Alphabet's attempts to disguise its past conspiratorial misconduct as mere "policy updates" is further undermined by a more fundamental reality –  these Platforms are *not* neutral conduits of information. They are developers of nearly all the content that appears on their sites through algorithmic amplification, suppression, curation, ranking, labeling, shadow-banning, recommendation systems, and *et cetera*. *See* n. 4, *supra*. Their entire business model is built on sophisticated psychological manipulation of user behavior, an area in which they possess unparalleled expertise. Plaintiffs and the courts, by contrast, have fallen far behind in understanding the depth, scale, and technological precision of modern information-manipulation systems. Big Tech uses behavioral science, machine-learning feedback loops, persuasive design,  friction-engineering, and *et cetera* to control not only what users see, but how they think, react, and behave. This is the full context in which Alphabet's conduct must be understood.

59.     Westall's most recent experience demonstrates the hollowness of Alphabet's assurance that it will "provide an opportunity for all creators to rejoin the platform." Instead of simply reinstating unlawfully suppressed users with full reach and searchability, Alphabet's counsel now suggests (again without any legal basis) that victims of admitted State action must somehow be reinstated before an imaginary "deadline" of

November 9, 2025. This is not a policy, it is a psychological tactic. It is *friction* / war of attrition. And friction is not accidental, it is a key facet of Big Tech's strategy.

60.    For Big Tech, the objective is not simply to censor offensive speech or protect the public from harm as a "Good Samaritan," but to deliberately shape human behavior, primarily in service of powerful corporations, political actors, and Government agencies. There was a time when these Platforms functioned as equal playing fields, and some of us remember that era, but that era has long-passed. Through deliberate content development (*i.e.,* information content provision conduct) designed directly into their algorithms, these companies have elevated preferred corporations and Government narratives above the very users they claim to serve. Google (just like Facebook and X) is not a neutral conduit. It is a direct competitor in the same information-delivery market as all other users, manipulating what users see while hiding behind the false illusion of Platform neutrality. By deceptively structuring what appears on their Platforms, these companies deliver their own preferred information and products (a form of their own speech), while suppressing competing voices (or voices that compete with their valued partners like the Government), all while relying on the Judiciary (predominantly federal; *i.e.*, a branch of Government) to shield them from all scrutiny by denying victims meaningful access to the courts and insulating Big Tech from "costly, protracted legal battles."

61.    Everything Big Tech does is engineered to be difficult, confusing, delayed, ambiguous, contradictory, costly, and ultimately futile, including litigation itself. Platform pre-suit appeals vanish into black holes. Explanations for crushing users shift without notice or substantiation. Alleged user "violations" are invented out of thin air. "Deadlines"

materialize only after the fact. "Justifications" for user-oriented malfeasance point to arbitrary and selectively enforced "Guidelines." Even in the face of *confirmed State action*, these companies continue to fight meritless procedural battles, not to prevail on the merits, but to make the litigation process appear insurmountable to others and to deter those seeking redress.

62.    Nothing Big Tech does is straightforward or honest … ever. The underlying reason is clear – the California judiciary's (*i.e.,* Government) two-decade-long misapplication and exploitation of Section 230(c)(1). By granting Platforms a *de facto* form of sovereign-like super-immunity, California courts signaled to Big Tech that psychological manipulation, content development, friction engineering, and procedural obstruction were not only permissible but effective shields against accountability. Big Tech internalized that Government message. The result is an industry that not only manipulates public speech but manipulates human behavior and law itself.

63.    Alphabet's admitted disproportionate suppression of "conservative" speakers is simply an extension of a broader Government / Corporate information-control strategy. Its willingness to target conservative voices, not-so-coincidentally, aligns with its institutional incentives – conservative speakers traditionally demand transparency, accountability, and limits on corporate-Government collusion, while institutional actors aligned with centralized control consistently support regulatory frameworks and partnerships that entrench Big Tech's dominance. In this information environment, suppressing conservative viewpoints was neither accidental nor incidental, it was economically advantageous, politically expedient, and fully aligned with Alphabet's long-term objective of maintaining information dominance with minimal accountability.

64.    In fact, Alphabet's own history shows that it never needed Congress to "force" reinstatement, these conservative channels could have been voluntarily restored at any time. Instead of honorably correcting its wrongdoing (for example, by reinstating the very channels it now admits were censored at the Government's direction, like Westall's), Alphabet chose, instead, to further hide the real basis for its censorship and preserve its ongoing editorial control over any disfavored users. Anticipating the political exposure and scrutiny it would face if Donald Trump won the 2024 election, Alphabet did not reform, it deliberately acted to obscure its State actions. Even before admitting to Congress that it wrongfully suppressed conservative speakers, Alphabet had already begun searching for ways to avoid re-leveling the information playing field … and is still doing so today. Now, despite publicly promising reinstatement, Alphabet is again generating the same friction and obstruction.

65.    Unbeknownst to Congress, in 2024, Google quietly converted numerous previously restricted conservative channels (originally restricted under COVID-19, medical, and election-integrity policies) into entirely new and fabricated violation categories such as "harassment." In other words, the very violations that had once fallen under the supposedly now-abandoned policies referenced in the King & Spalding letter were simply preemptively *migrated* into different policy buckets that Google knew would survive public scrutiny. Rather than undoing the Government-directed censorship it had imposed for years, Google preemptively repositioned those violations under new labels to ensure their continued suppression even after the original policies were eventually abandoned. Google prepared for exactly the political exposure and accountability it knew would eventually arrive.

66.     And it is no coincidence that "harassment" (the false label Google selected for Westall and many others) just happened to also be one of the specific categories listed under §230(c)(2)(A). By reframing its prior political censorship as "harassment," Google sought to fabricate the appearance that its content moderation was inherently done "in good faith" and statutorily protected. It was not, it is not. This deliberate reclassification was not an act of moderation at all, but an act of manipulation designed to shield prior State-aligned censorship behind other unrelated "Community Guidelines."

67.     This laundering of what was Government-induced censorship into separate and supposedly "private" "harassment" determinations is exactly what one would expect from a company that has repeatedly misled the public and that controls and affirmatively provides nearly the entire online informational environment. Alphabet's deceptive conduct demonstrates that it uses psychological levers not merely to police speech that has already occurred, but to influence what users will say in the future and what courts will think occurred, a strategy designed to continue to chill disfavored viewpoints and preserve its information-control architecture well into the future.

68.     The result is a predictable, systemic chilling effect – countless users must now question whether expressing a disfavored political viewpoint (whether about elections, health, or even basic social controversies such as how many genders there are) will result in demonetization, loss of livelihood, or permanent removal. Alphabet's reclassification scheme, therefore, cannot possibly be considered content moderation; it is behavior manipulation, designed to disguise the true reason why Westall was targeted.

69.     In short, Alphabet is not moderating content for the good of the public, it is engineering information outcomes, including suppressing disfavored speech before it even

occurs. It is not enforcing straightforward, universally understood rules (such as prohibitions on pornography, violence, or obscenity), it is reshaping public perception of its rules to create the illusion that anything inconvenient can be reframed as an arbitrary "violation." Alphabet behaves as though it can invent new rules at will, apply them retroactively, and rely on judicial deference to evade all accountability. Plaintiffs (and courts across the country) are forced to confront an exceptionally sophisticated adversary with technological, psychological, and structural advantages. Alphabet does not merely disseminate information anymore, it shapes how billions of people across the world perceive reality, a power accumulated through decades of legally unchecked conduct.

70.     The friction Alphabet deploys is deliberate, calculated, and central to its suppression strategy, made possible only because the Government has perpetually allowed it (and leveraged it during the Biden Administration). Far from demonstrating real "reform," Alphabet's conduct toward Westall illustrates precisely why meaningful judicial intervention (and heavy punitive damages) is now urgently required.

71.     For example, what happened to Westall in 2024 speaks for itself. On August 12, 2024, Westall's channel was reinstated. YouTube wrote: "After taking another look, we can confirm that your channel does not violate our Community Guidelines." Yet YouTube had previously removed at least thirteen videos for "medical misinformation," precisely the content Alphabet told Congress it would no longer penalize. Only two days later, on August 14, 2024, after affirmatively "confirm[ing]" that Westall's channel "does not violate" any of YouTube's guidelines (including harassment), YouTube terminated her channel again, this time for "repeated violations of our harassment policy." YouTube had literally just confirmed such violations did not exist. Further, Westall uploaded only four

videos during the brief two-day period between reinstatement and immediate removal, meaning YouTube's claim of "repeated" harassment would necessarily require at least two of those four videos to be harassing. YouTube, of course, never identified (per requests for same, or otherwise) even one.

72.    On August 15, 2024, Westall filed an appeal. And from August 15, 2024, through July 25, 2025, the appeal sat in a year-long purgatory. Google refused to respond, justify, or identify the purported "repeated harassment" violations. Then, nearly a year later, on July 25, 2025, the appeal was finally denied, again citing "harassment," again without identifying a single violating video of the four videos presented.

73.    This sequence exposes the real fraud, the hollowness of Alphabet's most recent pledge to Congress. Alphabet promised Congress that it would reinstate politically targeted conservative speakers, yet it simultaneously continued suppressing those very same users under preordained labels such as "Bullying and Harassment," a framing designed to conceal the true motivation behind the original censorship (maintaining Establishment-aligned information control). YouTube's pattern is entirely predictable – when accused of political censorship, it simply denies, deflects, distracts, and delays by reclassifying the user's prior State-directed violations under a new, supposedly "private" rule and falsely insisting that the removals had nothing to do with Government-aligned suppression but were instead legitimate enforcement actions.

74.    Such was the case here. Google initially denied Westall's appeal outright, insisting that her channel had been removed for "bullying and harassment." But when undersigned counsel sent another letter and made clear that litigation would be the next step, YouTube quietly "took another look" and magically reversed itself, confirming that

the very videos it had classified as bullying and harassing were, in fact, *not* violations at all. This abrupt reversal demonstrates not a good-faith review, but a panicked attempt to avoid judicial scrutiny. It is, and always was, a ruse … Deny, Deflect, Delay.

75.     The "policy change" explanation is accordingly not reform at all, it is just a pretext to admit but bury guilt. Westall is not interested in anymore Big Tech "promises," she seeks real accountability vis-à-vis this tribunal. Alphabet's conduct here could not possibly survive even a minimal §230(c)(2)(A) good-faith analysis or enjoy any other affirmative defense protection, for that matter. The Company: **(a)** fabricated a new justification ("harassment") never applied in years of content history; **(b)** contradicted itself repeatedly (first saying the content was compliant, then removing the channel, then claiming harassment, then reinstating again, confirming no harassment ever existed); **(c)** refused to identify or justify even one harassing video, despite undersigned counsel's direct requests for same; **(d)** engaged in political-class targeting (*i.e.,* conservatives), conduct nowhere protected in §230 or otherwise; **(e)** implemented a sham appeals process, designed to delay, deflect, and exhaust users rather than review claims in good faith; and **(f)** relied on the knowledge that California courts routinely shield such Platform misconduct under a judicially-invented form of private sovereign immunity in a structurally infirm jurisdiction ("rule for Big Tech, or else").

76.     In a properly functioning legal system, these actions would be subject to discovery, analysis, and accountability. But the California courts' two-decades-long misapplication of §230(c)(1) as a form of absolute immunity (under a structural dictate from the Ninth Circuit *en banc* to use §230 as a tool to curb/halt litigation against Big Tech) has insulated Big Tech from good-faith review, legal scrutiny, and liability. The judiciary,

particularly in California, has directly facilitated Big Tech's unlawful censorship and anticompetitive conduct by eliminating the very mechanism Congress created to prevent such abuse … the California judiciary, as to Big Tech matters, is captive / infirm.

77.    Thus, Alphabet's "we promise to do better" King & Spalding letter is no more credible than Facebook's serial apologies. Both companies are scrambling to rewrite history now that the Government's role in their censorship scheme is being fully exposed. But their conduct, especially toward Westall, demonstrates that nothing has changed. The promises are performative, the policy explanations are pretextual, and the targeting continues. Big Tech's assurances of reinstatement are not evidence of reform, they are clear evidence of guilt.

78.    Big Tech's responsibility was supposed to be to their users as a "Good Samaritan" – to protect free speech and ensure they remained a "platform for all ideas" (to borrow Meta's words). Instead, Big Tech (Google/YouTube, here) became an instrument of Government censorship, actively suppressing free speech (particularly dissenting or competitive voices) under Government direction and protection, all while repeatedly misleading the public about the real motives behind their restrictions on content, removal of users, and almost all Platform actions. This systemic cycle (doing wrong, apologizing, and then continuing the same harmful practices because there is no real accountability) underscores the urgent need for real, enforceable legal consequences, mandatory transparency, and structural reform. Promises and apologies are no longer sufficient, the pattern has shown that without binding legal consequences, nothing changes. Big Tech's repeated actions demonstrate a clear failure to uphold the principles of free speech, prioritizing Government agendas and corporate interests over the rights of its users. We

can no longer trust Big Tech (Google/YouTube, here) to "do better," as if "we'll do better" is an affirmative defense to already committed transgressions anyway (which it is most certainly not).

79.    Now facing intensifying political scrutiny and the erosion of its legal shield (Section 230), Alphabet is supposedly proactively making changes to reduce potential liabilities; *i.e.,* mitigate its damages. These moves reflect Big Tech's clear awareness of the shifting legal and political landscape. Their efforts, however, are transparently aimed at lessening the impact of accountability that now seems inevitable.

80.    To a nation already exhausted by politics intruding into their daily lives in predictable four-year cycles, Big Tech's sudden shift in tone (after years of coordinated deception) is both desperate and belated. The unconstitutional partnership between Government and Big Tech did not begin recently; it traces its roots back to at least 2016 (and likely far earlier), when federal actors and Platforms aligned to suppress speech and influence election outcomes, including efforts to stop then-candidate Trump from winning the 2016 election. Only now, after a decade or more of habitual abuse, are these companies finally offering partial admissions of wrongdoing and superficial promises of reform. But without firm judicial intervention, any such "reforms" will evaporate with the next political cycle. History shows that Big Tech's behavior rises and falls with electoral winds; absent enforceable accountability and structural restraints, the cycle of suppression, concealment, and performative contrition will simply reset itself three to four years from now when a new Administration is ushered in.

81.    Nor does Big Tech's recent "coming to Jesus" moment absolve Google or any other Platform of their prior involvement in the CIC. While it is convenient for Meta

and Alphabet (per Ex. A) to now claim they are abandoning their past misconduct (claims that deserve skepticism until proven by action) those assertions do nothing to erase the extensive harm already inflicted, including the injuries suffered by Westall through Google/YouTube's censorship, suppression, and misrepresentation.

82.    The reality is that Big Tech's apologies and overtures, such as the King & Spalding letter (Ex. A), are far too little and far too late. The damage is done, and will continue regardless of who occupies the White House if courts fail to impose meaningful accountability. Big Tech's role as a Governmental censorship instrument, combined with its long-standing evasion of judicial scrutiny, has severely eroded public trust and caused widespread constitutional harm. That includes direct, ongoing harm to Westall.

83.    For these reasons, Google's promises in the King & Spalding letter should not be believed (or, at the very least, viewed very skeptically moving forward). Nevertheless, the letter provides some genuine evidentiary value – it functions as a window into what actually occurred and, in several respects, as an admission of guilt. It reveals what Google was doing, why it was doing it, and how it now seeks to reframe its past conduct as federal pressure shifts. Accordingly, we now turn to the letter itself and explain the relevance of its excerpts for the Court, explaining what Google's statements truly mean and unpacking each claim to demonstrate its actual impact on Westall, the public at large, and the constitutional issues before this Court.

84.    We begin with King & Spalding's opening statement: "This statement of facts is submitted on behalf of our client Alphabet, Inc. and its subsidiary YouTube (collectively, "Alphabet" or the "Company") in response to subpoenas issued by the House Committee on the Judiciary (the "Committee") on February 15, 2023, and March 6,

2025." This opening statement establishes that this is a "statement of facts" regarding Alphabet, thus is in not refutable by Alphabet.

85.    Moving on:

> The Company is committed to doing its part to continue to keep the digital ecosystem safe, reliable, and open to free expression. Alphabet designs its products to work for everyone; bias towards a particular viewpoint is not in line with the Company's values or the Company's business interests. Alphabet's business model depends on being a useful source of information for everyone, and a home for users of all backgrounds. As a result, Alphabet has a natural, long-term business incentive to apply and develop its policies consistently, impartially, and independently.

Alphabet's claim that it will continue to "keep the digital ecosystem safe, reliable, and open to free expression" falsely presupposes that it has historically done so. The opposite is true. If Alphabet had been acting neutrally and in good faith, there would be no need for a Congressional investigation in the first place. The only reason Congress is scrutinizing Alphabet now is because Alphabet failed to behave impartially and repeatedly engaged in viewpoint discrimination, conduct that harmed the public, distorted the digital marketplace, and ran afoul of the Constitution when undertaken in concert with Government actors.

86.    Alphabet's further assertion that "bias towards a particular viewpoint is not in line with the Company's values or business interests" is demonstrably false and is directly contradicted by years of documented, systemic political bias in its moderation, recommendation (development), and suppression practices. That very bias is what brought Alphabet before Congress, what lies at the heart of Westall's injuries, and what necessitated the King & Spalding letter itself.

87.    The truth is that Alphabet has never been constrained by meaningful consumer/public safeguards (*i.e.*, never truly been subject to any meaningful liability/accountability); because courts (especially in California) misapplied §230(c)(1) as

blanket immunity rather than as a limited affirmative defense, Alphabet never faced legal consequences for its biased, censorial, or politically motivated content development. When the (California) judiciary refused to enforce constitutional boundaries, the legislature was forced to intervene, particularly once the balance of political power shifted back toward conservatives.

88.    Finally, Alphabet's suggestion that its "natural, long-term business incentive" is to apply its policies "consistently, impartially, and independently" is belied by the Company's actual "natural" incentive structure. Alphabet's business model does not depend on neutrality but on maximizing corporate growth, shaping and manipulating what content is developed or suppressed, and doing so while remaining shielded by Government-provided (and judicially manufactured) immunity.

89.    In reality, Alphabet's real "incentives" have never aligned with neutrality or the public interest; they have always aligned with profit, political influence, and the preservation of unconstitutional Government protections that have enabled its market dominance. Like any other self-interested corporation, Alphabet is merely pretending to be a "Good Samaritan" (hoping that courts look the other way), and relying on its co-Defendant, the United States, to continue unconstitutionally insulating it from scrutiny while simultaneously denying plaintiffs due process (hoping the structurally broken California judiciary will continue rubberstamping same). In other words, the only reasons Alphabet is now admitting responsibility and reluctantly reinstating YouTube channels are because public opinion has finally outweighed years of censorship and election interference, and conservatives regained control over enough Government to finally take action. The political winds thankfully shifted (just enough), conservatives returned to

power (just enough), and Alphabet could no longer conceal its misconduct behind judicially fabricated immunity. It got caught.

90.     Moving further along in the King & Spalding letter:

The Company appreciates the accountability from the House Judiciary Committee - led by Chairman Jim Jordan - and its critical role in advancing the core American value of freedom of expression. The Company has a commitment to freedom of expression. This commitment is unwavering and will not bend to political pressure. Transparency regarding government interactions with private platforms is essential for fostering public trust and upholding principles of free expression; the Committee's investigation brought to light new information that enhanced public understanding in this respect.

Ironically, Alphabet claims it "appreciates the accountability" provided by Congress, perhaps because it has enjoyed virtually *no* accountability in the courts for over a decade. It is difficult to reconcile Alphabet's professed "commitment to freedom of expression" with the fact that it systematically restrained an entire political class (namely conservatives, who also happened to represent the *electoral majority* that placed President Trump into office). A Platform that suppresses the dominant political viewpoint (or any political viewpoint, for that matter) cannot credibly claim to support free expression. The reality of Alphabet's conduct directly contradicts its stated principles – it is lying to the public because it got caught.

91.     The only reason Alphabet is facing this scrutiny now is because its efforts to manipulate public discourse and preserve Establishment power ultimately failed. The political balance shifted despite the Government's and Alphabet's best censorship efforts, not because of it. That failure forced Alphabet to offer reluctant admissions and partial reinstatements, admissions that would never have occurred had the Establishment retained dominant power.

92.     This moment accordingly represents a narrow and critical window in which lasting structural reform *must be imposed*. Without enforceable lasting restraints on Big Tech and the Government's unconstitutional entanglement with private Platforms, the suppression of free expression will inevitably return.

93.     Finally, while Westall agrees that transparency in Government/Platform interactions is essential, transparency in Platform actions against private citizens is equally indispensable. Discovery exists precisely to provide that transparency, especially when private Platforms protest, misrepresent facts, or attempt to evade accountability relying on the Government's systemic misapplication of law. Without discovery (which is almost universally denied in all Big Tech cases in California), neither the public nor the courts can accurately assess the full scope of Alphabet's role in the censorship ecosystem or determine whether its moderation conduct was undertaken in good faith, voluntarily, or even lawfully. This lack of transparency in the courts is particularly consequential here, given the harm inflicted upon victims like Westall. Westall's speech is every bit as valuable as that of Google, and, as a matter of constitutional principle, far more important than Google's corporate interests or having to fight "costly protracted legal battles."

94.     It is already extraordinarily difficult for Westall to wage this fight against a corporate giant like Google. But when the Government and the courts actively and unconstitutionally prevent that transparency (*i.e.,* block discovery and foreclose factual development), making meaningful redress all but impossible, the result is a nationwide chilling of due process itself. The implications, therefore, reach far beyond Westall's individual injuries; the Government's long-standing pattern of denying access to the courts and blocking discovery (so that it can continue leveraging Platform censorship without

scrutiny) sends a clear and chilling message to countless others that seeking justice is futile. It is not simply David versus Goliath, it is David versus Goliath and Goliath's even more powerful "Big Brother" (the Government).

95.    Moving along in the King & Spalding letter: "The COVID-19 pandemic was an unprecedented time in which online Platforms had to reach decisions about how best to balance freedom of expression with responsibility, including responsibility with respect to the moderation of user-generated content that could result in real world harm." The COVID-19 pandemic was certainly "an unprecedented time," but not for the reasons Alphabet implies. It was unprecedented because it marked the first time in American history when the Government openly used a national health crisis to drive a coordinated censorship campaign across all major online Platforms to control the outcome of a U.S. Presidential election.

96.    With regards to pubic "responsibility," Google was being pressured publicly by the Government Defendant to suppress so-called COVID-19 related health misinformation that "could cause real world harm." For example, on July 15, 2021, the U.S. Surgeon General issued his Health Misinformation Advisory, publicly urging Platforms to "do more" to restrict content that deviated from the Government's preferred narrative.

97.    Likewise, at a joint White House press briefing that same day, the Surgeon General and Press Secretary Jen Psaki amplified this demand and explicitly pressured Platforms to suppress so-called "misinformation," even when the speech at issue was completely lawful, expert-driven in many cases, or scientifically grounded. In public remarks, the Surgeon General referred to disfavored information as "poison," and used the

weight of his office to publicly demand that Platforms take "stronger action" to reduce the reach of speech the Government disapproved of. The advisory itself is publicly available at: **https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf** and the corresponding White House briefing is widely available online, including at: **https://www.nationalreview.com/news/psaki-white-house-flagging-covid-disinformation-for-social-media-companies/.** In other words, the Surgeon General painted any deviation from the Government's narrative as inherently dangerous and "likely to cause real-world harm." In reality, it was the Government's own misinformation (and the forced suppression of competing viewpoints) that caused real-world harm, not individuals like Westall who sought to provide the public with additional information necessary for genuine informed consent.

98.     Moving on in the King & Spalding letter:

> Senior Biden Administration officials, including White House officials, conducted repeated and sustained outreach to Alphabet and pressed the Company regarding certain user-generated content related to the COVID-19 pandemic that did not violate its policies. While the Company continued to develop and enforce its policies independently, Biden Administration officials continued to press the Company to remove non-violative user-generated content.

As online Platforms, including Alphabet, grappled with these decisions, the Administration's officials, including President Biden, created a political atmosphere that sought to influence the actions of Platforms based on their concerns regarding misinformation.

99.     Importantly, Plaintiff is not required to prove that the Government issued a word-for-word directive instructing Google to specifically take down Westall by name. At this stage, she need only allege plausible conspiracy or joint participation between the

Government and Google in order to survive dismissal and obtain discovery (real transparency). The King & Spalding letter admits Government officials "conducted repeated and sustained outreach to Alphabet and pressed the Company[…]," a direct acknowledgment of the pressure central to Westall's State-action theory.

100.    In *Missouri v. Biden*, Judge Doughty also recognized that Government agencies did far more than make public statements like the Surgeon General's – they carried out a concerted, behind-the-scenes effort to *repeatedly pressure* Platforms into censoring user information, including information provided by plaintiffs, in violation of First Amendment rights. As Judge Doughty explicitly articulated:

> The Defendants [Government] argue that by making public statements, this is nothing but government speech. However, *it was not the public statements that were the problem. It was the alleged use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on those platforms*. Plaintiffs point specifically to the various meetings, emails, follow-up contacts, and the *threat of amending Section 230 of the Communication Decency Act.* Plaintiffs have produced evidence that Defendants did not just use public statements to coerce and/or encourage social-media platforms to suppress free speech, but *rather used meetings, emails, phone calls, follow-up meetings, and the power of the government to pressure social-media platforms to change their policies and to suppress free speech. Content was seemingly suppressed even if it did not violate social-media policies.* It is the alleged coercion and/or significant encouragement that likely violates the Free Speech Clause, not government speech, and thus, the Court is not persuaded by Defendants' arguments here.

*Missouri*, No. 2:22-cv-01213, [D.E. 293] at 119 (emphasis added).

101.    Here, Westall points to the King & Spalding letter itself, which admits that the same Government repeatedly coerced and/or significantly encouraged Google to suppress free speech on its Platforms, including suppressing content that did not violate Google's own policies. As directly evidenced, including the stated basis for her initial

removal in 2020 and her subsequent recent reinstatements, Westall was a direct target of the Government's censorship efforts, carried out through Google as its instrument.

102.    The King & Spalding letter provides not only *plausibility* but *confirmation* of Google's pervasive entwinement with the Government. Through its admission that Google removed content that "did not violate its policies," the timing of Westall's initial takedown in August 2020, the Company's spontaneous and unexplained reinstatement of her channel in 2024 followed by recategorization of her violations and removal two days later, and her most recent (and pulling teeth) reinstatement in November 2025 (each action conceding that she had been wrongly restricted) collectively demonstrate that Westall was the victim of unlawful Government/Google suppression.

103.    Similarly, Westall need not prove that the Government wholly *overrode* Google's independent judgment; she must show only that Google's conduct was influenced by the Government's "repeated and sustained outreach to Alphabet and press[ing] the Company[…]," which Alphabet *admitted* in the King & Spalding letter. What matters under controlling State-action doctrine is not whether the Government dictated the precise outcome or named Westall specifically, but whether the Government became sufficiently involved in the decision-making process to blur the line between public and private action. It absolutely did. Precedent establishes that when the Government pressures, encourages, or insinuates itself into a private actor's moderation decisions (particularly when a Platform acts against its own written policies), the resulting conduct is attributable to the State. As the following makes clear, the threshold for joint participation is met whenever the Government's involvement is substantial enough that the Platform's actions cannot be

viewed as wholly private, and the King & Spalding letter easily (independently, without considering any other evidence) meets that threshold:

> Much like conspiracy and collusion, joint activity occurs whenever the government has so far insinuated itself' into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). To become 'pervasively entwined' in a private entity's workings, the government need only 'significantly involve itself in the private entity's actions and decisionmaking'; *it is not necessary to establish that 'state actors ... literally 'overrode' the private entity's independent judgment.'* *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020). 'Pervasive intertwinement' exists even if the private party is exercising independent judgment. *West v. Atkins*, 487 U.S. 42, 52, n.10 (1988); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (holding that a 'substantial degree of cooperative action' can constitute joint action).

*Missouri,* No. 2:22-cv-01213, [D.E. 293] at 116 (emphasis added).

104.    Continuing:

> For the same reasons as this Court has found Plaintiffs met their burden to show 'significant encouragement' by the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants, the NIAID Defendants, the CISA Defendants, and the State Department Defendants, this Court finds the Plaintiffs are likely to succeed on the merits that these Defendants 'jointly participated' in the actions of the private social-media companies as well, by insinuating themselves into the social-media companies' private affairs and blurring the line between public and private action. However, this Court finds Plaintiffs are not likely to succeed on the merits that the 'joint participation' occurred as a result of a conspiracy with the social-media companies. The evidence thus far shows that the social-media companies cooperated due to coercion, not because of a conspiracy.

*Id.* at 116-117.[6]

105.    And finally:

---

[6] As correctly pointed out in *Missouri*, Westall does not need to ultimately prove conspiracy; rather, as correctly pointed out in *Missouri*, Westall need only prove that which is already obvious – Google's admitted capitulation to the Government's extreme pressure / protection leveraging / coercion to censor Westall.

> This Court finds the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the NIAID Defendants, the FBI Defendants, the CISA Defendants, and the State Department Defendants likely 'jointly participated' with the social-media companies to such an extent that said Defendants have become 'pervasively entwined' in the private companies' workings to such an extent as to blur the line between public and private action. Therefore, Plaintiffs are likely to succeed on the merits that the government Defendants are responsible for the private social-media companies' decisions to censor protected content on social media platforms.

*Id.* at 117.

106.    Judge Doughty made clear that it is unnecessary to prove that Platforms acted as part of a formal conspiracy to establish standing, or that the Government "literally 'overrode' the platform's independent judgment," for the Government's conduct to constitute a direct or indirect violation of the First Amendment. When the Government becomes significantly involved in the decision-making processes of a private entity (so deeply that the line between public and private action becomes blurred, as when Alphabet admitted to Congress in the King & Spalding letter that it acted at the urging of the Biden Administration), the Government is properly considered a "joint participant." Liability arises simply from the "pervasive entwinement of public institutions and public officials in the private entity's composition and workings." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 121 S. Ct. 924, 932 (2001). The King & Spalding letter's admissions easily, by themselves, meet that threshold.

107.    Here, the admitted entwinement establishes standing. Westall suffered a concrete and particularized injury when her channel was removed and her livelihood significantly disrupted in August 2020, during the very period when the Government (including the Biden campaign, transition team, and later the Biden Administration) was escalating its pressure campaign on Platforms to remove disfavored COVID-19 and

political content. That timing is not incidental or coincidental, it places Westall's injuries squarely within the window of Government/Platform entwinement recently acknowledged in the King & Spalding letter. At minimum, this Complaint alleges that at least one Government agency pressured at least one Platform (Alphabet) to censor or interfere with the free speech and business relationships of at least one Westall. That alone is sufficient to establish injury-in-fact, traceability, and redressability. Westall was not a bystander to some generalized censorship landscape, she was a direct casualty of the Government's pressure campaign and Google's compliance with it. Her channel was taken down as part of the very entwinement that SCOTUS and Judge Doughty recognize as transforming private conduct into State action. Accordingly, her injuries are concrete, particularized, traceable to Government and Platform conduct, and fully redressable by this Court.

108.    Most notably, Westall's 2020 content directly contradicted the Government's preferred COVID-19 and election-related narratives at the precise time federal officials (including the Surgeon General, numerous state Attorneys General, senior Intelligence Community personnel, the White House, and even the President) were demanding that Platforms remove content that was neither unlawful nor violative of the Platforms' own published rules. Google, like other Big Tech companies, modified or expanded its policies precisely to align with the Government's suppression demands, yet later claimed "the Company continued to develop and enforce its policies independently." It did no such thing. Google was admittedly under repeated and sustained Government pressure to change its policies. And neither Westall nor this Court is required to take Google at its word; she is entitled to the transparency that only discovery can provide. Was

Google acting independently or at the Government's direction? The evidence must be produced so the truth can be fully ascertained.

109.    Google's statement that "[i]t is unacceptable and wrong when any government, including the Biden Administration, attempts to dictate how the Company moderates content" is, standing alone, absolutely correct. But the second half of that sentence is, upon information and belief, entirely false. Google further claimed that "the Company has consistently fought against those efforts on First Amendment grounds." Where? In what case? When did Google or its parent company, Alphabet, file suit against the United States alleging that the Biden Administration (or any Government officials, for that matter) were attempting to compel censorship of Americans? Google has fought hard to prevent the Government from compelling it to *host* speech (when doing so served its interests), but not to prevent the Government from compelling *censorship*. On the contrary, it complied with that infringement on users' free speech because its free speech (*i.e.,* its political objectives) aligned with the Government. If Google represented to Congress that it "consistently fought" such Governmental demands while, in reality, capitulating and operationalizing them, then the King & Spalding letter is not merely misleading public-relations spin, it is evidence of fraud on Congress designed to obscure the true extent of Government/Google joint participation in unconstitutional censorship.

110.    This same pattern of spontaneously changing policies, or drafting them to be intentionally ambiguous to manipulate information-delivery, has long-existed in the Social Media marketplace. Platforms have long since been quietly modifying their rules to eliminate their competition while relying on judicially fabricated immunity to avoid scrutiny. That is precisely how Big Tech got so "Big." That process simply continued on

unchecked; only this time, the target was the majority political viewpoint (which is precisely why the Republicans now control the White House, House, and Senate).

111.    For far too long, courts have treated Big Tech's internal policies, and the ad-hoc changes to those policies, as if they were legally unassailable, almost as though they constituted a form of private regulatory code immune from all judicial review. But that position collapses under even the most basic constitutional scrutiny. Imagine a Platform rewriting its policies to prohibit all Black Americans from posting because it "did not value their perspectives." Would courts defer to such a policy simply because the Platform phrased it abstractly; *e.g.,* "we restrict information we disagree with, including speech from users whose personal characteristics we find undesirable"? Of course no, the court system and the country would lose their minds. A discriminatory or unconstitutional policy cannot be legitimized by dressing it up in neutral or ambiguous language; *i.e.*, lipstick on pigs does not make pigs fancy. Yet that is exactly what Big Tech does. Here, Google suppressed lawful conservative political speech by adopting or modifying policies to target viewpoints the Government and the Platform found inconvenient. The Constitution does not permit courts to accept such policy manipulations (let alone at face value) when the evidence shows they were crafted to disguise unlawful, Government-induced censorship (as here).

112.    Upon information and belief, Westall was placed on Google's *Government-generated* categorical target lists of speakers disseminating information the Administration sought to suppress. Shortly thereafter, she lost her channel, despite the fact that she violated none of Google's published rules (as though those rules were immutable or consistently applied). Google then (twice, including very recently) refused to reinstate her channel and instead offered shifting, false, and pretextual rationales for its denials, such as

"harassment." In other words, the King & Spalding representation to Congress that Google would reinstate accounts that were wrongly censored truly meant that it would reinstate *some* accounts while continuing to suppress others by rebranding them under false labels. This is not unique to Westall, it is now a pattern, with many similarly-situated speakers receiving the same contrived "bullying and harassment" designation as a pretext for continued Platform suppression.

113.    Once Google was confronted a third time by undersigned counsel with the promise  of  litigation if Google / YouTube did not shape up fast, Google/YouTube magically reversed course and reinstated the *exact same content* it had repeatedly declared and *reaffirmed* to be "harassing." Google could not possibly defend that classification as being done in "good faith" (let alone as a "Good Samaritan") when pressed by counsel to justify it, because the true basis for Westall's suppression had nothing to do with harassment; rather, it was rooted in the dozen-plus COVID–19–related videos that predated her brief 2024 reinstatement and that the Government had sought to suppress. This most recent reversal accordingly facially concedes (whether intentionally or not) that Westall's removal in 2020 (and again in 2024) were not grounded in any legitimate policy rationale or in any real harmful content, but was instead the product of either **(a)** the Government's censorship partnership with Google, or **(b)** Google's own implementation of unlawful, discriminatory, and politically motivated policies.

114.    Assuming *arguendo* (contrary to the evidence) that Google acted entirely privately here (*i.e.*, sans Government involvement), the conduct would still be unlawful. It was not undertaken in "good faith" or as a "Good Samaritan," and it was not consistent with any lawful exercise of editorial discretion. Google acted with the intent to demonetize

Westall and tortiously interfere with her ability to earn an honest living and compete fairly in the information-delivery marketplace. Google is not merely the dominant Platform, it is functioning *deceptively* as a disguised information content provider, shaping, engineering, and developing content for its own financial and political ends, all while hiding behind judicially fabricated unconstitutional Section 230 "immunity" to avoid accountability.

115.    Here, Google's conversion of its rationale (from COVID-19 or election-related suppression to a fabricated "harassment" justification) in 2024 was nothing more than an effort to bury the evidence of what it has done over the past four years behind false labels and shifting explanations. Google is masking the true basis for its actions because the scope of its unlawful conduct is so vast (and the resulting liability so enormous) that full public exposure could bankrupt the company. And given the magnitude of harm Google has inflicted upon the American public through this pattern of deception, censorship and unlawful policy manipulation, such consequences would be well-deserved.

116.    And while Alphabet now seeks to portray itself as an unwilling participant somehow caught in the middle, the truth is that Platforms like Google and YouTube willfully joined the censorship campaign because they understood it would serve their actual business model: self-preservation, market dominance, and financial expansion. COVID-19 merely served as the convenient pretext. Under the banner of "safety," Alphabet helped the Government silence board-certified physicians, including, for example, Dr. Robert Malone (the inventor of mRNA vaccine technology) whose expertise was dismissed as "misinformation" because it conflicted with the Government's preferred narrative. Alphabet and its companies were not making decisions about what content was "offensive," they were making nationwide medical decisions equating to practicing

medicine without a license. They suppressed competing medical opinions, elevated Government-approved messaging, and deprived the public of potentially life-saving information. People died as a direct result of what Google did.

117.    Thus, this is not merely a story about election or COVID-19 "misinformation," nor about so-called "harassment." Westall's case exposes Google's content-development decisions that had severe real-world consequences, decisions that altered medical outcomes, restricted informed consent, and prevented Americans from accessing alternatives that could have saved lives. The true narrative is one of Establishment power, Government corruption, and election control. Alphabet's conduct, whether undertaken under Government pressure or not, crossed over from private moderation into unconstitutional State-action censorship (indeed, sedition, if not treason) that inflicted tangible harm on millions of people, including Westall.

118.    The King & Spalding letter continues: "It is unacceptable and wrong when any government, including the Biden Administration, attempts to dictate how the Company moderates content, and the Company has consistently fought against those efforts on First Amendment grounds." This statement suggests Alphabet stood up to the Biden Administration's censorship pressure and defended users' speech from Government intrusion. That, however, is not what really happened. Alphabet has never brought a single lawsuit, injunction, or constitutional challenge against federal jawboning, nor did it intervene in any of the major anti-censorship cases, or any related litigation where user First Amendment violations were actually being litigated. **Indeed, speaking of major anti-censorship cases, Alphabet/Google/YouTube just continues to vehemently fight those whose lives/businesses they destroyed with their censorship, rather than rectify**

the situations (as they did fairly recently with President Trump to the tune of about $25,000,000.00). *See, e.g., Cancer Step Outside the Box, LLC, et al. v. Dept. of State, et al.*, No. 3:25-cv-07399-AMO (N.D. Cal.) and *Webseed, Inc., et al. v. Dept. of State, et al.*, No. 3:25-cv-03020-AMO (N.D. Cal.).

119.    What Alphabet "fought," and what it invoked the First Amendment to protect/insulate, was something entirely different – its own editorial censorship rights, not the public's right to speak or to be free from Government-induced suppression. Alphabet's First Amendment battles (such as the NetChoice cases in Texas and Florida and its challenge to California's content-design regulations) were efforts to prevent governments from compelling the Company to *carry speech* it preferred to downrank, demonetize, or remove (*i.e.,* censor). Put differently, Alphabet only used the First Amendment argument to defend its own ability to censor its users and to continue to restrict the free speech of millions of Americans, not to stop the Government from compelling user censorship. So, the above-sentence in the King & Spalding letter amounts to clever *equivocation* – it is a statement that is accurate in one sense but deliberately misleading in another. Worth repeating – Alphabet's invocation of First Amendment "protection" refers only to safeguarding its own power to restrict speech, not to defending citizens against Government-driven censorship.

120.    Judge Doughty's findings in *Missouri v. Biden* confirm that this dynamic was not hypothetical, it was operational. In that case, the Government argued that it could not have coerced Social Media companies by threatening to revoke or amend §230 because the President cannot unilaterally change a statute. Judge Doughty rejected that argument outright, noting that the threat did not depend on presidential authority but on political

reality and implied power (*e.g.,* "Establishment" power). At the time, the Democratic Party controlled the House, the Senate, and the Presidency. The Government's warnings about §230 accordingly carried real force, particularly because Platforms depended on §230 as their primary liability shield. As Judge Doughty explained:

> Defendants combined their threats to amend Section 230 with the power to do so by holding a majority in both the House of Representatives and the Senate, and in holding the Presidency. They also combined their threats to amend Section 230 with emails, meetings, press conferences, and intense pressure by the White House, as well as the Surgeon General Defendants… All that is required is that the government's words or actions 'could reasonably be interpreted as an implied threat.'… Section 230 is even more valuable to these social-media platforms… These actions could reasonably be interpreted as an implied threat by the Defendants, amounting to coercion.

*Missouri*, No. 2:22-cv-01213, [D.E. 293] at 99–100.

121.    This judicial finding is critical here because it confirms two essential points: **(a)** §230 was used as a coercive tool, even without formal legislative action, and **(b)** Social Media companies reasonably perceived those threats as coercion, especially where discovery, liability, and litigation exposure were at stake. In sum/short, the Government weaponized §230 to induce censorship compliance, and Platforms like Alphabet (through its King & Spalding letter), have finally now admitted (only because they were caught, not because they are righteous) they capitulated.

122.    This Government leverage over §230 reveals the deeper constitutional flaw §230 has produced over time. Alphabet has leveraged the First Amendment to elevate its own speech rights above those of its users, fully aware that courts misreading §230(c)(1) would incorrectly treat the Platform's content-development and suppression decisions (*i.e.,* information content provision decisions) as both constitutionally protected and simultaneously "immune from suit." The combination of these two Government-created

protection mechanisms (Alphabet's judicially fabricated First Amendment superiority and the California courts' equally fabricated §230(c)(1) statutory immunity) renders §230(c)(1) unconstitutional as applied in any case where it is invoked to deny access to discovery, because it deprives the restrained party of any legal remedy; *i.e.*, throws due process to the curb. In practice, users are stripped of their First Amendment rights, Platforms are granted superior speech rights, and §230(c)(1) is then invoked to bar the very claims needed to challenge that private or public suppression. The result is a systemic deprivation of due process and a complete foreclosure of judicial review, which the Constitution does not permit.

123.    This judicially manufactured inversion created an unconstitutional hierarchy in which Platforms enjoy *superior* First Amendment status, while the very people the First Amendment was designed to protect (users) are left without any. Once more, Alphabet invoked the First Amendment not to restore, defend, or even acknowledge the speech rights of the public, but to preserve its own *supremacy over user speech*. The King & Spalding letter exploits this technical truth to imply the opposite reality – a rhetorical sleight-of-hand portraying Alphabet as nobly resisting Government censorship when, in fact, it has fought only to protect and preserve its *own* censorship power, even as it willfully capitulated to Government-induced or Government-demanded suppression of lawful speech.

124.    This legal inversion directly produces the constitutional Catch-22 that infects almost every user-censorship case today. Platforms claim a First Amendment right to restrain user speech, whereas users assert a right to be free from unlawful restraint (whether private, public, or the product of Government/Platform entwinement, as here).

Yet every path to remedy is blocked by the same Government involved in the conspiracy to suppress speech and protect its instrument from liability. When users sue Platforms, the Government (primarily California federal courts, as Westall previously experienced, *see Doe, et al. v. Google, LLC,* No. 20-cv-07502-BLF (N.D. Cal.); *see also* n. 5, *supra*) invokes §230(c)(1) to bar the case at the outset (long before discovery), extinguishing any opportunity to obtain a remedy for the restraint (or to even find out what really happened in unabridged fashion … believe it or not, we consider the discussion in this lengthy Complaint to merely describe the tip of the iceberg). When users sue the Government for its involvement, the Government insists that a "private platform" made the decision, even though the Government repeatedly and simultaneously pressured those Platforms to censor. Meanwhile, the Platform insists it acted "independently," because admitting otherwise would *prima faci*e establish State action (like the King & Spalding letter just did), yet it still claims purported "publisher" immunity under §230(c)(1) to justify its suppression. To be clear, in any constitutionally sound application of §230(c)(1), the provision does *not* protect a Platform's own first-party editorial conduct at all, it protects only the Platform's role as a "provider or user of an interactive computer service" when passively transmitting third-party content.

125.    In this Government framework, however, the user (*e.g.*, Westall) is trapped between the Government's misapplication of §230(c)(1) and the Platform's asserted First Amendment right to censor (restrain their liberties):

- **The Platform says:** "We have a right to censor you privately."

- **The Government says:** "The platform censored you, not us."

- **§ 230(c)(1) says (per wayward, captive California courts):** "You cannot sue the platform and/or discover whether the Government was involved in the decision or even determine whether the platform's censorship decision was unlawful. You are barred from litigation."

126.     No constitutional doctrine permits speech to be restrained (privately or publicly) while every avenue for judicial review is blocked. Yet that is precisely how the system has operated for over two decades (namely  in California, which infects the rest of the country), and this structural defect is what enabled the Government's inducement of censorship to persist. The implicit message became:

> We are the big bad Government, and we declare that you (Big Tech; *e.g.,* Google), must censor conservatives' speech we don't like. If you do not, we might just tell our judicial counterparts in California to apply §230(c)(1) correctly and expose you to real liability. But if you comply and claim you acted 'privately,' we will ensure – through those same California's courts, where most Big Tech cases are funneled – that you are protected from 'costly, protracted legal battles.'

In that specific framework, discovery into private Platform conduct (let alone into Government/Platform censorship) almost never occurs, thereby perpetuating the very public/private censorship regime the Constitution forbids.

127.     The California federal courts (at least certain captive judges … we are only aware of one seemingly non-captive California judge, Judge Alsup, through Westlaw) have played an active role in sustaining this censorship architecture by preventing discovery into what was actually occurring within Big Tech from 2016 to the present. In other words, the problem cannot be fixed because the very Government (executive) that seeks to censor through Big Tech is the same Government (judicial) that misapplies §230(c)(1) to deny plaintiffs access to the truth by blocking discovery. This is no coincidence. It is, in fact,

entirely predictable that SCOTUS passed three times on *Fyk v. Facebook*, No. 4:18-cv-05159-HSG (N.D. Cal.) (also handled by undersigned counsel) because that case presented the simple, straightforward solution needed to unify §230(c)(1) across all federal courts. *See* Ex. C, *infra*. And once §230(c)(1) is applied as written, Big Tech becomes exposed to liability for nearly everything (if not everything) it has done over the past decade and Government/Platform censorship ends permanently.

128.    This psychological equivocation maneuver used in paragraph 10 of the King & Spalding letter is not unique to Alphabet, it is emblematic of how major Platforms communicate with both lawmakers and the public. These companies systematically deliberately lace their public statements with ambiguity so they are never wed to any particular position, sentiment, or commitment set forth therein. Their statements are deliberately crafted to project transparency while, in actuality, being immersed in a dense cryptic, amorphous fog that fosters prospective deniability.

129.    Big Tech routinely frames its policies and actions in ways that seem principled, pro-speech, pro-safety, or pro-user, while the underlying reality reveals the exact opposite – they are fighting to preserve their ability to censor users without restraint, to protect corporate power, corporate liability shields, and corporate influence. Their public-facing claims are never the full story. Instead, Big Tech puts forth carefully crafted (lawyer-generated) statements that create the appearance of cooperation, responsibility, and freedom (pillars of American society and civility, we submit) notwithstanding their historical conduct directly contravening those values. The following excerpt from the King & Spalding letter is a textbook example of how Big Tech misleads the public and

lawmakers with precision-engineered language that is facially reassuring but deliberately misleading at the root:

> YouTube's mission is to give everyone a voice and show them the world. Every day, YouTube builds and improves tools and systems that empower creators, viewers, and businesses to find and share information. Over two billion logged-in users worldwide visit each month, and over 500 hours of content are uploaded every minute by an extraordinarily diverse community of creators, who span over 100 countries and 80 languages. On a daily basis, users watch over a billion hours of video on YouTube.

The epitome of equivocation. If "YouTube's mission is to give *everyone* a voice and show them the world," then why is it censoring so many people, particularly conservative speakers? The statement sounds pro-speech, but the underlying reality (manifested by YouTube's actual conduct) is anything but pro-speech. And, importantly, the phrasing "show them the world" is not neutral/passive hosting, it is an affirmative indication that YouTube's role is to *select* and *determine* what users see. That is not passive transmission of material, it is an example of deliberate information development.

130.    Courts often miss this nuance. If a user searches for "cats" and the Platform merely displays cat videos uploaded by others, that is not content development. But if the user searches for "cats" and the Platform is *designed* to deliver cat-food advertisements, inject corporate content, or suppress competitor materials to advance the Platform's own interests (*e.g.,* financial, or political as was the case here), then the Platform is shaping and manipulating the output. That is *prima facie* "development" under §230(f)(3).

131.    The same principle applies here. If users seek conservative content (or seek to share conservative content, or COVID-19 content, or election content) and the Platform deliberately manipulates what appears, what is suppressed, or what is amplified based on its own intent, whether through design decisions, moderation decisions, algorithmic design,

and/or Government strong-arming, then the Platform is not acting neutrally. The Platform is universally developing content. *See* n. 4, *supra*. And development is, by statutory definition, information content provision subject to liability.

132.    Thus, YouTube's claim that it merely wants to "show users the world" is itself cagey – the Platform presents a benevolent, user-centric mission and insists (when convenient) that it is a neutral, passive conduit for third-party speech. In reality, YouTube functions as a full-blown, uber-biased publisher, affirmatively deciding what content moves, where it moves, and to whom it moves (just as any other publisher would do), all while continuing to fraudulently invoke §230(c)(1) as though it were merely, unknowingly transmitting third-party material. This is why the public overwhelmingly recognizes that these companies are not Platforms in any meaningful sense – *they are publishers*, and they act as publishers precisely because the Government has allowed them to behave that way for more than two decades while remaining insulated from suit as supposed neutral non-publishers.

133.    This dual-role posture is possible only because courts have abandoned the statutory meaning of "development," thereby allowing Platforms to exercise expansive editorial power without bearing any editorial responsibility/liability, and because Government protection has repeatedly blocked access to discovery that would expose this conduct.

134.    Accordingly, whether Alphabet's/YouTube's actions taken against Westall are viewed through a lens of private conduct, Government-coerced censorship, or the equally unconstitutional framework of unfettered Government-conferred prior-restraint authority (which enabled and insulated private unlawful action), the ultimate blame still

lies significantly with the Government. Put differently, Google could not (and would not) have acted on the Government's behalf had that same Government (particularly, the California federal courts) properly applied the law for the past two-plus decades.

135.   And, critically, under the statutory analysis, the public/private distinction here is irrelevant. The deliberate act of restricting, suppressing, or removing Westall's content is itself a form of *intent-driven* content provision (*i.e.,* a form of its own speech) – de-development, the inverse of development – and accordingly constitutes "information content provision" under §230(f)(3). Each action Google took against Westall (the 2020 removal, the spontaneous reinstatement in 2024, the subsequent reclassification and renewed restriction just a couple days later, and the most recent reinstatement) were all intentional development decisions subject to discovery and judicial scrutiny.

136.   Those actions must, at bare minimum, be evaluated under a good-faith / "Good Samaritan" standard, which necessarily requires discovery into what actually occurred – whether the Government induced or significantly encouraged Westall's censorship, or whether Google acted unlawfully entirely on its own. Either scenario involves affirmative development conduct, not passive hosting; *i.e.*, either way, Alphabet is up the proverbial sh%& creek without a paddle.

137.   The King & Spalding letter continues:

> There is a wider variety of views on the YouTube platform than on any other information source in history. YouTube will strive to foster self-expression on an array of topics as diverse as its user base, to nurture a thriving creative and informational ecosystem, and to be an engine of economic opportunity.

YouTube's claim that it "will strive to foster self-expression on an array of topics as diverse as its user base" is materially misleading. The allowable "array of topics" is only as broad

as the subset of the *"user base"* that is actually permitted to remain on the Platform (*i.e.,* allowed to use Alphabet's so-called free computer services); namely, those whose viewpoints align with YouTube's preferred ideological positions. When YouTube targets a category of users (an entire "user base"), as it did with Westall and conservatives generally, the individual materials posted by that group are not removed because they are objectively "offensive" or harmful (at least not in good faith), but because YouTube suppresses the *entire set of topics and perspectives* associated with that user category/base. The censorship is directed at *people* and *viewpoints*, not at any specific "material" / content. This is why Big Tech can rarely, if ever, articulate any good-faith justification for restricting Westall's content … none existed. It is also why restrictions always point to ambiguous policies that often have no bearing on the content at all.

138.    This form of broad and ambiguous user category/base suppression arises from YouTube's own editorial intent (its own First Amendment expression), whether directed by Government or not, to engineer an informational delivery/provision outcome, such as influencing electoral narratives, suppressing dissenting medical viewpoints, privileging certain political positions, restraining competitors, or amplifying Government-preferred messaging. At scale, the power these Platforms wield is terrifying – straight out of Orwell's *1984* playbook. Again, imagine what happens when AI takes over for all content manipulation globally – *1984* on steroids, likely irreversibly so. Here, YouTube's editorial intent is reflected not in isolated takedowns, but in systematic manipulation of entire user categories (*i.e.,* whole user bases that are restricted).

139.    Put differently, the Platform is not merely removing discrete items of harmful "material" within the meaning of §230(c)(2), it is restricting the user's access to

the interactive computer service itself in order to shape, steer, and develop the broader ideological information environment. The information content provision here is Platform-wide and built directly into YouTube's algorithmic design … its business model. The target is not a particular video, the target is an entire *perspective*, engineered to manipulate what the general public sees, believes, and ultimately accepts.

140.    This is information content provision on an unprecedented scale, hidden in plain sight, as YouTube is continually engaged in outcome-oriented development (and, as to disfavored viewpoints, "de-development") of the information ecosystem, all while hiding behind Government-manufactured "platform" protections that were never meant to apply to such conduct. None of the major Platforms are passive conduits entitled to §230(c)(1) protection. They are all actively providing, shaping, and manipulating content through every technological and editorial mechanism available, while publicly pretending to be neutral intermediaries and privately functioning as the most powerful publishers in American history ridiculously free from any publisher liability.

141.    Big Tech's entire business model depends on this ongoing deception (publisher disguised as a Platform) … act like the good guys, claim to be neutral, claim to be passive, but use algorithmic power, suppression tools, visibility controls, monetization levers, and recommendation engines to manufacture an ideological environment of their choosing, often in alignment with Government demands.

142.    The King & Spalding letter continues: "YouTube creates new economic opportunities for artists, creators, podcasters, journalists, and small businesses to share their creativity and products in the United States and across the globe."

143.    YouTube's claim that it serves to create "economic opportunity" is also misleading. The "opportunity" exists only for those whose content comports with YouTube's preferred viewpoints. If it does not, YouTube will restrict, demonetize, or extinguish that economic opportunity, precisely what it did to Westall first in March 2020.

144.    YouTube uses economic leverage as yet another content development mechanism – if a user expresses a disfavored viewpoint, the Platform eliminates access to monetization (*i.e.,* its economic opportunities), depriving the user of participation in the competitive marketplace that YouTube itself controls. This is tortious interference designed to coerce viewpoint compliance. Nothing in §230 protects such tortious conduct. Section 230 immunizes Platforms only for removing *material* they deem objectionable in *good faith*. It does not immunize restraining trade, manipulating monetization, eliminating economic opportunity, or coercing compliance by weaponizing access to income, for examples.

145.    Even if YouTube's removal of certain videos was lawful (it was not), YouTube's removal of Westall's monetization is not "material" within the meaning of §230(c)(2), and §230(c)(1) is wholly irrelevant to first-party interference with a user's business relations or prospective economic advantage. YouTube's aspirational language about diversity, expression, and economic opportunity is textbook *equivocation* – it masks an unlawful system negligently defectively designed to suppress disfavored speakers (*i.e.*, whole user categories), manipulate economic incentives (monetization), and reshape the information marketplace in YouTube's own image (information content provision), all while hiding behind a misapplied §230 immunity and pretending to be a passive "computer service" merely hosting or organizing third-party content.

146.    Thus, the relevance here is clear and direct – Westall was part of the "user base" that YouTube sought to restrain and deny economic opportunities to, not because her materials were objectionable within the narrow, good-faith boundaries of §230(c)(2)(A), but because her viewpoints did not align with YouTube's (or the Government's) preferred ideological narrative. Her content was not the target, her viewpoint was.

147.    And the sequence of actions demonstrates precisely how the Platforms' suppression mechanisms function in practice. YouTube first stripped her of the "economic opportunity" it publicly advertises to the nation, using demonetization as a behavioral control mechanism. When that failed to induce compliance, YouTube escalated to the ultimate restraint – cutting off her access to the interactive computer service altogether in order to suppress her viewpoint completely. This is not content moderation, this is behavioral enforcement. And it is textbook chilling effect, using economic punishment and access deprivation to force users into ideological conformity.

148.    The King & Spalding letter continues: "YouTube's Community Guidelines and Terms of Service apply equally to all users – from private citizens to the most visible public figures –  and to all types of content, regardless of the viewpoints expressed."

149.    This statement is simply not true. The entire purpose of YouTube's (Big Tech's) deliberately ambiguous Community Guidelines is to preserve maximum discretion and dominance over content-provision outcomes. The policies are written so broadly, and the violation categories so vaguely, that any enforcement action can be retrofitted with an *ex post facto* justification. When Westall challenged opposing counsel to identify any two August 2024 videos that were supposedly "harassing" and to explain how they constituted harassment,

neither Google/YouTube nor its attorneys could provide an answer. Because no such justification existed. The categorization was entirely pretextual, designed to obscure the real motive – ideological suppression under the guise of "policy enforcement." In other words, YouTube does not apply its rules "equally to all users." Rather, it applies them *when* it wants, *how* it wants, and *to whom* it wants, at its sole, unreviewable, and unjustifiable discretion. That is not equality, it is unbounded arbitrariness devoid of justice.

150.    And that arbitrary dynamic exists for a reason. Because the Government has repeatedly refused to hold these companies accountable (and, worse, has actively insulated them from accountability), plaintiffs are systematically denied discovery, denied transparency, and denied any ability to know why they were actually removed (all because of the Government). The system is designed to shield the truth. For a user like Westall, being a woman could be the "reason" for censorship, being a "conservative" could be the "reason" for censorship, contradicting Government's messaging could be the "reason" for censorship, being disliked personally by someone at YouTube could be the "reason" for censorship … the list goes on, the point is a user never really knows. As alleged here, Westall was censored because the Government wanted her viewpoints silenced and Google capitulated. None of this is equality, it is discrimination executed behind the impenetrable barrier of misapplied §230(c)(1) immunity. Without correct statutory application and judicial oversight, there is (and will be) no accountability; without accountability, there is no justification;

and without justification, there is no equality … only the arbitrary and unlawful restraint of speech by entities the Government has empowered and protected.

151.    That is why Westall now sues both the Government and Google, not only for acting jointly in suppressing her speech, but also for enabling and perpetuating this censorship regime through decades of misapplied law, deliberate ambiguity, and judicial errors that deprived due process by preventing "costly, protracted legal battles" (per the structurally broken jurisdiction that is the Ninth Circuit) by unconstitutionally insulating Platforms from all scrutiny (*i.e.*, having to justify their prior restraint). The Government cannot interpret the law to favor its preferred private actors but that is precisely what it does (and admittedly so) and precisely what happened here.

152.    The King & Spalding letter continues:

> In contrast to other large platforms, YouTube has not operated a fact-checking program that identifies and compensates fact-checking partners to produce content to support moderation. YouTube has not and will not empower fact-checkers to take action on or label content across the Company's services.

This statement would be funny if the overall situation was not so tragic – YouTube is throwing other Platforms (especially Facebook/Meta) under the bus.

153.    "Fact-checking" programs were never about neutral verification, they were a mechanism for laundering first-party content *creation* through supposedly "independent" third parties. Because Platforms realized that courts had abandoned the statutory meaning of "development" under §230(f)(3), fact-checking simply expanded their ability to manipulate content. Rather than injecting their own counter-speech directly, Platforms paid subcontractors to

create it for them, and then used their "development" cover to amplify that manufactured counter-position across the Platform. In other words, once Facebook realized it could already exploit its "development" authority with impunity, it simply took the practice one step further. YouTube now attempts to hold itself out as more principled by comparison, but the distinction is superficial. The entire business model of Google (just like Facebook) is to discriminatorily apply deliberately ambiguous rules to engineer content-delivery outcomes while pretending to be neutral. And because both companies know the Government (particularly the federal court system in California) will shield them from discovery, they can conceal the real reasons behind their actions indefinitely.

154.   In reality, these programs allowed Platforms to manufacture (*i.e.,* create) counter-narratives that aligned with their editorial objectives or with the Government's objectives. Indeed, many of these "fact-checking" operations were Government messaging pipelines masquerading as independent verification companies.

155.   Using Facebook to illustrate, the process worked as follows: the Platform (or Government counterpart) identifies content it wants to suppress, flags it internally, and forwards it to a paid third-party subcontractor to purportedly "rate its accuracy." The subcontractor then produces content labeling the disfavored post as misleading or false. That rating is then fed directly into the Platform's ranking algorithm to reduce distribution (another form of deliberate content development). Facebook has openly admitted as much.

156.    For example, as Facebook explained in its own Newsroom article, *Remove, Reduce, Inform: New Steps to Manage Problematic Content*: "There are types of content that are *problematic* but don't meet the standards for removal under our Community Standards, such as misinformation and clickbait. … While we allow it to be posted on Facebook, we want to make sure it's not broadly distributed." (Emphasis Added).

157.    This is not neutral policy enforcement, this is targeted suppression. Facebook then operationalized it through its internally defined measure of "accuracy," which has no objective public standard and is not a protected category in §230. As Tessa Lyons (Facebook) explained:

> We identify potential hoaxes or misinformation… and once we predict those things, we send them to independent third-party fact-checkers with whom we partner… the fact-checkers are able to review the content and rate its accuracy… once they mark an individual piece of content false, and apply it to the newsfeed ranking algorithm… we show that piece of content lower in Newsfeed… we also put more context around it.

158.    Every part of this is content development under §230(f)(3): the Platform identifies speech it dislikes, hires someone to create a counter-message, and then uses / amplifies that counter-message to manipulate distribution outcomes. It is first-party editorial activity masquerading as "third-party" "fact-checking," and it directly contradicts the myth that these companies are passive conduits of information protected by §230(c)(1).

159.    So, when YouTube tells Congress that it does not run such a program, it is not making a principled statement. It is distancing itself from Facebook's more explicit version of the same tactic while continuing to engage in

63

its own forms of editorial content *development* (only through different mechanisms).

160.    The King & Spalding letter continued:

> YouTube also began offering a feature on YouTube beginning in June 2024 that allows users to add notes to provide relevant, timely, and understandable context on videos. The pilot is available on mobile in the U.S. and in English, and YouTube continues to collect feedback on the feature. YouTube also features an extensive comment section, where viewers can comment and share their views on content posted by creators.

161.    Although YouTube does not use the classic "fact-checking" model (which is the most obvious form of first-party content-creation laundering) it now employs a far more sophisticated workaround. In June 2024, when it became increasingly clear that President Trump could return to the White House and Congress could swing back to Republican control (*i.e.*, that accountability was on the horizon), YouTube introduced a new feature allowing users to "add notes to provide relevant, timely, and understandable context on videos." Not so coincidentally, this rollout occurred roughly two months before YouTube *magically* reinstated Westall's channel and then deleted it again two days later under a false "repeated harassment" rationale.

162.    This new "notes" feature serves the same functional purpose as traditional fact-checking and, in many ways, is more potent. It still allows bad actors (*e.g.,* Government) to inject counter-narratives, but in a new form that is far harder to detect, trace, or attribute. Classic fact-checkers were relatively easy for users to identify and ignore, they were institutional overlays that carried their own credibility problems. But "notes," comments, and other purported user-generated "context" exploit a far more powerful psychological mechanism: *social proof.* When viewers see dozens of comments or "notes" appearing to come from ordinary users like themselves, each declaring a post

wrong, misleading, or dangerous, the natural human tendency is to assume that the *majority* believes it, without examining who is actually behind those accounts. The appearance of consensus becomes persuasive in itself.

163.    In reality, many of these so-called "users" are not users at all. A minimal investigation reveals that such accounts (often called troll accounts, bot accounts, puppet accounts, or agitator accounts) have almost no friends, no organic interaction, and followers who are themselves similarly hollow. These are synthetic personas generated by sophisticated AI systems and operated across server farms to simulate the illusion of broad public agreement. The new "notes" feature gives these artificial accounts direct influence over public perception by enabling them to attach "corrective" context to targeted posts, thereby laundering Platform-aligned or Government-aligned speech through what appear to be ordinary people.

164.    Whereas traditional fact-checking tied Platform manipulation to identifiable, compensated third-party entities, this new system decentralizes the same activity across thousands of fabricated identities. That decentralization makes the influence exponentially harder to detect and vastly more powerful. What appears to be grassroots consensus is, in truth, a coordinated influence operation designed to manufacture the *illusion* of consensus.

165.    AI-driven operations make this trivial. Entire server farms can now generate thousands of synthetic, individualized "notes" on any targeted topic that perfectly mimic authentic human responses. Just as earlier fact-checking subcontractors created Platform-aligned counter-speech, these distributed AI-generated "notes" allow Platforms (and those

influencing them) to seed the information market with manufactured context at scale, all while concealing who is actually behind it.

166.    These Platforms have a glaring structural design flaw – there is no meaningful verification that the "users" producing these notes (which are, themselves, an automated form of harassment) are even real people. At scale, this is not merely an individual safety issue, it is a national security vulnerability. It enables foreign governments, domestic political operatives, coordinated NGOs, and even intelligence-aligned entities (just to name a few) to weaponize mass synthetic speech against Americans. And Platforms such as Alphabet are not only aware of this vulnerability, they are deliberately facilitating it because the resulting informational influence aligns with their own editorial objectives and, in many instances, helps further facilitate the Government's future censorship agenda.

167.    When the legacy media lost control of the narrative because of Social Media, the Government lost control over the American public. In response, the Government quietly embedded itself inside Big Tech operations, manipulating content flows and informational narratives from behind the scenes. When those covert methods failed to prevent the outcome of the 2016 election, Government pressure escalated dramatically and became overt; *e.g.*, public demands for censorship, threats to amend §230, and coordinated pressure campaigns against specific speech categories and individuals. And when tortious interference, algorithmic suppression, and content throttling by companies like Google on behalf of the Government still failed to fully control dissent, the censorship apparatus evolved again.

168.    The next stage of censorship is AI-driven influence, vastly more powerful, vastly harder to detect (if detectable), and capable of generating the illusion of overwhelming public consensus out of nothing. In the coming years, without strict judicial intervention, the public will have no way to distinguish genuine human expression from manufactured narratives (*e.g.,* what is known as a "deep fake"). Trust itself becomes impossible, and with it the ability of citizens to engage in self-government ... indeed, when trust is eliminated, communication breaks down ... and when communication breaks down, free speech guaranteed under the First Amendment (communication being speech) is rendered extinct. Incredibly scary stuff, not the kind of stuff undersigned wants to leave to his young children.

169.    This is simply the evolutionary progression of control. Instead of laundering content creation through a single, trackable "fact-checker," Platforms now diffuse the same activity across countless seemingly independent accounts. The result is a more potent, less detectable, and far more manipulable method of shaping public perception, one that masquerades as authentic grassroots sentiment while being anything but.

170.    This feature, introduced precisely when political power was shifting, is not an honorable or neutral methodology at all ... it is simply the next evolution of content control. It is a more advanced mechanism for shaping, steering, and developing informational outcomes, an upgraded version of the old fact-checking model that now expands the Platform's (and the Government's) capacity to manipulate public perception while maintaining full plausible deniability.

171.    To put this in perspective: all too often, individuals have no idea that the "person" they are engaging with in heated political debate is not a real human being at all,

but a digital persona generated by an AI controlled cell phone sitting on rack eight, shelf four of a server farm somewhere in a foreign country, engineered to destabilize American discourse and push public narratives hostile to individual liberty. That is not science fiction, it is the operational reality of the modern information ecosystem, and YouTube's new "notes" feature is tailored to amplify it.

172.    The King & Spalding letter continues:

The Company terminated channels for repeatedly violating its Community Guidelines on elections integrity content through 2023 and COVID-19 content through 2024. Today, YouTube's Community Guidelines allow for a wider range of content regarding COVID-19 and elections integrity. Reflecting the Company5s commitment to free expression, YouTube will provide an opportunity for all creators to rejoin the platform if the Company terminated their channels for repeated violations of COVID-19 and elections integrity policies that are no longer in effect.

173.    Westall's COVID-19-related posts were removed precisely during the period in which YouTube was enforcing Government-pressured, Government-aligned content-restriction policies. The "violations" attributed to her channel during that time undeniably fell within the window of State-influenced censorship. Yet Alphabet recently attempted to deny her reinstatement three separate times by arbitrarily and disingenuously recategorizing those prior State-action removals as "harassment."

174.    Countless similarly-situated users, who were censored under now-withdrawn Government-influenced policies, have likewise been denied reinstatement based on pretextual or fabricated justifications. The pattern is unmistakable: when no meaningful accountability / legal threat exists, reinstatement is arbitrarily denied; when litigation is threatened or accountability imminent, YouTube suddenly "discovers" that its prior classifications were erroneous. That is not genuine reinstatement or equal treatment, it is continued fraud and deception.

175.    YouTube's claim that "all creators" will be given an opportunity to return is accordingly hollow. No user knows why reinstatement is actually denied, because discovery into these decisions is, again, nearly impossible under the current, Government-distorted application of §230(c)(1). That collapse of judicial oversight leaves plaintiffs with nothing but unverifiable corporate promises and unverifiable corporate explanations, precisely the environment in which Platforms can misrepresent their actions without fear of consequence.

176.    This Court should order YouTube to reinstate every real user account seeking reinstatement for restrictions imposed between January 1, 2020, and the present, unless YouTube can specifically identify, in writing, a particular policy violation and particular items (because it claims "repeated" violations) of content that justify continued restraint. Generalities, categories, and ambiguous "harassment" labels are insufficient. The Platform must identify genuine violations, tied to actual and specific policy text, not to Government influence or Alphabet's own viewpoint-based editorial preferences.

177.    Only that kind of injunctive/declaratory relief would ensure that the unconstitutional State action (*i.e.,* the harm complained of herein) is unwound across the board, and that YouTube and the Government cannot continue leveraging the misapplication of §230 immunity to evade accountability and scrutiny for Government-facilitated censorship.

178.    Westall respectfully requests that the Court enter narrowly tailored injunctive relief that does not compel Alphabet/YouTube to host any third-party speech (an outcome the Company would undoubtedly challenge under their First Amendment), but instead requires Alphabet to operate with basic business transparency and

accountability. Specifically, the Court should order Alphabet to maintain simple, clear, specific, and unambiguous policies governing user conduct and content restrictions, and to provide a written explanation any time it restrains a user's liberties, including, but not limited to, shadow banning, algorithmic suppression, demonetization, temporary restriction, or permanent removal. The user must know they are being restrained, how they are being restrained, and why they are being restrained.

179.    Such explanation must: **(a)** identify whether and how the Platform is restricting a user's access or the availability of a user's content (including non-transparent forms of content development such as shadow banning, algorithmic suppression, or any other hidden restraints); **(b)** identify the precise policy provision that was violated; **(c)** describe the specific conduct or content that allegedly triggered that policy's enforcement; and **(d)** provide a non-pretextual justification sufficient to allow the user (and the Court) to later assess whether the Platform acted lawfully and in good faith. Critically, because §230(c)(2)(A) protects only "good faith" moderation, any failure by Alphabet to provide a timely, specific, and policy-grounded explanation constitutes a forfeiture of its ability to assert any good faith justification under §230. Without such disclosure, neither the user nor the Court can evaluate whether Alphabet actually acted in good faith, and a claim of good faith that cannot be evaluated is no claim at all.

180.    Failure to provide this explanation should subject Alphabet to civil penalties or other appropriate sanctions. This relief does not infringe upon Alphabet's editorial rights, it merely enforces transparency in the company's operations, prevents arbitrary or discriminatory enforcement, and provides users with the information necessary to legally challenge unlawful conduct; *i.e.*, it makes Alphabet adhere to the "Good Samaritan"

intelligible principle overarching all of §230(c). In short, the suggested injunction preserves Alphabet's legitimate First Amendment rights (including its ability to censor private speech) while also preventing those rights from being weaponized to obscure misconduct, evade discovery, or facilitate unlawful censorship, thereby ensuring that users' First Amendment freedoms are equally protected rather than subordinated through judicially-manufactured immunity.

181.    The King & Spalding letter continues:

> Transparency regarding government interactions with private companies is essential for fostering public trust and upholding the principles of free expression. Laws around the world affect the availability of content across Alphabet's products and services, and the Company publishes data in its quarterly Transparency Report regarding content removal requests in an effort to inform discussions about online content regulation.

182.    The above statement is materially misleading. Foreign laws do not dictate how speech is regulated within the United States, nor do any foreign parliaments, ministries, tribunals, or regulators have constitutional authority to impose speech restrictions on American users or Platforms operating inside U.S. borders, including through private companies. The First Amendment and the Supremacy Clause foreclose any such external imposition. This is especially critical today because we are engaged in what appears to be *information warfare*, where adversarial actors (foreign, domestic, private, and public) and complicit Government/Platform entwinements exploit speech regulation policies to influence public opinion, suppress dissent, and reshape ideological outcomes.

183.    Alphabet's suggestion that "laws around the world" affect content availability on its U.S. services is accordingly another act of equivocation. It is technically true only in the limited sense that Alphabet chooses to comply with foreign censorship laws *in those foreign jurisdictions*, but false as applied domestically. If the United States

Government is not permitted to restrain Americans' speech under the First Amendment, then foreign governments, a fortiori, cannot. Yet, for example, the U.K.'s newly empowered Online Safety Act 2023 and enforcement actions by Ofcom illustrate that foreign regulators are trying to extend foreign jurisdiction over American speech and U.S.-based Platforms.

184.    Per an article on the issue:[7]

> Free speech advocates say that this is going to bring about a culture of 'if in doubt, cut it out' as platforms seek to avoid being subject to Ofcom's enforcement powers. On the other side, we have Musk and [Meta chief executive Mark] Zuckerberg who have spoken out about the online safety laws in the UK and 'institutionalising censorship.' Duties in relation to misogynistic content, for example, are voluntary unlike the requirements to tackle illegal content and child safety.

185.    In other words, and for example, if a U.S. Tech Platform censors speech critical of the British Parliament simply because of U.K. regulatory pressure or global policy alignment, this becomes a direct vector for foreign-government-influenced censorship of Americans. The United States was literally founded over rejection of foreign control of political expression; the Revolution abolished the British system of seditious libel, Crown-imposed prior restraint, and punishments for criticizing government … yet Alphabet is now helping walk America right back into it.

186.    The United States Government should accordingly be proactively protecting American Platforms (and with it, American speech) from extraterritorial censorship demands, not casually facilitating them as Alphabet's King & Spalding letter attempts to do. Alphabet cannot be compelled by any foreign law to suppress American

---

[7] https://www.theguardian.com/media/2025/apr/01/us-officials-challenge-ofcoms-risk-to-free-speech-caused-by-online-safety-laws?utm_source=chatgpt.com

speech, including Westall's, without automatically sacrificing both constitutional rights and American sovereignty. When Alphabet applies foreign censorship rules to U.S. users, even voluntarily, it must do so at its own peril. Upon information and belief, the U.K. Government itself contributed to and reinforced the Biden Administration's COVID-19 and election censorship initiatives that directly harmed Westall.

187.    Alphabet obscures the truth by attempting to frame its compliance with global censorship initiatives as though they are somehow legally mandated in the United States or even relevant to how American speech must be treated or what content is available to Americans. These are discretionary, viewpoint-based content-development actions carried out on behalf of a foreign government, laundered through the false appearance of foreign policy "compliance." American free speech does not care about foreign policy. Alphabet's framing provides no lawful justification whatsoever for suppressing the First Amendment speech rights of Americans or for concealing content critical to foreign entities.

188.    Westall further requests, therefore, narrowly tailored injunctive relief prohibiting Alphabet (and, by necessary implication, any similarly-situated Platform operating in the United States) from applying any foreign speech restriction policy or foreign regulatory standard to any U.S. user or U.S.-based content unless that restriction is independently required by U.S. law and consistent with the First Amendment. This remedy does not compel Alphabet to host any foreign speech or any particular third-party content. Instead, it protects American citizens from being subjected to foreign censorship regimes that carry no legal weight in the United States and that violate the core constitutional principle that American speech is governed only by American law.

189.    Such injunctive relief would simply require Alphabet to: **(a)** immediately disclose to any affected U.S. user whenever a restriction (or even a request for a restriction) is based, in whole or in part, on any foreign law, foreign regulatory standard, or any foreign request (whether granted, denied, or pending); **(b)** affirm that no restriction will be imposed on a U.S. user pursuant to any foreign law, regulation, or foreign government request unless that restriction comports with the Constitution and laws of the United States; and **(c)** refrain from enforcing any foreign speech rules, foreign legal standards, or foreign censorship requests against U.S. users unless such enforcement is expressly permitted by domestic law and fully consistent with the First Amendment.

190.    This relief is constitutionally sound. It protects Alphabet's First Amendment rights by ensuring the company retains full editorial freedom over its own speech (including private censorship decisions), while simultaneously preventing Alphabet from using its editorial freedom as a vehicle for foreign censorship of Americans, something the Constitution forbids absolutely.

191.    Moving further along in the King & Spalding letter:

> Governments and law enforcement entities make legal requests in an effort to moderate content according to their views, and their demands come with significant penalties for non-compliance. Alphabet has a track record of pushing back against overly broad or otherwise inappropriate government demands for user data and content removals, including objecting to some demands entirely.

192.    The assertion that "Governments and law enforcement entities make legal requests […] according to their views" is both constitutionally repugnant and materially misleading. In the United States, law enforcement (including Attorneys General) may only act pursuant to and in accordance with the law, not pursuant to their "views," preferences,

political aims, or ideological positions. Government views are not a lawful basis for suppressing protected expression – unless the aim is the creation of the Fourth Reich.

193.    Here, we provide a concrete example of how law enforcement abused its authority. As uncovered by America First Legal, on March 16, 2021, Rowan Kane (Counselor to the Connecticut Attorney General and Deputy Director of Policy) circulated an email to himself, copying Margaret Chapple,[8] attaching a coordinated letter addressed to Jack Dorsey and Mark Zuckerberg. The email sought confirmation from other state AGs to "sign on" to a censorship initiative orchestrated through the Center for Countering Digital Hate ("CCDH"), a foreign (U.K.-based) influence organization granted U.S. 501(c)(3) status that functioned as a quasi-diplomatic arm for suppressing constitutionally protected American speech. The Connecticut AG was part of a broader coalition that included the AGs of New York, Delaware, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania, Rhode Island, and Virginia.[9] The objective was unmistakable – leverage coordinated Governmental influence to target, pressure, and silence American speakers, not pursuant to law or private policies, but pursuant to shared political law enforcement "views" and "requests."

194.    Yet none of this constitutes lawful law-enforcement activity (*i.e.,* Government harm). A true law-enforcement action directed at speech must rest on a proper legal foundation. For example, a judicial warrant, a criminal investigation supported by

---

[8]    https://aflegal.org/america-first-legal-releases-new-evidence-files-formal-complaint-with-the-doj-to-investigate-uk-based-center-for-countering-digital-hate-for-engaging-in-a-foreign-influence-campaign/

[9]  https://ag.ny.gov/press-release/2021/attorney-general-james-calls-facebook-and-twitter-stop-spread-anti-vaxxer

probable cause, or a clearly applicable statutory mandate. What occurred instead was ideologically coordinated pressure masquerading as "law enforcement" to control the outcome of a Presidential election, with CCDH acting as an intermediary NGO to launder a foreign censorship agenda into U.S. policy. This is incredibly dangerous.

195.    Thus, when Alphabet receives any "request" from a Government actor (or AG coalition) that is premised on viewpoint, political preference, or ideological disagreement, that request carries no lawful compulsory force whatsoever. If Alphabet voluntarily complies (and it is not acting pursuant to a warrant, statute, court order, or any other legitimate legal authority), then Alphabet is making a voluntary editorial choice, and it does so at its own peril (*i.e.,* exposure to civil liability).

196.    To illustrate the legal distinction, consider two contrasting scenarios. If law enforcement sends a request stating: "Take down this video because it encourages children to ingest dangerous chemicals" (such as the well-known Tide Pod challenge) or asphyxiate themselves (such as the well-known Hangman challenge), the Platform may lawfully act in good faith and would almost certainly be afforded §230(c)(2)(A) protection. In that circumstance, law enforcement is alerting the Platform to a *prima facie* dangerous act/scenario. Removal is tied to identifiable harm or potential illegality, and accordingly would easily qualify as a statutorily protected good faith action. Conversely, if the Platform refuses to remove such content after notice, it risks liability (*i.e.,* takes on partial responsibility) because it is now *knowingly* providing (or affirmatively developing) dangerous material (*see, e.g.*, *Anderson v. TikTok*). At that point, §230(c)(1) does not apply to such development conduct, and it is doubtful that knowingly allowing such harmful content to persist could ever be deemed "good faith" conduct.

197.    This stands in stark contrast to a second category of Government request: "Take down this post about hydroxychloroquine as an alternative treatment for COVID-19 because it contradicts the Government's CDC health guidance." To Westall's knowledge, no one has ever died or been harmed from properly prescribed hydroxychloroquine in fifty years. It is sold over the counter in many countries, and at the time Westall was censored, it was being prescribed by board-certified American physicians, many of whom were also restricted by Alphabet at the Government's request, an assessment increasingly validated by later studies. The difference between ingesting a chemical designed to clean laundry and a lawful, FDA-approved medication prescribed by doctors is categorical. Yet the Government demanded the removal of both, in this example, based solely on viewpoint disagreement.

198.    That is precisely where §230's "good faith" distinction becomes critical. The Platform must independently determine whether content is genuinely harmful under §230(c)(2)(A) protections or merely disfavored by the Government. That decision is the Platform's own to make and subject to later review by the trier of fact.

199.    Viewpoint disagreement is never a lawful basis for the Government to demand removal of protected speech, including, as repugnant as it is, reckless but still protected speech such as the Tide Pod challenge. If Alphabet voluntarily complies with such a Government viewpoint-based request, it is not acting under any form of lawful Government compulsion. It is, instead, voluntarily adopting the Government's preferred viewpoint as its own editorial choice and accordingly assumes *full responsibility* for its own expressive conduct. Whether it likes it or not, Alphabet becomes a functional participant (*i.e.,* Government Defendant instrument) in unconstitutional restraint the

moment it acts based on a Government "request" that lacks lawful authority (*i.e.,* lacks official warrant, subpoena, court order, or statutory mandate). It is no different than a getaway driver who is not forced to assist in a robbery but chooses to participate and is accordingly equally responsible for the underlying unlawful act.

200.     Whether Alphabet acted at the Government's urging or entirely voluntarily is, therefore, immaterial. What matters is that Alphabet imposed viewpoint-discriminatory restrictions on Westall's speech without any lawful authority (no warrant, subpoena, or statutory mandate). In doing so, Alphabet either adopted the Government's preferred viewpoint as its own or substituted its own. In either scenario, Alphabet engaged in affirmative editorial conduct, and those actions are subject to a full good faith inquiry, an inquiry that cannot occur without discovery unless Westall is to be denied due process (and it would be unfathomable for this Court to be complicit in the denial of due process).

201.     Once Alphabet physically imposed a restriction (which it indisputably did here in 2020 and 2024 and affirmed again in 2025), it ceased functioning as a passive intermediary (*i.e.,* an inactive Platform) and became an active co-developer (or deliberate "de-developer") of the restrained content, meaning it became a biased information content provider with respect to restricting Westall's viewpoint. Put differently, Alphabet became the co-developer of the Government's preferred viewpoint (or its own). By taking that affirmative and viewpoint-discriminatory editorial action to advance one viewpoint over another, Alphabet forfeited any possible claim to §230(c)(1)'s Platform-inaction protections, so-called Platform "immunity."

202.     In other words, whether Alphabet acted at the Government's request or entirely on its own is irrelevant to its responsibility, the dispositive fact is that it *did* act,

and that affirmative, viewpoint-discriminatory restraint imposed against Westall (in favor of the Government's preferred viewpoint or Alphabet's own) immediately opened Alphabet up to full discovery, strict good faith scrutiny, and liability. Once Alphabet chose to restrict Westall's speech (*i.e.,* took on responsibility in part for viewpoint development), its conduct became actionable, its true motives became discoverable, and its entitlement to any §230 protection became a factual question, not a presumption. Either way, Alphabet's deliberate actions, at minimum, triggered §230(c)(2)(A)'s good faith scrutiny, a factual inquiry that cannot be presumed and cannot be resolved at the pleading stage as immune without full discovery into Alphabet's motives, deliberations, communications, and Government coordination.

203.    The only circumstance that could possibly transform Alphabet's conduct into pure State action (conduct attributable solely to the Government; *i.e.,* Alphabet had no responsibility, even in part) would be proof that Alphabet acted under an actual Government order, warrant, or extreme coercive threat leaving it no independent editorial choice. Constitutionally, this is akin to an unwilling participant having a gun to his head and being forced to drive the getaway car. Only under such extreme, legally cognizable coercion could Alphabet argue that its actions were not its own.

204.    But that obviously did not happen here. Alphabet itself, through counsel in the King & Spalding letter, explicitly disclaimed such coercion. Alphabet admitted: "While the Company continued to develop and enforce its policies independently, Biden Administration officials continued to press the Company to remove non-violative user-generated content."

205.    Alphabet could not have been clearer. It "continued to develop and enforce its policies independently," meaning Alphabet maintained full editorial discretion (*i.e.*, it was not under lawful Government order) and full responsibility for its own actions taken against users such as Westall. That admission forecloses the Government-Compulsion Defense. No entity can claim it acted under binding Governmental command while simultaneously claiming it exercised independent enforcement. If Alphabet "enforced its policies independently," then Alphabet independently chose to (de)develop Westall's speech – and, in the alternative, chose to affirmatively develop and promote the Government's preferred speech (or its own) – and accordingly shares greatly in accounting for all resulting constitutional and statutory consequences.

206.    Thus, the King & Spalding letter destroys Alphabet's potential affirmative defenses. Alphabet cannot claim it was "officially commanded" to restrict Westall while simultaneously admitting that its enforcement decisions were voluntary and self-directed. And it certainly cannot argue that willfully carrying out the Government's preferred censorship qualifies as "good faith" conduct under §230(c)(2)(A)'s narrow protections. Alphabet chose to act. Alphabet chose to modify and apply its own policies to censor on the Government's behalf. Alphabet chose to restrict Westall's speech. And once Alphabet affirmatively acted to restrain Westall's liberties, she became entitled to legal redress unless Alphabet can later prove (through discovery) that its actions were justifiably taken in good faith under §230(c)(2)(A). Alphabet plainly did not function as a passive intermediary, and Westall is certainly not treating Alphabet as "the publisher or speaker" of her own content protected by §230(c)(1); Alphabet acted as an active and independent co-developer of the restriction and is fully accountable for the consequences.

207.    Here, the Government walked Alphabet straight into liability (thinking it could protect it later in the captured California court system), no different than how a bank robber walks a getaway driver into criminal responsibility. Once Alphabet voluntarily chose to assist the Government, it became equally accountable for the unlawful act it helped effectuate; it *aided and abetted* the unconstitutional restraint. And if this Court were to immunize such conduct without discovery, it would be aiding and abetting Alphabet's aiding and abetting of the Government's unconstitutional conduct, placing the Government on both the front-end and the back-end of the wrongdoing. It would be as if the bank robbers knew they would be placed in charge of the criminal prosecution (*i.e.*, knew any legal challenge would end up in a controlled/captive court). As extraordinary as that analogy sounds, it reflects the precise dynamic the Government has fostered for well over a decade.

208.    Only strict, meaningful judicial action here will deter this recurring pattern of Government-induced censorship and due process denial going forward. Such action is essential to ensure that Alphabet (and every other Platform) thinks many times over before engaging in any Government-requested restraint of lawful speech absent a valid court order, warrant, or subpoena.

209.    Accordingly, this Court must reaffirm the fundamental rule that the State may not participate, directly or indirectly, in censoring Americans' speech, including by shielding one private actor's censorship of another or by predetermining that such censorship was justified or immune from suit. Alphabet cannot plausibly dispute that it restricted Westall's materials. Whether it now claims its decisions were driven by Government pressure, COVID-19 content, election content, alleged "harassment," or any

other post-hoc rationale, Westall is entitled to discover *why*. Alphabet must now prove that its restrictive actions were taken in good faith under §230(c)(2)(A) if it is to be afforded any affirmative defense. Absent such proof, no liability protections apply.

210.    Had Big Tech actually fought the Government's censorship efforts (as the First Amendment empowers them to do) instead of fighting to preserve their own ability to censor (*i.e.,* to avoid being compelled to host lawful speech they find problematic), the Platforms would have long since confronted an unavoidable reality: the Government could have stripped away their supposed §230(c)(1) "immunity" simply by insisting that courts apply the statute ***as written***. Properly applied, §230(c)(1) provides no immunity for *any* affirmative editorial actions, at all … only for genuine editorial *inaction*. Big Tech fully understood that if the Government ever demanded fidelity to the statute's text, their entire information content provision / development apparatus would collapse overnight. Rather than risk losing their unilateral power to silence disfavored voices and amplify favored voices, the Platforms made a calculated choice: they voluntarily aligned themselves with the Government's unconstitutional suppression of political dissent rather than lose power. They willfully became the Government's patsies, believing they would be rewarded with continued judicial misuse of §230(c)(1) as *de facto* immunity. With the shift in political control, however, that protection quickly evaporated. Assuming this Court applies the statute as written, Alphabet will be properly exposed to true accountability.

211.    In short, Big Tech fought not for free speech but for the right to continue suppressing it. And, in order to preserve its market dominance and the undue protections it enjoyed, it voluntarily aided and abetted the Government's censorship regime to maintain control over information delivery and avoid costly, protracted legal exposure. Here, the

Government decided to rob Westall of her free speech and Alphabet willfully drove the getaway car. This Court cannot help them get away with it through continued misapplication of §230(c)(1).

212.    Since when does an accomplice to a "crime" – fully aware that it is aiding and abetting the wrongdoing – escape liability merely by saying "sorry"? Nothing complained of herein was accidental. This coordinated "crime" not only harmed Westall but nearly destroyed free speech in America, and with it the very foundations of our constitutional republic … free speech is the *First* Amendment for a reason. Big Tech was never a victim of the Government; rather, Westall was made a victim of both the Government and Big Tech acting in concert for over a decade.

213.    Alphabet's recent enlightening admissions / statements are not isolated. The outgoing Biden Administration's own admissions are equally revealing. In fact, in President Biden's farewell address, he openly acknowledges and defends the Administration's role in shaping, influencing, and directing public-facing information flows during COVID-19 and the 2020 election cycle. His farewell message is available here: https://www.youtube.com/watch?v=nMcQ2yiV1PU  The transcript of this video can be found here: https://www.nytimes.com/2025/01/15/us/politics/full-transcript-of-president-bidens-farewell-address.html.

214.    Biden's farewell address underscores the transformative power of Social Media in dismantling the Administrative State's grip on narrative control. Biden's remarks reflect both a grudging acknowledgment of Social Media's shift toward free speech and a veiled warning about the implications of this change for the entrenched power structures of the Administrative State. While Biden frames "misinformation" as a national threat, the

real danger to the constitutional order has always been the Government's effort to control public discourse and suppress political dissent. What Biden described as a "threat" is, in reality, nothing more than the Government's temporary loss of narrative control.

215.    Biden's farewell address acknowledges the Administrative State's reliance on narrative control. Biden's comment that "social media is giving up on fact-checking" signals a critical shift away from the suppression of ideas deemed "dangerous" by the Government and its allies. For years, Platforms like Google/YouTube operated in joint participation with Government to censor dissenting/critical voices, including Westall, often falsely labeling them as purveyors of "misinformation." But, their information was not false, it merely contradicted the Government's narratives. This labeling was not about protecting public health or safety but rather about vilifying dissenters/critics and preserving the Administrative State's monopoly on truth.

216.    Now, the tide is turning. Social Media's pivot toward free expression represents a seismic shift in the balance of power. By breaking free from the chains of Government coercion, these Platforms are now (albeit frictionally) allowing truth (long-suppressed) to slowly emerge as a disinfectant to lies propagated to maintain control and power. As Biden lamented the decline of traditional media, calling it "the crumbling of the free press" and the disappearance of editors, he inadvertently highlighted the real triumph of Social Media in leveling the information playing field. Traditional media, once the gatekeepers of information, has been replaced by a more democratic-decentralized system where individuals can speak, share, and challenge authority without relying on Legacy / Establishment institutions.

217.    This change is the greatest threat the Administrative State has ever faced. Social Media's decentralization dismantles the consolidated mechanisms of control that relied on suppressing dissent. The Administrative State's influence depended on the suppression of truths that could challenge its authority – truths that now find a Platform in which to challenge power (*i.e.*, unless, of course, the Platform imparts its own expression in manipulating the access and availability of problematic content).

218.    Biden's farewell remarks framed misinformation as an existential threat, asserting that Americans are being buried under an "avalanche of misinformation and disinformation enabling the abuse of power." This framing, however, serves as a final attempt to delegitimize the power of free and open discourse restored by unmolested Social Media. The Administrative State does not fear misinformation per se, it fears the truth that dismantles its lies and control. By framing truth-tellers (like Westall) as purveyors of purported misinformation, the Government has historically weaponized the concept of "fact-checking" (when they control the fact-checkers) to silence dissent, as evidenced by Big Tech's recent admissions of Government coercion to censor truthful and lawful content during the COVID pandemic and the 2020-2024 Presidential election cycle.

219.    This case represents a crucial step in cementing this shift toward freedom of speech and decentralization of power. It challenges the entrenched practices of Establishment suppression that were orchestrated under the guise of combating misinformation. As Platforms embrace their original purpose of fostering open dialogue, the Administrative State's ability to dictate narratives is slowly unraveling.

220.    While Social Media has broken some chains of suppression, Biden's warning about AI highlights a chilling possibility – the reversal of these gains. Biden's

comments about AI, which he calls "the most consequential technology of our time," reflect its dual potential to empower and oppress. In the hands of those seeking to regain control, AI could flood the internet with manufactured consensus, creating an illusion of agreement and burying truth beneath a mountain of synthetic noise. Biden himself warned of a "tech-industrial complex" that could pose "real dangers for our country," echoing President Eisenhower's caution against the military-industrial complex. We submit, the "real danger for our country" is the Establishment's CIC.

221.    AI's ability to fabricate seemingly authentic accounts, manipulate public opinion, and obscure dissent poses a direct threat to the newfound freedom Platforms have started to embrace. As Obama warned during his presidency, the proliferation of falsehoods could overwhelm the public's ability to discern truth. https://youtu.be/J4zpbuuwPeU at 0:00 – 0:08, 0:41 – 1:00 (Barack Obama's April 21, 2022, speech to Stanford University graduates: "flood [the] country's public square with … enough raw sewage, … raise enough questions, spread enough dirt, plant enough conspiracy theorizing, that citizens no longer know what to believe").  AI could weaponize this dynamic on an unprecedented scale, undoing the progress made in reclaiming free speech.

222.    This case takes on even greater significance in this context. By establishing clear protections against the misuse of Platforms for suppression and restoring accountability, it creates a bulwark against the potential misuse of AI. The stakes here extend far beyond one case or one Platform, they encompass the very future of free speech in an age of technological upheaval.

223.    As Biden left office, his farewell address unintentionally underscored the importance of this case. The fight for free speech is not merely a legal battle, it is a battle

for the soul of democracy. Social Media has temporarily broken the chains of suppression, allowing truth to shine through the fog of lies. Yet, as AI looms on the horizon, the potential for a new form of suppression demands vigilance right here, right now.[10] "If not us, then who? If not now, then when?" "When [they] came for the communists, I kept quiet; I wasn't a communist. When they came for the trade unionists, I kept quiet; I wasn't a trade unionist. When they locked up the social democrats, I kept quiet; I wasn't a social democrat. When they locked up the Jews, I kept quiet; I wasn't a Jew. When they came for me, there was no one left to protest." Yep, the situation at hand is that important and that urgent.

224.    This case seeks to cement the gains made in restoring free speech and to ensure that neither Government coercion / protection nor technological manipulation can stifle the growing voices of the people. The internet has become the new frontier of freedom, and this case is a defining moment in protecting that freedom for generations to come while there is still something and/or someone left to protest and protect.

### Chronological History of the CIC that Enveloped Westall

225.    Westall, along with many others, was censored on Platforms like Google/YouTube per Government directives, often carried out in coordination with (known and unknown) NGOs. These organizations provided the Government with operational cover while pressuring Platforms to silence those critical of COVID-19 policies, for example. This case illustrates how the Government exerted influence over Big Tech (utilizing §230 as leverage) and jointly participated to suppress dissent/criticism under the pretext of combating purported "misinformation," and it highlights how this

---

[10] The reality of the glaring need for this Court to step up right here, right now is further reinforced by the fact that – according to a fairly recent Gallup poll, public confidence in the judiciary has plummeted, with a 35% decrease reflecting growing distrust in the courts.

influence extends to private market manipulation and tortious interference, including efforts to deliberately disrupt advertising revenue streams, further silencing opposition and eliminating competing viewpoints.

226.    The averments that follow are largely (if not entirely) fashioned as a chronology. This chronological approach was largely adopted to clearly and irrefutably demonstrate concrete harm (ongoing to the present), traceability / entwinement, and redressability relating to the CIC and Westall.

227.    In an email dated **March 15, 2020**, Zuckerberg (Meta) proposed coordinating with Anthony Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts." Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."[11] Once again, discussion of other Big Tech companies like Meta is relevant here because the situation was/is no different with respect to Westall's transgressor – Google/YouTube.

228.    "But an even bigger deal is his offer [REDACTED]. The sooner we get that offer up the food-chain the better." ~ Dr. Deborah Birx (at the time, serving as the White House's Coronavirus Response Coordinator). Dr. Birx also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest." Fauci responded that "I will write or call Mark and tell

---

[11] Unless otherwise noted, the citations/quotations found in this section of the Complaint come from public records contained within the *Missouri v. Biden* case.

him that I am interested in doing this. I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for U.S. Government] point of contact."

229.    In a **March 17, 2020**, email from Fauci to Zuckerberg, Fauci agreed to the collaboration that Zuckerberg proposed and described the redacted proposal as "very exciting."

230.    As early as **June 2020**, the CIS, working with CISA, was planning a "Reporting Portal" for Government officials seeking to suppress election misinformation that would allow "social-media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible." CIS and CISA work closely to remove so-called "misinformation" by flagging content for removal by Social Media companies. The Democratic National Committee, Common Cause, and the NAACP were also empowered like the federal agencies to file tickets seeking censorship of content. A DHS-funded collaboration, the Elections Infrastructure Information Sharing and Analysis Center, also had access.

231.    In **November 2020**, a new cyber offensive was launched by the United Kingdom's signal intelligence agency (Government Communications Headquarters), seeking to target websites that publish content deemed to be "propaganda" raising concerns over COVID-19 vaccine development and the multi-national pharmaceutical corporations involved.[12]

232.    On **November 11, 2020**, the United States and United Kingdom intelligence agencies launched a joint initiative to combat disfavored narratives surrounding COVID-

---

[12]  https://unlimitedhangout.com/2020/11/reports/us-uk-intel-agencies-declare-cyber-war-on-independent-media/

19 and its vaccine development. This effort, described as a "cyber war" (better characterized as a joint Government Information War), targeted independent media outlets, like that of Westall, that challenged Government and pharmaceutical narratives, suggesting a potential role for the CCDH in advancing this effort under the guise of a U.S. nonprofit organization (501(c)(3)). The U.K.'s Government Communications Headquarters ("GCHQ") spearheaded censorship operations to disrupt these disfavored outlets, employing tactics like blocking communications and encrypting data to impede their ability to publish content. This initiative marked a significant escalation in State-sponsored joint-participant efforts to suppress domestic dissenting voices under the guise of combating misinformation.

233.    On **November 17, 2020**, during a Senate Judiciary Committee hearing, Senator Richard Blumenthal stated: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power… . And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." This marked a significant call and renewed effort for holding Tech Platforms accountable for their expansive influence and legal protections. But as is typical of modern Democratic legislative branding, the rhetoric masked the opposite reality. Just as there is nothing *patriotic* about the Patriot Act and nothing *affordable* about the Affordable Care Act, there was nothing genuinely reformative about this so-called "Section 230 reform." It was not a path to accountability but a calculated effort to reassert Governmental leverage over Big Tech. The Government performed outrage, while quietly signaling that "real accountability" would come only if the Platforms failed to keep cooperating, failed to maintain the censorship regime status

quo the Government wanted. The threat of reform was never about protecting victims, it was about protecting Governmental control. Blumenthal's statement was accordingly not a principled call for legal correction, it was a warning shot. The message to Big Tech was unmistakable: stay obedient, keep censoring, and the Government will continue misapplying §230(c)(1); resist, and the Government will strip you of the Government protections you rely on. The "reform agenda" was simply a disguise for coercive leverage.

234.    On **December 2, 2020**, Bruce Reed, Biden's former chief of staff and top tech advisor, publicly declared that it was "long past time" to hold Social Media companies accountable for the content published on their Platforms, signaling the need for meaningful reforms to Section 230.

235.    On **December 11, 2020**, shortly after the 2020 elections, the United States granted the CCDH 501(c)(3) tax-exempt status. This timing raised questions about CCDH's alignment with the Government.

236.    On **January 23, 2021**, Biden took office and Clarke Humphrey (then White House digital director for Biden's COVID-19 response team) promptly goes on the offensive with respect to Robert Kennedy, Jr. (a supposed "misinformation" spreader like Westall).

237.    On **February 7, 2021**, Twitter stated that it had been "recently bombarded" with censorship requests from the White House and would prefer to have a streamlined process. Twitter noted that "[i]n a given day last week for example, we had more than four different people within the White House reaching out for issues."

238.    On **February 8, 2021**, Facebook emailed Rob Flaherty (former Deputy Assistant to the President and Director of Digital Strategy) and Humphrey to explain its

newest anticompetitive censorship by substitution efforts[13] – expansion of its COVID-19 censorship policy to promote authoritative COVID-19 vaccine information and expanded its efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines, and alternative health information in general.

239.    On **February 9, 2021**, Flaherty followed up with Facebook in regard to its COVID-19 policy, accusing Facebook of causing "political violence" spurred by Facebook groups by failing to censor false COVID-19 claims, and suggested having an oral meeting to discuss their policies. Facebook responded the same day, stating that even though "vaccine-skeptical" content did not violate its policies, it would have the content's "distribution reduced" and strong warning labels added (a form of its own speech), "so fewer people will see the post." This served as additional evidence that Big Tech companies like Facebook/Google/Twitter were not taking independent stances or engaging in independent thought processes concerning COVID-related censorship; *i.e.*, this confirms that Big Tech was doing nothing other than kowtowing to Government's (namely, the Biden Administration's) censorship demands.

240.    In the same messaging with Flaherty, Facebook advised that it was working to censor content that *did not* violate Facebook's policy in other ways by "preventing posts discouraging vaccines from going viral on our platform" (*i.e.,* content development) and

---

[13] "Censorship by substitution" occurs when the Government (or a Platform acting with it as was the case here) suppresses one viewpoint (*e.g.,* Westall's) and replaces it with a preferred narrative. This practice was only made possible because courts misapplied §230(c)(1) as blanket "immunity," insulating Platforms even when they engaged in affirmative content *development*. By treating active viewpoint suppression and State-aligned amplification as so-called protected Platform inaction, courts enabled precisely the kind of content-development Congress prohibited. The result was a Government-curated narrative masquerading as public discourse – subtle, systemic, and far more dangerous than direct deletion.

by using information labels (another form of their own speech) and preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines. Facebook also informed Flaherty (Government) that it was relying on the advice of "public health authorities" (Government) to determine its COVID-19 policies. Again, Big Tech kowtowing to Government's censorship demands / opinions: "yes, Government, we will censor whatever you want, for whatever reason you want … even if it neither violates our policies nor is offensive, so long as you continue to protect us from costly protracted legal battles."

241.    On **February 18, 2021,** the House Energy and Commerce Committee announced that Zuckerberg (Meta, then Facebook), Pichai (Google/YouTube), and Dorsey (X, then Twitter) would testify at a hearing scheduled for **March 25, 2021**. The Government Defendants pre-planned[14] their March 25, 2021, assault on free speech, demonstrating clear premeditation and coordination.

---

[14] The March 25, 2021, congressional hearing was announced on February 18, 2021, more than a month *before* the "Disinformation Dozen" report was publicly released on March 24, 2021. This timing makes clear the sequence was pre-arranged by Government: Facebook supplied internal data to the Government, which was then funneled to CCDH to produce the report; the report was scheduled for release the day before the hearing; and the hearing itself was structured around that report's central claim that purportedly "12 people" were responsible for "65% of COVID-19 misinformation." The simultaneous effort to secure signatures from twelve state Attorneys General further confirms that the Government intended the report to serve as a coordinated and preplanned pressure instrument to force at least the Big Three Platforms (Facebook, Google, Twitter) into suppressing dissenting COVID-19 and vaccine speech on the Government's behalf. This is why Facebook's interactions with the Government cannot be viewed in isolation: the Government's actions toward all three companies were part of a unified Government-led censorship campaign to suppress Americans' viewpoints based on the Government's own misinformation. And, upon information and belief, the purpose of that campaign was not public health, but political control to shape public discourse ahead of the upcoming elections and preserve Establishment power by compelling Platforms to silence dissent.

242.    In a **February 19, 2021,** email between Flaherty, Humphrey, several Facebook employees, and others, Flaherty asked to hear more from Facebook about "mis and dis" (information) and later stated that one of his questions was about "algorithmic productions" (code language for: computer automated content development / provision). Flaherty also asked if "plans are in the works … to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story." Upon information and belief, per Flaherty's request, a Government arranged meeting was held on March 1, 2021, with the subject being "Misinfo & Disinfo." Not only does this further evidence Big Tech's absolute subservience to the Government's censorship-related demands, but it also illustrates that Big Tech was / is redesigning its product ("algorithmic productions") around the Government's demands (a form of negligent product design / deliberate design defect).

243.    On **February 24, 2021**, in an email exchange with Flaherty, Facebook advised that at an upcoming meeting, it would provide detailed information on content that did not explicitly violate policy but could "contribute to vaccine hesitancy." During this exchange, Flaherty requested detailed metrics on the scale of removals (*i.e.,* to determine how effective the Government's efforts were in coercing censorship at least on Facebook) and examples of such content (*i.e.,* whether Facebook was taking down what the Government wanted taken down). Upon information and belief, this is when the Government requested the COVID-19 / vaccine related "data" from Facebook (hereafter referred to as the "data," and again in violation of the Fourth Amendment), which the White House subsequently provided to the CCDH. This vaccine hesitancy Facebook data was then used by the CCDH to prepare its preplanned March 24, 2021, hit piece targeting

COVID-19 critics, which was subsequently leveraged by the House Energy and Commerce Committee during its March 25, 2021, hearing. At this hearing, the CCDH report (relying on the data requested and provided by the White House) was presented, and direct calls for the censorship of various COVID-19 critics were made. In other words, March 25, 2021, was the moment when covert Government censorship efforts with Big Tech became overt, when the Government openly called on Platforms to effectuate its censorship directives. This underscores the premeditated facially unconstitutional nature of the Government's collusion with Facebook and NGOs such CCDH in orchestrating and executing joint censorship efforts.

244.    On **March 1, 2021**, Flaherty, Humphrey, and others participated in the prescheduled "Twitter / COVID Misinfo" meeting with Twitter, underscoring Twitter's participation in the Government's joint censorship efforts.

245.    On **March 2, 2021**, Facebook sent an email to Andrew Slavitt (former White House Senior COVID-19 Advisor), Flaherty, and Humphrey, assuring the Government that Facebook is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy." Here, Facebook assured the White House that it was actively suppressing vaccine-related content, targeting repeat offenders, and limiting the spread of posts that could contribute to "vaccine hesitancy."

246.    On **March 12, 2021**, Facebook emailed Flaherty stating: "[h]opefully, this [data] format works for the various teams and audiences within the White House/HHS that

may find this data [about vaccine hesitancy] valuable." This email also provided a detailed report and summary regarding survey data on vaccine uptake from January 10, 2021, to February 27, 2021.

247.    On **March 15, 2021**, Flaherty emailed (subject line – "you are hiding the ball") Facebook, stating: "I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content as you define it – is playing a role." In this email train, Flaherty continued by making clear that the White House was seeking more aggressive action on "borderline content." Specifically, Flaherty's emails stated, in pertinent part:

> I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us.

248.    Facebook responded as follows: "[w]e obviously have work to do to gain your trust…*We are also working to get you useful information* that's on the level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and *I'll expect you to hold me accountable*." Upon information and belief, the "on the level" data Facebook was trying to provide to the White House was not truly "on the level;" but, rather, the result of coercion from Government pressure to deliver results that aligned with the White House's censorship agenda. The duress Facebook faced is evident in its response to the White House's demands, stating, "hold me accountable," signaling the intense pressure to produce "biggest" actionable targets. The White House's focus was aimed at creating a showing of force to chill speech across Platforms, with folks like Westall as the central

targets. This sequence highlights the premeditated collaboration between the White House, Big Tech, and NGOs to manufacture a chilling narrative and enforce joint censorship efforts, unjustly and unconstitutionally harming folks like Westall in the process.

249.    As previously discussed – but important to note again within this chronological timeline – an America First Legal Investigation uncovered a **March 16, 2021**, email sent by Rowan Kane (Counselor to the Connecticut Attorney General and Deputy Director of Policy) to himself, with Margaret Chapple also copied.[15] The email included an attached letter addressed to Dorsey and Zuckerberg and requested confirmation from other state attorneys general offices to "sign-on" to the letter by close of business on **March 23, 2021** (the day before the CCDH report was scheduled to be released and only two days before the Congressional hearing was scheduled). The Connecticut Attorney General's office was part of a larger coalition that included the Attorneys General of New York, Delaware, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania, Rhode Island, and Virginia.[16]

250.    On **March 19, 2021**, Facebook had an in-person meeting with White House officials, including Flaherty and Slavitt. Facebook followed up on **March 21, 2021**, noting that the White House had demanded a consistent point of contact with Facebook (upon information and belief, the Government sought or established similar direct points of contact within Google and Twitter alike), additional data from Facebook, "Levers for

---

[15]    https://aflegal.org/america-first-legal-releases-new-evidence-files-formal-complaint-with-the-doj-to-investigate-uk-based-center-for-countering-digital-hate-for-engaging-in-a-foreign-influence-campaign/

[16]    https://ag.ny.gov/press-release/2021/attorney-general-james-calls-facebook-and-twitter-stop-spread-anti-vaxxer

Tackling Vaccine Hesitancy Content," and censorship policies for Meta's WhatsApp. Facebook noted that, in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines "that does not contain actionable misinformation" (again, negligent product redesign / content development by Facebook purely per the Government's demand as well as a form of Facebook's own speech). Facebook also provided a report for the White House on the requested information on WhatsApp policies:

> You asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved last week and that we will be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines that do not contain actionable misinformation.

251.    On **March 22, 2021**, Flaherty responded to this email, demanding more detailed information and a plan from Facebook to censor the spread of "vaccine hesitancy" on Facebook. Flaherty also requested more information about and demanded greater censorship by Facebook of "sensational," "vaccine skeptical" content. He also requested more information about WhatsApp regarding vaccine hesitancy. Further, Flaherty stated to Facebook that the White House was hoping they could be "partners here, even if it hasn't worked so far." Upon information and belief, the White House sought similar direct partnerships with Google and Twitter. A meeting was then scheduled for March 24, 2021 (the CCDH hit piece drop day) between Facebook and White House officials to discuss these issues. This indicates the White House had full advanced knowledge of the impending CCDH report.

252.    The "Twitter Files" refers to a series of internal Twitter communications and documents released publicly beginning in December 2022 after Elon Musk's

acquisition of the company. These disclosures exposed previously hidden coordination between federal agencies, political actors, NGOs, and Twitter employees regarding content moderation, viewpoint suppression, and Government-influenced censorship practices across multiple issue areas, including COVID-19, vaccines, and elections. Withing these files was a **March 23, 2021,** email from Hannah Murphy of the *Financial Times*, stating: "In a report embargoed for tomorrow, the CCDH is urging Twitter and other platforms (Facebook, **Google**) to ban the accounts of twelve individuals it has found responsible for around two-thirds of online anti-vaccine content."[17]

253.    Upon information and belief, the embargo of the CCDH report referenced by Murphy was orchestrated by the White House, underscoring premeditated coordination between the Government, the CCDH, legacy media, and Platforms. This timing conspicuously coincides with the **March 23, 2021,** deadline for Attorneys General to sign onto a related letter. Evidence suggests the CCDH provided advance copies of the report to the Connecticut Attorney General's office, the Financial Times, and the White House before its public release on March 24, 2021.

254.    Upon information and belief, the meeting scheduled on **March 22, 2021,** for **March 24, 2021**, was preplanned to provide White House officials, Platforms, and specific Congressional members with advance notice of the report, facilitating their coordination in the broader censorship effort to target individuals like Westall. This meeting and its timing further demonstrate premeditated efforts to align the report's release with Governmental actions.

---

[17] An embargo is a restriction on the release or distribution of information, goods, or actions until a specified time. Often imposed by governments or regulatory bodies, embargoes control the timing of public announcements, trade, or sensitive data.

255.    On **March 25, 2021,** Zuckerberg (Meta, then Facebook), Dorsey (X, then Twitter), and Sundar Pichai (Google) testified before Congress. During this hearing, Congressional members directly and publicly pressured these CEOs to remove COVID-19 and vaccine critics from their Platforms.

256.    Based on the conspicuous alignment of key dates, it is self-evident that a coordinated effort took place. The House Energy and Commerce Committee pre-scheduled its March 25, 2021, hearing on February 18, 2021, strategically aligning it with the attorneys generals' March 23, 2021, letter, and media release, as well as the planned March 24, 2021, CCDH report release. The timing of these events, when considered alongside the facts and evidence, reveals an inconceivable alignment of timelines that cannot be dismissed as a mistake or coincidence. Instead, this was a meticulously planned and premeditated assault on free speech orchestrated by U.S. Government and its censorship instruments (*e.g.*, Alphabet/Google/YouTube). This sequence of events demonstrates a deliberate and coordinated conspiratorial effort between the White House, Attorneys General, Congress, NGOs, Big Tech, and legacy media to suppress dissenting voices like Westall, shape public opinion, and influence oversight discussions on Platform censorship.

257.    At the March 25, 2021, congressional hearing, Representative Mike Doyle introduced the now-revealed Government-coordinated and preplanned CCDH 40-page hit piece. Representative Doyle's interrogation of Zuckerberg, Dorsey, and Pichai (during which he aggressively insisted that the Social Media giants immediately censor various individuals and entities) was laced with hostility and urgency. Representative Doyle's agitated and forceful approach successfully garnered verbal commitments from

Zuckerberg, Dorsey, and Pichai to take swift action in eradicating COVID-19 critics from their Platforms without delay.

258.    After expressing some initial reluctance, Facebook, Twitter, and Google ultimately capitulated to Representative Doyle's demands, agreeing to immediate and sustained censorship. This decision was made without any independent assessment or analysis by the Platforms or the Government to determine whether targeted individuals had, in fact, engaged in any "offensive" conduct that would have independently justified such action in the ordinary course of providing interactive computer services. The Platforms' removals were plainly the product of Government pressure – not any objective or preexisting application of their own policies – because they openly agreed at that hearing to take the requested actions *before* their policies were revised and *before* they began implementing those specific removals. Their subsequent conduct merely confirmed their capitulation to the Government's censorship demands.

259.    This coordinated conduct was incontrovertibly State action / State censorship targeting the individuals (not "offensive" content removals along the lines of the CDA, 47 U.S.C. § 230) targeted by the Government. Facebook complied with Representative Doyle's / the Government's censorship demands *immediately*, Twitter a week later, and Google/YouTube approximately one-and-a-half months later. Alphabet was slower to act, but acted. In May Google/YouTube began restricting users based on the Government's Congressional requests and, in August 2021, Westall was finally targeted. In other words, the Defendant Government (including the White House, Attorneys General, and Congress) was deliberately targeting individuals akin to Westall, from the moment the Biden Administration entered office, and used NGOs, legacy media, and Social Media

Platforms as its instruments to ultimately execute their coordinated censorship plans which directly affected individuals like Westall. Notably, neither Zuckerberg, Dorsey, nor Pichai made any independent assessment of the "censorship worthy" content at that hearing, yet they committed at that same hearing to censoring the Government's targets nonetheless – further demonstrating that their actions were based on the Government's demands rather than any independent evaluation of targeted content. Simply put, the Government said, "Take our critics down," and Big Tech replied, "Sure thing, boss!" – and then carried out the orders in the following years.

260.    Big Tech companies often fall back on this circular and pretextual notion of "repeat violation" – the Platform first identifies a target it wants banned, then affirmatively searches (digitally) for other instances to label "violations." Platforms subsequently claim that these "repeated violations" (which they are actively searching for – not passively determining – a form of content development) serve as justification for banning the targeted party, even though the supposed infractions result from the Platforms' deliberate intent to de-develop targeted users and their materials to find some sort of fault or wrongdoing in the target they want to remove (indeed, Westall was the victim of such a censorship fishing expedition as exemplified by here 2024 reinstatement and subsequent pretextual restriction only two days later). Distilled, the approach boils down to – "we do not want you, the user, on our platform, so we will find a reason to get rid of you." Notably, users are sometimes cited for content violations stemming from posts made as much as a decade earlier (which is patently absurd) – content that would be nearly impossible to find, content that nobody will likely ever see again, and content that did not violate the "rules" at the time it was posted. Yet, these outdated posts are conveniently used as retroactive justification for

claiming "repeated" violations to enforce a "repeat violation" ban. This backwards post-hoc approach (targeting an individual and then searching retroactively for information supportive of such decisions, rather than making present day decisions) is driven by the very same predetermined outcome the Government sought here, rather than objective standards, which certainly is not the behavior of a "Good Samaritan" functioning in "good faith." In other words, some Platforms have designed their interactive computer service products to target individuals not based on the offensiveness of their content, at all; but, rather, on their own interests, the interests of the Government, or their own anticompetitive intent.

261.    On **April 21, 2021**, the Government met with several YouTube officials (YouTube is, of course, owned by Google/Alphabet).

262.    By email dated **April 22, 2021**, Flaherty provided a recap of the meeting and stated his concern that misinformation on **YouTube** was "shared at the highest (and I mean the highest) levels of the White House." Flaherty indicated that the White House remains concerned that YouTube is "funneling people into hesitancy and intensifying people's vaccine hesitancy." Flaherty further shared that "we" want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better. Flaherty again noted vaccine hesitancy was a concern that is shared by the highest ("and I mean the highest") levels of the White House.

263.    On **April 23, 2021**, Flaherty sent Facebook an email including a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" ("the Brief"), which indicated that Facebook plays a major role in the spread of COVID vaccine misinformation and found that Facebook's policy and enforcement gaps enable misinformation to spread.

In other words, there was constant pressure on these three major companies to target Government dissent. The Brief recommended much more aggressive censorship (more aggressive enforcement of Facebook's policies; *i.e.,* find more "repeat violations" to target) and called for progressively severe penalties. The Brief further recommended Facebook stop distributing anti-vaccine content in News Feed or in group recommendations (a form of content development). The Brief also called for "warning screens" (a form of their own creation / speech) before linking to domains known to promote vaccine misinformation. Flaherty noted sending this Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."

264.    On **May 1, 2021,** Facebook's Nick Clegg (President of Global Affairs) sent an email to Slavitt indicating Facebook and the White House met recently to "share research work." Clegg apologized for not catching and censoring three pieces of vaccine content that went viral and promised to censor such content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted [*i.e.,* (de)(developed]) them before they went viral, and this has exposed gaps in our operational and technical process." Clegg told Slavitt that Facebook teams had spent the past twenty-four hours analyzing gaps and would be making changes (notably, to their product / services) the upcoming week. Clegg also noted the White House's demands from a recent meeting: **(a)** address Non-English mis/disinformation circulating without moderation; **(b)** do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation; **(c)** monitor events that host anti-vaccine and

COVID disinformation; and **(d)** address twelve accounts that were responsible for 73% of vaccine misinformation.

265.    Regarding the twelve accounts identified in the CCDH report, in Facebook's four objectives, tracking the same four Government demands, Facebook noted that it was scrutinizing (*i.e.*, targeting) these specific accounts and censoring them whenever it could, but that most of the content did not violate Facebook's policies. In other words, this further demonstrates that the Big Three Platforms were not applying their policies neutrally, they were pre-targeting specific Americans flagged for Government censorship and then searching for violations that did not actually exist. This was not passive, good faith moderation of objectionable material. It was affirmative, Government-directed and targeted content development, proactively hunting for pretextual violations rather than reacting to actual ones. Facebook referred to its new policy as their "Dedicated Vaccine Discouraging Entities." It might as well have been named: "Government Dissent Targeted Users." In sum, Facebook changed its products and policies, just like Twitter and YouTube did, at the Government's request and assured the Government that it would continue to persistently target individuals (akin to Westall).

266.    Ironically, Facebook even suggested that too much censorship might be counterproductive and drive vaccine hesitancy: "[a]mong experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'" In other words, Facebook cautioned the Government that overtly censoring too much content might expose their conspiracy to censor and that is precisely what

happened; but, again, the Establishment had no choice. It was all or nothing in the 2020-2024 election cycle. It was win the election or die (*i.e.,* face real accountability).

267.    On **May 3, 2021**, it was reported that DHS intended to "partner with private firms," (upon information and belief, that included Social Media companies, and private NGOs), to monitor disfavored speech online.[18]

268.    The Department of Homeland Security ("DHS"), as a Government agency, is constitutionally restricted in its ability to monitor citizens online. Under the Fourth Amendment, the Government is limited to browsing publicly available information on Platforms unless it obtains proper legal authorization. This limitation does not, however, cover the detailed information previously sought by Flaherty and other White House officials in preparation for their March censorship efforts (*i.e.,* there was no official warrant, subpoena, or court order). This overreach indicates that the Government not only violated First Amendment rights but also Fourth Amendment rights by leveraging private entities to gather and act on information beyond its constitutional authority. To circumvent these restrictions, DHS "partnered" with private Social Media companies, outsourcing tactics that would otherwise be unlawful for the Government to perform directly. For example, in gathering information, DHS relied (in whole or in part) on Platforms to engage in practices such as assuming false identities to infiltrate private groups, tactics that would constitute clear Fourth Amendment violations if executed directly by the Government. Upon information and belief, and as previously discussed above, many of the players in

---

[18]    https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html

this censorship scheme have also created or utilized bot or fake accounts to drive Government-preferred narratives, further manipulating public discourse.

269.    On **May 5, 2021**, Jen Psaki (then White House Press Secretary) began her own public pressuring of Big Tech, commenting at a White House press conference threatening that there could be "legal consequences" if Big Tech did not censor more aggressively pursuant to Government demands. A primary example of "legal consequence" leveraged by the Government would be the use of / eligibility for Section 230 immunity, as discussed elsewhere in this Complaint.

270.    Also at a **May 5, 2021**, White House press conference involving Psaki and Tom Vilsack (Secretary of Agriculture), Psaki stated that "t]he President's view is that the major Platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."[19] Psaki immediately went on to state that Biden "supports . . . a robust anti-trust program," and that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." The Government wielded Section 230 immunity as both a carrot and a stick – creating a "rewarded if you do, damned if you don't" scenario for Big Tech. If Big

---

[19] Under the proper interpretation / application of Section 230, amplification / restriction constitutes content development, making it the Platform's own speech and disqualifying it from Section 230(c)(1) protection instantly. Platforms may only restrict (not amplify at all) content strictly in "good faith" under Section 230(c)(2). Yet, Platforms have long acted as information content providers through selective amplification and de-amplification (*i.e.*, content development). Now acting on behalf of the Government, these Platforms engage in censorship far beyond Section 230's intended protections, raising serious constitutional concerns.

Tech was doing enough to appease Government's insatiable desire to censor COVID dissenters/critics (Westall), then the Government was content to leave the overbroad Section 230 immunity framework intact. Whenever the Government felt that Big Tech was not bending over backwards far enough to meet its censorship expectations, however, it threatened antitrust accountability (revocation of Section 230 immunity), leveraging this judicial antitrust pressure to foster compliance with its demands.

271.    In **May 2021**, the Government started to turn up the heat on Big Tech regarding efforts to censor pursuant to Government's demands. More specifically, on **May 6, 2021**, Flaherty demanded more information about Facebook's efforts to demote borderline content, stating, "[n]ot to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quicky?" Flaherty also criticized Facebook's efforts to censor "[s]eems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo-dozen – they're being deemed as not dedicated – so it feels like that problem likely coming over to groups." Tensions rose between the White House and Facebook, culminating with Flaherty's **July 15, 2021**, email to Facebook: "Are you guys fu@king serious? I want an answer on what happened here and I want it today." *Missouri*, [D.E. 293[ at 22-23.

272.    On **May 20, 2021**, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort."[20] Hsiang suggested

---

[20] Discovery will doubtless reveal what (if any) additional individuals / entities need to be added to the universe of Defendants. For example, in a response to a third-party subpoena in another similar action, YouTube (owned by Google/Alphabet) has identified myriad individuals (Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others), as federal officials likely to have "communicated with YouTube custodians about

a change to results yielded by a search for "who can get vaccinated now." A subsequent meeting was arranged. This is a prime example of censorship by substitution, where Government-facilitated propaganda was deliberately identified to displace Americans' speech.

273.    On **May 25, 2021**, the first meeting occurred between the Office of the Surgeon General (Vivek Murthy) and Platforms (Clegg), as well as Slavitt. The purpose of this call was to introduce Murthy to Clegg. After the meetings with Platforms, the Platforms fell in line with the Office of Surgeon General's and White House's requests. For examples, Facebook announced policy updates on May 27, 2021, and Clegg emailed Murthy with a report of misinformation on Facebook on May 28, 2021. One of the more noteworthy Facebook policy changes that occurred following meetings with the Surgeon General (and pursuant to Facebook's unwavering desire to be in the good graces of an

---

misinformation about COVID, the census, or elections." We do not yet know, sans discovery, the degree to which the aforementioned individuals contributed to the wrongdoing at issue here. And the same goes for Mina Hsiang, for that matter. Did Ms. Hsiang's conversation(s) with Google ultimately result in change to the Google search engine that influenced search results? Did Ms. Hsiang's suggestion(s) relate to the silencing of COVID-19 vaxx dissenters such as Westall? Did a search result change occur that harmed Westall? We do not yet know the extent of involvement of various individuals / entities mentioned in this Complaint, but we would be remiss to leave such mentions / discussions out, as such discussions lend context to the overall story / lend clarity to the overall picture. For example, mention of Ms. Hsiang's conversation with Google illustrates the width and breadth of the Government's censorship efforts – the censorship efforts were so widespread as to encompass ordinary Google search results and we will be quite curious to learn in discovery, among many other things, whether Google manually manipulated its ordinary search results in relation to Westall and whether such manipulation has exacerbated the harms suffered by Westall. Hence, the earlier reservation of right to amend this Complaint (n. 2).

incredibly demanding and protective Government) was Facebook's policy change to expand penalties for individual Facebook accounts that shared misinformation.

274.    From **May 28, 2021, to July 10, 2021**, a senior Meta executive reportedly copied Slavitt on his emails to Murthy alerting them that Meta, pursuant to the White House's requests, was engaging in censorship of COVID-19 misinformation and expanding penalties for individual Facebook accounts that share misinformation. Meta further assured the Government that "there is considerably more we can do in 'partnership' with you and your team to *drive behavior*;" *i.e.*, chill unwanted speech.

275.    In **June 2021**, the National Security Council released its National Strategy for Countering Domestic Terrorism ("NSCDT").[21] The NCSDT repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism." It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and other forms of disinformation and misinformation." It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "[e]specially on Internet-based communications platforms such as social-media." It stated that DHS and others "are currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences." The Strategy memo identified, as its "broader priority," the task of "enhancing faith in Government and addressing the extreme polarization, fueled by a crisis of disinformation and misinformation often channeled through Platforms, which can tear Americans apart." And it called for DHS and others to "accelerat[e] work to contend with

---

[21]    https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf

an information environment that challenges healthy democratic discourse," and to "find[]
ways to counter the influence and impact" of online disinformation.

276.    This broadened mandate, aligning with the expanded mission of GEC at the
time, effectively labels a wide range of dissenting perspectives, including Westall, as
"threats" (*i.e.,* threats to the Administrative State). Beyond traditional threats, the
Government began categorizing groups and ideologies far removed from violence or
extremism as potential threats to public safety. While white supremacist and neo-Nazi
organizations, anarchist extremists, and anti-Government factions like militias and
sovereign citizen movements were identified (groups that, as deplorable as their views may
be, still retain First Amendment protections for their speech), the scope expanded
significantly. This broader categorization began to scrutinize, for examples, environmental
and animal rights activists (*e.g.*, Earth Liberation Front, "ELF," and Animal Liberation
Front, "ALF"), as well as religious organizations.

277.    This expansive definition of "domestic terrorism" demonstrates how the
Administrative State leveraged the NCSDT to target more than those engaged in violence,
now also targeting suppression of dissent from a wide array of problematic ideological and
political perspectives. By broadly labeling these groups as threats to "healthy democratic
discourse," the Government has chilled constitutionally protected speech under the guise
of maintaining public safety.

278.    Beginning on **June 14, 2021**, Facebook (Clegg) "began sending bi-weekly
COVID content reports."

279.    On **July 6, 2021**, Eric Waldo (Senior Advisor to the Surgeon General)
emailed Twitter to set up the rollout call for the Office of the Surgeon General's health

advisory on misinformation and told Twitter that Murthy had been thinking about how to stop the spread of health misinformation (Government dissent); that he knew Twitter's teams were working hard and thinking deeply about the issue; and that he would like to chat over Zoom to discuss. Twitter ultimately publicly endorsed the Office of the Surgeon General's call for greater censorship of health misinformation.

280.    Waldo sent an email to YouTube (owned by Google/Alphabet) on **July 6, 2021**, to set up the rollout call and to state that the Office of the Surgeon General's purpose was to stop the spread of misinformation (*i.e.,* Government dissent) on Platforms. Succumbing to the Government's censorship pressure, YouTube eventually adopted a new policy on combatting COVID-19 misinformation and began providing federal officials with updates on YouTube's efforts to combat the misinformation.

281.    On **July 12, 2021**, and **July 14, 2021**, the Office of the Surgeon General held pre-rollout calls with Twitter and YouTube regarding the forthcoming Surgeon General's health advisory on misinformation. *Id.* at 31. Much like the CCDH shared its report with the Government before its official release, these "pre-rollout" discussions reveal the reverse dynamic – the Government actively sharing its plans with Big Tech to align its censorship efforts in advance. This pre-coordination underscores the entwinement between the Government and Platforms, illustrating how both parties worked hand-in-glove at all times to suppress dissent and manipulate public discourse under the fraudulent veil of combating misinformation.

282.     On **July 15, 2021**, the Surgeon General of the United States released a report entitled "Confronting Health Misinformation."[22] That same day, a joint press conference was held between Psaki and Murthy, "the two made the comments … which publicly called for social-media platforms 'to do more' to take action against misinformation super-spreaders." "Murthy was directly involved in editing and approving the final work product for the July 15, 2021, health advisory on misinformation." The Surgeon General's July 15, 2021, rollout was coordinated with Renee DiResta ("DiResta") from the Stanford Internet Observatory, a leading organization of the Virality Project. And this was not the full extent of the Surgeon General's partnership / coordination with the Stanford Internet Observatory / Virality Project. Again, much like the Government's relationship with the CCDH, this coordination with Stanford highlights how NGOs played a pivotal role in amplifying and operationalizing the Government's censorship efforts, creating a seamless partnership aimed at suppressing dissent under the pretense of addressing health misinformation.

283.     The July 15, 2021, rollout with Facebook "was negatively affected because of the public attacks by the White House and Office of the Surgeon General towards Facebook for allowing misinformation to spread. Clegg of Facebook reached out to attempt to request 'de-escalation' and 'working together' instead of the public pressure. In the call between Clegg and Murthy, Murthy told Clegg he wanted Facebook to do more to censor misinformation on its platforms."

---

[22]    https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf; *see also*

*https://www.nationalreview.com/news/psaki-white-house-flagging-covid-disinformation-for-social-media-companies/*

284.    In deposition, Waldo "admitted that Murthy used his office to directly advocate for social-media platforms to take stronger actions against health 'misinformation' and that those actions involved putting pressure on social-media platforms to reduce the dissemination of health misinformation. Surgeon General Murthy's message was given to social-media platforms both publicly and privately." Waldo also admitted that Murthy used his "bully pulpit" to talk about health misinformation and to put public pressure on Platforms.

285.    At the aforementioned **July 15, 2021**, press conference, Murthy described health misinformation as one of the biggest obstacles to ending the pandemic; insisted that his advisory was on an urgent public health threat; and stated that misinformation poses an imminent threat to the nation's health and takes away the freedom to make informed decisions. By restricting dissenting medical viewpoints, the Government did not protect public health, it restricted the public's access to competing information. Murthy further stated that health disinformation is false, inaccurate, or misleading, based upon the best evidence at the time (*i.e.,* based on the Government's opinions). The irony, however, is that Murthy's efforts to suppress dissenting voices / alternative perspectives (like Westall's) stripped Americans of their ability to exercise informed consent, the very foundation of personal freedom and medical autonomy.

286.    Murthy called upon Platforms to operate with greater transparency and accountability (*i.e.,* censor more), to monitor information more clearly, and to "consistently take action against misinformation super-spreaders on their platforms." By doing so, the Government effectively attempted to bypass Fourth Amendment restrictions, forcing private information to be made more publicly available to the Government.

287.    At his deposition, Waldo agreed that the word "accountable" carries with it the threat of consequences. Murthy further demanded Platforms do "much, much, more" [censoring] and take "aggressive action" against misinformation because the failure to do so is "costing people their lives." Sadly, the Government's efforts to censor Westall's health options/criticisms and quash informed consent (most of which later proved correct), likely resulted in more lives lost.

288.    Under a heading entitled "What Technology Platforms Can Do" (for the Government) the Surgeon General's health advisory called for Platforms to take a series of steps to increase and enable greater Social Media censorship of misinformation, including *product* changes, changing *algorithms* to avoid amplifying misinformation, building in "frictions" to reduce the sharing of misinformation, and practicing the early detection of misinformation super-spreaders, along with other measures. The consequences for misinformation would include flagging problematic posts, suppressing the spread of the information, suspension, and permanent de-platforming.

289.    On **July 16, 2021**, Biden remarked on purported anti-vaccine misinformation, stating that individuals supposedly conveying supposed COVID misinformation were "killing people." More realistically, however, the suppression of open dialogue and dissenting opinions, often revolving around incomplete or evolving science, likely cost lives by undermining informed decision-making and trust in public health narratives. Also on **July 16, 2021**, Clegg emailed Murthy and stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."

290.    On **July 17, 2021**, a Facebook official sent an email to Anita B. Dunn (Senior Advisor to the President) asking for ways to "get back into the White House's good graces" and stated Facebook and the White House were "100% on the same team here in fighting this." In other words, Facebook wanted the Government to return to using the carrot rather than continuing to endure the stick.

291.    On **July 18, 2021**, Clegg messaged Murthy stating "I imagine you and your team are feeling a little aggrieved – as is the [Facebook] team, it's not great to be accused of killing people – but as I said by email, I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits." As a result of this communication, a meeting was scheduled for July 23, 2021. *Id.* at 35. To be abundantly clear, Westall is accusing the Defendants of unconstitutional and unlawful actions that suppressed potentially life-saving information that, if freely available, *may well have been life-saving* … and that their actions more likely than not contributed to preventable loss of life. Indeed, the consequences of the Defendant's censorship were not abstract. For example, hydroxychloroquine was derided as "horse medicine," even though it is an FDA-approved drug used safely by millions for decades and was being prescribed by licensed physicians during the pandemic. Similarly, ivermectin was mocked as "livestock dewormer," despite decades of human medical use and emerging international data suggesting potential antiviral properties worth studying. Early discussion of natural immunity was labeled "misinformation" and removed from Platforms, even though subsequent studies, including those published by NIH-funded researchers, confirmed that natural immunity was real, durable, and clinically significant.

292.    The Office of the Surgeon General also collaborated with the Democratic National Committee. Flaherty emailed Murthy on **July 19, 2021**, to put Murthy in touch with Jiore Craig from the DNC who worked on misinformation and disinformation issues. Upon information and belief, the Democratic Party was deeply embedded in the Government/Platform censorship apparatus, further evidence that these censorship efforts were not merely public-health initiatives, but were designed to shape and control political outcomes, including the upcoming elections.

293.    At a **July 20, 2021**, White House press conference, Kate Bedingfield (White House Communications Director) stated that the White House would be announcing whether Platforms are legally liable for misinformation spread on their Platforms and examining how misinformation fits into the liability protection granted by Section 230 of the CDA (which shields Platforms from being responsible for posts by third parties on their sites). Bedingfield further stated the administration was reviewing policies that could include amending the CDA and that the Platforms "should be held accountable.[23] The public and private pressure from the White House had its intended effect on Big Tech – scores of individuals (like Westall) were censored, and pages, groups, and accounts linked to those who were censored were also removed.

---

[23] Bedingfield's statements expose the profound inversion of §230(c)(1)'s statutory purpose. Section 230(c)(1) was enacted to protect Platforms from liability for third-party content, not to penalize them for failing to remove Government-disfavored speech. But because courts (in California) had already been weaponized to misapply §230(c)(1) as a shield for unlawful conduct (*i.e.,* Government censorship), the White House sought to repurpose that same distortion in reverse: to threaten Platforms with liability if they did not censor enough. In effect, the Executive Branch attempted to convert §230(c)(1) into a coercive tool compelling Platforms to suppress protected speech, a use precisely opposite Congress's intent. This is direct evidence that the Government not only benefited from the judiciary's misapplication of §230(c)(1), but relied upon it as leverage to induce unconstitutional censorship across the industry.

294.    On the same day, **July 20, 2021**, Humphrey emailed Facebook asking for the takedown of an Instagram account parodying Fauci. In less than two minutes, Facebook replied, "Yep, on it!" Soon thereafter, Facebook reported that the account had been censored.

295.    On **July 21, 2021**, Facebook emailed Waldo and Fullenwider with CrowdTangle (note: CrowdTangle is a Facebook entity) data and with "interventions" that created "frictions" with regard to COVID misinformation, in contemplation of product design changes aimed at the ability to use Social Media services rather than aimed at the restriction of information. The interventions also included limiting forwarding of WhatsApp messages, placing warning labels on fact-checked content, and creating "friction" when someone tries to share these posts on Facebook. Facebook also reported other censorship policy and actions, including censoring content that contributes to the risk of imminent physical harm, permanently banning pages, groups, and accounts that repeatedly broke Facebook's COVID-19 misinformation rules, and reducing the reach of posts, pages, groups, and accounts that share other false claims **"that do not violate our policies** but may present misleading or sensationalized information about COVID-19 and vaccines."

296.    On **July 21, 2021**, Clegg had a meeting with Murthy's office:



297.     Following the July 21, 2021, meeting, Clegg had to report back to Murthy

as to Facebook's censorship:

298.     In this **July 23, 2021**, email from Facebook to the HHS, Facebook inquires

as to setting up a "regular cadence of meetings with" the Government / HHS, stating,

among other things that the Government / HHS had identified four steps / processes for

Facebook to undertake to improve on its free speech censorship abilities and capabilities.

Upon information and belief, the Government had a similar "cadence" of meetings with

Google/YouTube.



299.    Another call took place on **July 23, 2021,** between Murthy (Surgeon General), Waldo (Surgeon General assistant), DJ Patil (chief data scientist in the Obama administration), Clegg (Facebook), and Rice (Facebook). At the meeting, Murthy raised the issue of wanting to better understand the reach of misinformation and disinformation as it relates to health on Facebook; Murthy often referred to health misinformation in these meetings as "poison." The Surgeon General's health advisory explicitly called for Platforms to do more [censoring] to control the reach of misinformation. Ironically, as it turns out, the vaccines proved to be the real "poison."

300.    At the **July 23, 2021,** meeting, the Office of the Surgeon General officials were concerned about understanding the reach of Facebook's data. Clegg even sent a

follow-up email after the meeting to make sure Murthy saw the steps Facebook had been taking to adjust policies with respect to misinformation. Clegg also reported that Facebook had changed its product design for the Government by "expand[ing] the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." Further, Facebook also agreed to "do more" to censor COVID misinformation, to make its internal data on misinformation available to federal officials, to report back to the Office of the Surgeon General, and to "strive to do all we can to meet our 'shared' goals.'"

301.    On **July 23, 2021**, Clegg emailed Murthy stating, "I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation… ."

302.    On **July 26, 2021**, the Global Internet Forum to Counter Terrorism ("GIFCT") (a consortium founded by the largest U.S. Tech companies, including Google/YouTube, Facebook (Meta), Microsoft, and Twitter) announced that it was "significantly expanding the types of extremist content shared between firms in a key [blacklist] database" by moving beyond images and videos into content-based, speech-classification tracking. GIFCT's advisory committee included representatives from the U.S. Department of Homeland Security, meaning the Government directly participated in (and influenced) the shared-moderation framework. Because Google/YouTube is a founding member of GIFCT and sits on its Operating Board, Alphabet was directly involved in this coordinated expansion of cross-Platform speech surveillance.

303.    "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few

specific live-streamed attacks." "Until now, the [GIFCT] database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. Upon information and belief, DHS officials have access to such database(s) as tools to advance censorship of online speech.

304.    On **July 30, 2021**, Waldo had a meeting with Google/YouTube representatives. At the meeting, Google/YouTube reported to the Office of the Surgeon General what [State] actions they were taking following the Surgeon General's health advisory on misinformation.

305.    On **August 2, 2021**, DHS Secretary Mayorkas announced that DHS was working directly with Social Media companies to censor disfavored speech on Platforms. "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with Tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'"[24]

306.    Soon after Mayorkas's **August 2, 2021**, comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS.

307.    On **September 13, 2021**, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding

---

[24]    https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/

"[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID- 19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic."[25]

308.    Waldo's testimony makes one thing unmistakably clear – the censorship machinery at issue here did not originate with Biden, nor did it depend on his inauguration. The censorship directives were already in motion during the transition period before Biden assumed office, which demonstrates that these efforts do not "belong" to any one President at all. They belong to the Establishment: the entrenched, bureaucratic, multi-agency coalition of Government officials, political operatives, national-security actors, and Government-funded NGOs whose power endures across administrations. And critically, these Establishment actors were already using COVID-19 as the legal and moral pretext to suppress political dissent during the run-up to the 2020 election. This is why Westall was hit hardest in mid-to-late 2020, while the censorship regime was still covert, and framing political control as "public health protection," which provided the perfect cover to control the upcoming election.

_____

[25] The DHS memorandum's conflation of two categorically *unrelated* subject areas (political speech about election integrity and scientific or medical debate about COVID-19) reveals the true underlying purpose of the proposed Disinformation Governance Board. COVID-19 "misinformation" has no logical or statutory nexus to the validity or administration of American elections. Yet DHS grouped them together, treating both as threats to "national security" warranting centralized suppression authority. This blending exposes the true nature of the censorship effort: it was not about public health, but about controlling public perception and political dissent in the run-up to, and aftermath of, federal elections. By merging election skepticism with pandemic-related scientific disagreement, DHS constructed an all-purpose psychological-operations framework, one in Platforms acted as Governmental instruments to shape political opinion, suppress disfavored viewpoints, and preserve Establishment power.

309.    The proof is in the Government's own documents. COVID "misinformation" and election "misinformation" were consistently blended together by federal agencies (especially DHS) as if they were one unified threat stream. COVID has absolutely nothing to do with elections, yet the Government merged them because the real objective was not public health but narrative control ahead of the 2020 vote. Once COVID was declared the justification, any dissenting content (whether about treatments, lockdowns, mandates, fraud concerns, or institutional trust) was treated as an election threat. This blending reveals the true motive – control the election by controlling the information ecosystem.

310.    The roots of this system go back well before the 2020 election cycle. The Smith–Mundt Modernization Act of 2012[26] legalized the domestic dissemination of federal propaganda, and the 2013 NDAA created the Global Engagement Center (GEC), a federal information-warfare hub that later became central to domestic censorship operations. In practice, these statutes functioned as the Government's internal, covert information-

---

[26] The Smith–Mundt Modernization Act of 2012 ("SMMA"), which authorizes domestic dissemination of Government-produced informational materials, raises grave constitutional problems when applied within the modern Social Media ecosystem. While the Government may speak for itself, SMMA becomes unconstitutional *as applied* when the Government uses dominant private Platforms as conduits for its preferred narratives while simultaneously suppressing or inducing suppression of competing private viewpoints. Unlike traditional media, Platforms operate as algorithmically curated quasi-public forums where amplification is a zero-sum function. Government injection of propaganda into these systems necessarily *substitutes* Government speech for private speech, distorting the marketplace of ideas and enabling the Government to crowd out dissent through covert algorithmic elevation of its own messaging. Because the First Amendment forbids the Government from manipulating public discourse through private intermediaries, Westall seeks injunctive relief prohibiting the Government from injecting propaganda into Platforms under SMMA, or, in the alternative, a declaration that SMMA is unconstitutional *as applied* to digital Platforms where Government messaging structurally displaces private expression.

governance architecture. Smith–Mundt authorized the Government to inject its own narrative into the domestic information stream, while the GEC provided the mechanism to suppress competing or dissenting information.[27] Together, they enabled the Government to shape online narratives long before the White House publicly chastised Big Tech. What became overt under Biden (press conferences, public threats, and explicit demands to censor) was merely the unmasking of a long-running Governmental censorship apparatus that had already been operating quietly throughout the 2016, 2018, and 2020 election cycles, and then operated openly in the run-up to both the 2020 and 2024 elections.

311.    Thus, the censorship imposed on Westall was not limited to the Biden presidency; it was part of a much larger, long-running Establishment effort to suppress liberty and control public discourse. The restraint of her liberties was a product of a pre-existing, covert, Establishment-run censorship apparatus in which Google/YouTube participated long before the Biden Administration. COVID-19 became the perfect justification; "public health protection" served as the pretext, and election "stability" served as the parallel justification. And Big Tech functioned as the Government's enforcement arm.

312.    When Biden took office, the restraints came off. The covert censorship architecture that had been operating beneath the surface became overt, aggressive, and officially sanctioned. Westall's censorship sits at this precise inflection point, where covert

---

[27] The GEC was officially closed after Congress declined to renew its mandate, and on April 16, 2025, Marco Rubio (then U.S. Secretary of State) formally shuttered its successor office, stating that it had "spent millions of dollars to actively silence and censor the voices of Americans they were supposed to be serving."

https://www.politico.com/news/2025/04/16/state-department-shutters-gec-foreign-disinformation-00292982?wptouch_preview_theme=enabled

suppression throughout 2020 transitioned into overt Governmental control and coordination in 2021.

313.    On **August 10, 2021**, Waldo and Flaherty had a call with Rice, Facebook was told to report to federal officials as to Facebook's actions to remove "disinformation" and to provide details regarding a vaccine misinformation operation Facebook had uncovered.

314.    On **August 18, 2021**, still under the Government's immense censorship pressure (and constantly being asked by the Government to demonstrate compliance with the Government's censorship demands), Facebook published an article entitled "How We're Taking Action Against Vaccine Misinformation Superspreaders."[28] In the article, in an effort to further quell the Government and its constant censorship demands, Facebook explained:

> In recent weeks, there has been a debate about whether the global problem of COVID-19 vaccine misinformation can be solved simply by removing 12 people from social media platforms. People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. There isn't any evidence to support this claim. Moreover, focusing on such a small group of people distracts from the complex challenges we all face in addressing misinformation about COVID-19 vaccines.
>
> That said, any amount of COVID-19 vaccine misinformation that violates our policies is too much by our standards — and we have removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies. We have also imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people, like moving their posts lower in News Feed so fewer people see them or not recommending them to others. We've applied penalties to some of their website domains as well so any posts including their website content are moved lower in News Feed.

---

[28]    https://about.fb.com/news/2021/08/taking-action-against-vaccine-misinformation-superspreaders/

315.    Translated, Facebook was explicitly informing the Government that there was no evidence to support the claim that certain individuals accounted for "73% of the misinformation" online, yet simultaneously reassuring the Government that Facebook was *still* moderating those individuals' content. In other words, the Government's assertions were false, and Facebook (and likewise Twitter and Google/YouTube) continued complying with the censorship demands regardless of whether the Government's underlying claims were accurate, justified, or supported by evidence. Likely, this flawed statistic stems from the CCDH's inability to properly interpret the information the Government had obtained from Facebook per its February 24, 2021, request. It is also worth noting that Facebook, having learned from its experience with the deletion of the purported "300 Russian bot accounts" in the run-up to the 2016 election, had indicated that removing a dozen accounts would not achieve the level of censorship the Government desires. This acknowledgment reveals the ongoing collaboration and mutual understanding between Facebook and the Government (and between all of Big Tech's major players and the Government, for that matter) to refine and amplify their censorship strategies to better align with the Government's overall censorship objectives.

316.    On **August 20, 2021**, Clegg followed-up with Waldo and Flaherty with an email entitled "Limiting Potentially Harmful Misinformation," which detailed more efforts to censor COVID-19 Misinformation. Facebook continued to report back to Waldo and Flaherty with updates on September 19, 2021, and September 29, 2021.

317.    Also on **August 20, 2021**, Clegg emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform. These changes will apply across Facebook

and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content" and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation." In addition, Clegg sent a "Facebook bi-weekly covid content report" to Murthy (Surgeon General) and to Slavitt (White House) to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their liking.

318.    On **August 23, 2021**, Flaherty emailed Facebook requesting a report on how Facebook intended to promote the FDA approval of the Pfizer vaccine. He also stated that the White House would appreciate a "push" and provided suggested language.

319.    On **September 14, 2021**, another meeting took place between Google/YouTube, Waldo, and Flaherty to discuss a new policy YouTube was working on and to provide the federal officials with an update on YouTube's efforts to combat harmful COVID-19 misinformation on its Platform.

320.    On **September 18, 2021**, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Facebook provide an explanation "as we have long asked for how big the problem is, what solutions you're implementing, and how effective they've been." The "solutions" referred to policies to censor and suppress more private speech on Facebook's Platforms, and Facebook promised to "brief" the White House on those.

321.    On **October 29, 2021**, Facebook asked federal officials to provide a "federal health contract" to dictate "what content would be censored on Facebook's platforms." Federal officials informed Facebook that the CDC was the federal health authority that could dictate what content could be censored as misinformation.

322.    On **October 29, 2021**, the Surgeon General tweeted from his official account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake."[29] Interactive computer service providers (the Platforms) are protected under Section 230(c)(1) from being treated as the publisher or speaker of third-party content, even if they fail to remove potentially harmful material. The ongoing pressure exerted by the Government, however, such as demanding Platforms take "responsibility for stopping health misinformation on their platforms," was deliberately aimed at eroding Platforms' confidence in their Section 230 protections. This tactic coerced Platforms into overcompensating by engaging in heightened censorship, undermining the statutory safeguards intended to shield them from such liability.

323.    Notably, Murthy's October 29, 2021, statement emphasized that "*the rest* of the social media ecosystem take responsibility," explicitly extending this expectation beyond just Facebook, Google/YouTube, and Twitter to include other Platforms like Vimeo or Pinterest. This highlighted the Government's expansive and coercive approach, pressuring the entire spectrum of online Platforms to align with its content moderation demands.

324.    On **November 10, 2021**, CISA (an agency within DHS) announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online." CISA

---

[29] https://twitter.com/Surgeon_General/status/1454181191494606854

Director Jen Easterly stated: "*I am actually going to grow and strengthen my misinformation and disinformation team*," further describing so-called "misinformation" and "disinformation" as "a top threat for CISA, which is charged with securing critical infrastructure, to confront."

325.    Once again, the Government invoked COVID-safety rhetoric serving as the pretext for suppressing election-related dissent, blending the two categories into a single justification for expanded censorship authority. This reflects the same "equivocation" discussed earlier: COVID dissent = election dissent = threat to national stability. By deliberately fusing unrelated subjects (public health debate and election-integrity concerns) the Government manufactured a unified rationale for a censorship regime targeting all forms of Establishment-disfavored speech. This is yet another example of the Government collapsing distinct issues into one fabricated "threat," enabling broad suppression of constitutionally protected expression under the guise of securing "critical infrastructure." The implicit message was absurd on its face: "There is a public-health crisis (manufactured by the Government), so we must tighten control over the election." Public health and election administration are mutually exclusive domains. Their forced conflation exposes the Government's true objective … not safety, but control.

326.    Easterly claimed that Social Media speech is a form of "infrastructure," and that policing speech online by the federal Government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." In other words, CISA

declared that safeguarding "cognitive infrastructure" (protecting minds from misinformation and disinformation) is vital in securing physical infrastructure.

327.    Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other Government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." Said differently, the Government jointly participates with private entities to **(a)** ensure Americans are censored, and **(b)** substitute enough propaganda to ensure the Administrative State's version of the cognitive infrastructure.

328.    Easterly texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful,"[30] and complained about the Government's need to overcome the Platforms' "hesitation" to working with the Government: "Platforms

---

[30] Prebunking (the use of predictive analytics, AI-driven sentiment analysis, or data-mining to identify individuals or content deemed likely to spread "misinformation") is conceptually analogous to what law-enforcement scholars call "predictive policing." These systems use historical data and algorithmic risk-scoring to flag people or communities for surveillance or enforcement before any actual wrongdoing occurs. In practice, predictive policing has produced widely criticized outcomes: bias, lack of transparency, and the targeting of marginalized groups. As one leading assessment recently explained, predictive-policing tools often rely on biased data, provide no public accountability or transparency, and institutionalize "pre-crime" policing in violation of due-process and civil-rights norms.  Accordingly, when the Government adopts "prebunking" (using AI or analytics to forecast which Americans might dissent or spread disfavored information) and then pressures or compels Platforms to suppress them, it transforms Social Media into a tool of predictive social control. Absent robust safeguards, transparency, and judicial oversight, such measures threaten to institutionalize viewpoint-based suppression and undermine the First Amendment's core protections of free speech and association. Here is a video to better explain the Government's efforts to predictively police content: https://x.com/newstart_2024/status/1994904783258370138

have got to get more comfortable with gov't. It's really interesting how hesitant they remain." Said differently, the Government sought deeper collaboration with private Platforms to identify and neutralize dissenting views, expressing frustration at the Platforms' reluctance and openly exploring ways to increase pressure to accelerate compliance. And just like a getaway driver who hesitates because he knows he is being drawn into a crime, the Platforms' reluctance reflected their awareness that these demands crossed the line into State action. Yet they participated anyway, and with that participation assumed full responsibility for the unlawful censorship scheme.

329.    "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." Translated, Easterly was suggesting that federal officials should take an active role in steering Americans toward Government-approved "facts," undermining the public's ability to independently evaluate information and, in contexts such as health and medicine, to exercise genuine informed consent.

330.    Today, a veritable army of federal bureaucrats is involved in censorship activities "across the federal enterprise." There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting Platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos." Easterly's acknowledgment specifically underscores the "pervasive entwinement" at the heart of

Government censorship, where the chaotic reality of numerous federal officials independently contacting Platforms to censor speech necessitated a coordinated approach, further entrenching the Government's influence over / participation with private entities.

331.    On **December 21, 2021**, Murthy made additional censorship relevant statements on the following Platforms:

> a **December 21, 2021** podcast threatening to hold social-media platforms accountable for not censoring misinformation; … a **January 3, 2022** podcast with Alyssa Milano stating that 'platformers need to step up to be accountable for making their spaces safer'; … and a **February 14, 2022** panel discussion hosted by the Rockefeller Foundation, wherein they discussed that technology platforms enabled the speed, scale, and sophistication with which this misinformation was spreading… .

332.    In **January 2022**, Facebook reported to Rowe, Murthy, Flaherty, and Slavitt that it had "labeled and demoted" vaccine humor posts whose content could discourage vaccination. Facebook also reported to the White House that it "labeled and demoted" posts suggesting natural immunity to a COVID-19 infection is superior to vaccine immunity.

333.    On **February 1, 2022**, Psaki stated that the White House wanted every Platform to do more to call out misinformation and disinformation, and to uplift (*i.e.*, help develop in part) accurate information.

334.    On **February 17, 2022**, Lauren Protentis (CISA) contacted Facebook stating: "The Deputy Secretary at Treasury [Wally Adeyemo] would like to be connected to industry partners [*e.g.*, Google, Facebook, Twitter] to discuss potential influence operations on social media. We'd like to make the connection to Facebook if you're amenable?" Upon information and belief, nearly identical outreach was sent that same day to Twitter, Microsoft, and Google/YouTube at Adeyemo's direct request. Notably, "influence operations" is a term of art used by the Government to describe its own psychological and cognitive-shaping activities, operations designed to control narratives,

perceptions, and public interpretation of events. These inquiries must be understood in the broader context of federal narrative-management efforts surrounding politically sensitive matters, including, for example, January 6, 2021, where later reporting revealed that more than 270 federal agents were embedded in the crowd, contrary to prior Governmental denials. *See, e.g., FBI Bombshell: 274 Agents Sent to Capitol for J6, Many Later Complained They Were Political Pawns,* MSN.[31]

335.    The common thread is unmistakable – the Government regularly misleads the public while increasingly relying on private Platforms to execute federally directed psychological-influence strategies under the pretext of combating "misinformation." Indeed, the Establishment Government is often the primary source of misinformation itself, enabled, in part, by statutes like the SMMA, which legally authorize federal dissemination of domestic propaganda. Thus, the true danger is not "misinformation" as the Government claims; the real danger is Government-driven influence operations masquerading as public-safety initiatives.

336.    On **February 7, 2022**, DHS issued a National Terrorism Advisory Bulletin.[32] It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." The first critical "factor" contributing to a "heightened threat environment [of terrorism]," according to the Bulletin, is "(1) the proliferation of false or

---

[31]    https://www.msn.com/en-us/news/us/fbi-bombshell-274-agents-sent-to-capitol-for-j6-many-later-complained-they-were-political-pawns/ar-AA1Nkyhx

[32]    https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-february-07-2022.

misleading narratives, which sow discord or undermine public trust in U.S. government institutions." *Id.* Again, the first "[k]ey factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or misleading narratives regarding unsubstantiated widespread election fraud and COVID-19. Grievances associated with these themes inspired violent extremist attacks during 2021." The Bulletin stated that DHS is *directly coordinating* with Platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience."

337.    The Government had now redefined free speech as a form of domestic terrorism and a threat to national security, using vague claims of misinformation to silence political dissent. This tactic fully undermines the principles of free expression, suppresses opposing political viewpoints, and helped secure the Administrative State's grip on power, eroding the constitutional protections at the core of American democracy.

338.    On **March 3, 2022**, the Office of the Surgeon General issued a formal Request for Information ("RFI"), published in the Federal Register, seeking information from Platforms and others about the spread of misinformation. The RFI indicated that the Office of the Surgeon General was expanding attempts to control the spread of misinformation on Social Media and other Tech Platforms. The RFI also sought

information about censorship policies, how they were enforced, and information about disfavored speakers. The RFI was sent to Microsoft, Facebook, Google/YouTube, LinkedIn, and Twitter, by Max Lesko (Murthy's Chief of Staff), requesting responses from these Platforms. Murthy again restated Platforms' responsibility to reduce the spread of misinformation in an interview with GQ Magazine. Murthy also specifically called upon Spotify to censor health information.

339.    On **April 12, 2022**, CISA published another bulletin announcing that it was coordinating directly with Platforms to police "Mis, Dis, Malinformation" (which it calls "MDM"). CISA, Mis, Dis, Malinformation.[33] It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." Upon information and belief, these "private sector partners" include Social Media firms like Google/YouTube, and the "reporting and analysis" includes flagging disfavored content for censorship.

340.    On **April 25, 2022**, at a White House press conference after being asked to respond to news that Elon Musk may buy Twitter, Psaki again mentioned the threat to Social Media companies to amend Section 230 of the CDA, linking these threats to Platforms' failure to censor misinformation and disinformation. Ironically, a proper reading of Section 230(c)(1) would, again, actually protect Platforms from being treated as "the publisher or speaker" of another's information when they fail to remove mis or

---

[33] https://www.cisa.gov/mdm

disinformation. Here, however, the Government is implicating a nuanced argument: if the Platform *chose not to act*, like the determination in *Anderson v. TikTok*, it could potentially be held liable for its own decision-making. This nuanced understanding of Section 230(c)(1) (largely ignored by the California Courts submissive to Big Tech) is critical to the proper application of Section 230 protections overall.

341.    On **April 27, 2022,** Mayorkas announced that DHS was creating the "Disinformation Governance Board."[34] "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." He stated: "The goal is to bring the resources of the Department together to address this threat." This is as Orwellian as it gets, the Disinformation Governance Board mirrors the infamous "Ministry of Truth" from Orwell's *1984*, where the government seeks to control narratives, redefine truth, and suppress dissent under the semblance of maintaining order and security.

342.    In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks." Again, how are those two subjects connected?

---

[34]    https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation

343.     On **April 25, 2022,** Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"[35] Psaki responded: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social-media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress."

344.     At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?" She responded by specifically linking the legal threats to the Platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social-media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." Psaki's statement includes a Freudian slip, as she initially uses "we" before backtracking to include Biden. Critics have long-argued that Biden was not the only one in charge (if in charge at all).

345.     The "we" in Psaki's statement likely refers to the broader network of Administrative State actors (the permanent Establishment) coordinating efforts to undermine Americans' rights. This dynamic has become even more apparent in light of

---

[35]  https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/

recent events. President Trump has publicly announced that he has "terminated" approximately 92% of former President Biden's executive orders on the ground that they were autopen-signed without Biden's specific knowledge or personal consent. Whether or not those announcements carry legal effect, the episode underscores a far deeper and longstanding problem: a Governmental apparatus so vast, unaccountable, and self-propelling that even the sitting President may not fully control or personally direct the actions carried out in his name. In reality, many within the political left were far more concerned with preventing President Trump from regaining an unfiltered ability to communicate directly with the American electorate (thereby breaking the Administrative State's grip on information) than they ever were with COVID-19 health safety. That objective ultimately failed, as President Trump overcame that informational blockade in the 2024 election.

346.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation? Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?" Psaki responded: "we engage regularly with all social-media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for – or engagement in those efforts." In other words, the Government's strategy operated on a predictable "carrot-and-stick" model. It would first attempt the carrot

approach with Twitter – encouragement, "partnership," and requests framed as cooperation. But, if that failed, the Government would immediately reach for the stick – the threat of Section 230. That threat was not abstract. The Government could selectively weaponize §230 through the California courts, applying the statute properly to expose Platforms like Twitter to liability if they resisted censorship demands, while refusing to apply the statute properly to insulate Platforms that complied. Put differently, resistance triggered "real" §230 scrutiny; cooperation was rewarded with continued, unlawful §230(c)(1) immunity.

347.    The profound irony here is that the real public health crisis was the Government's active suppression of alternative health information, such as that offered by Westall, which limited (if not outright eliminated) "informed consent." Since then, Fauci and the CDC have both acknowledged risks associated with vaccines. These risks have tragically resulted in physical vaccine injuries and even deaths. In other words, the Government's actions, in coordination with the CCDH and Tech Platforms, not only suppressed vital information but also directly contributed to the loss of lives, a devastating and unconscionable consequence of their ongoing censorship efforts.

348.    Speaking of Fauci's admissions and Westall's efforts to inform the public about COVID-19 and vaccinations, the **December 4, 2024,** House Report is particularly telling. This report, when distilled, validates critics such as Westall while discrediting the actions of the Government and Fauci.

349.    Notably, Fauci and the CDC are not alone in their admissions. As early as October 2020, the FDA acknowledged the dangerous real-world side effects of the COVID-19 vaccination. *See* https://www.fda.gov/media/143557/download

**FDA Safety Surveillance of COVID-19 Vaccines :**
**DRAFT Working list of possible adverse event outcomes**
**\*\*\*Subject to change\*\*\***

- Guillain-Barré syndrome
- Acute disseminated encephalomyelitis
- Transverse myelitis
- Encephalitis/myelitis/encephalomyelitis/
  meningoencephalitis/meningitis/
  encepholapathy
- Convulsions/seizures
- Stroke
- Narcolepsy and cataplexy
- Anaphylaxis
- Acute myocardial infarction
- Myocarditis/pericarditis
- Autoimmune disease

- Deaths
- Pregnancy and birth outcomes
- Other acute demyelinating diseases
- Non-anaphylactic allergic reactions
- Thrombocytopenia
- Disseminated intravascular coagulation
- Venous thromboembolism
- Arthritis and arthralgia/joint pain
- Kawasaki disease
- Multisystem Inflammatory Syndrome
  in Children
- Vaccine enhanced disease

350.    On **April 28, 2022**, Jankowicz (head of DHS' DGB) arranged for a meeting between Secretary Mayorkas and / or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss "public-private partnerships [*i.e.*, psy-ops], MDM, and countering DVE. The meeting is off the record and closed press." This was to be a cozy meeting: Jankowicz, who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." Keeping the meeting "off the record" indicates they were fully aware their conduct violated people's rights; *i.e.*, Defendants' unconstitutional actions to suppress dissent were intentional (knowing and willful), escalating this matter above and beyond mere negligence.

351.    The Government's actions not only violated their constitutional oaths but also suppressed vital information, directly contributing to the loss of lives, a consequence

that underscores the gravity of their coordinated censorship efforts. Such willful disregard for their constitutional duties constitutes a serious violation of the public trust and the Constitution. As legal scholars have noted, serious or serial violations of the Constitution or departure from sworn constitutional duty are grounds for impeachment. This misconduct, therefore, should warrant immediate impeachment proceedings for all Government employees involved herein (if any still hold office) to uphold the integrity of our constitutional system. Every single Government agent involved in the censorship of Americans should be fired and permanently barred from holding any Government position again (which is one such punishment available under the Treason Cause of Action below).

352.    Again, in censoring individuals like Westall, Platforms clearly engage in retroactive enforcement tactics Platforms employ, targeting individuals by changing their policies and then working backwards to find repeated "violations" that were not considered offenses at the time. In some instances, Platforms like Facebook have gone back as much as an entire decade (mentioned previously) to unearth alleged infractions against individuals they aim to suppress. By retroactively applying newly crafted "standards," these Platforms justify revoking interactive services, in violation of their legal duties, that they claim to provide freely to all and for "all ideas," revealing the completely arbitrary and punitive nature of their censorship practices. And Google/YouTube engaged in such retroactivity with respect to Westall.

353.    On **June 13, 2022,** Flaherty demanded Meta continue to produce periodic COVID-19 insight reports to track COVID-19 misinformation, and he expressed a concern about misinformation regarding the upcoming authorization of COVID-19 vaccines for children under five years of age. Meta agreed to do so on June 22, 2022.

354.   On **June 14, 2022**, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled *"A Conversation on Battling Misinformation."* There, McCarthy openly demanded that Platforms censor and suppress speech that contradicted federal officials' preferred narratives on climate change. Now the progression becomes unmistakable: from health, to elections, to climate. What began as "public-health safety" morphed into "election integrity," and then into "climate misinformation." This episode exposes a critical truth – the classic slippery slope of Governmental censorship. Once the Government succeeded in compelling Platforms to suppress one category of disfavored speech, the scope of censorship expanded seamlessly into others.

355.   The Government's censorship operation was not confined to the GEC, CISA, the White House COVID team, or any single federal actor; nor was it confined to any single subject matter such as public health or elections. It was multi-agency, multi-issue, and omnidirectional, a coordinated Establishment-level scramble to preserve status-quo power by controlling the flow of information across every politically sensitive domain. In short, the moment Platforms capitulated on COVID or elections, the Government pressed further, treating all contested issues (health, elections, climate) as interchangeable pretexts for expanding federal narrative control.

356.   During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis- and-disinformation around climate change online and in other platforms' has 'made your job harder?'" "McCarthy responded by slamming social-media companies: 'We have to get tighter, we have to get better at communicating, and frankly, the tech

companies have to stop allowing specific individuals over and over again to spread disinformation.'" "She suggested further that 'we have to be smarter than that and we need the tech companies to really jump in.'" "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'"

357.    On **June 17, 2022**, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet, which owns Google/YouTube, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy resource centers.[36] The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if Platforms do not increase censorship, such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal. The letter cited "research by the Center for Countering Digital Hate (CCDH)," the same organization that Jen Psaki and the White House coordinated with to demand censorship. The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics. The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps;" that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions;" and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like

---

[36] https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf

abortion on Google Search and Google Maps." Now the Government's censorship demands had expanded yet again, moving from "public health" safety, to "election" safety, to "climate" safety, and now to suppressing information related to protecting unborn children, a category that plainly has nothing to do with public safety at all.

358.    In sum, the Government is not only advocating for the killing of unborn babies, but also actively working to suppress differing viewpoints. It is one thing to debate the legislative merits of abortion, but it is entirely another thing for Government actors to impose their opinions on public discourse, let alone coordinate with private entities to suppress opposing perspectives. The unavoidable question is – why is the Government using censorship to suppress life-affirming information? Such conduct is, at minimum, morally troubling and far outside any legitimate conception of "safety."

359.    This episode also reveals that the censorship regime extended far beyond traditional Platforms. It reached into mapping and navigation systems themselves (core digital infrastructure), demonstrating just how deeply embedded Government viewpoint suppression had become across multiple layers of the information ecosystem.

360.    On **June 23, 2022,** Facebook assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5-years old (a highly controversial topic) would be censored.[37]

361.    On **August 26, 2022**, Zuckerberg appeared on "The Joe Rogan Experience" podcast and, when asked about Facebook's censorship of the Hunter Biden laptop story, revealed that Facebook had acted as a result of communications from the FBI.

---

[37] https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html

362.    Zuckerberg stated: "The FBI came to us" and told Facebook to be "on high alert," asserting to Facebook that there had been "a lot of Russian propaganda" in the 2016 presidential election, and warning Facebook that "there's about to be some kind of dump that's similar to that, so just be vigilant."[38]

363.    On **March 7, 2023,** it was revealed that in mid-December 2022, after publication of the initial installment of the Twitter Files, instead of investigating possible violations of the First Amendment by Government actors seeking to induce, encourage, and promote Social Media censorship, the Biden Administration instead commenced an investigation of Twitter and the Twitter Files journalists. Notably, on December 13, 2022, the Federal Trade Commission sent private communications to Twitter demanding that Twitter disclose its interactions with Twitter Files journalists "Bari Weiss, Matt Taibbi, [and] Michael Shellenberger" and "[i]dentify all journalists and other members of the media" with whom Twitter had shared internal documents.[39] The exposed information threatened the Administrative State's agenda; hence, the Administration targeted Twitter and whistleblowing journalists instead of investigating possible violations of the First Amendment. This reveals a deliberate effort to suppress dissent and control the narrative rather than uphold constitutional protections.

364.    On **March 9, 2023**, Matt Taibbi provided the following statement to Congress regarding the "Twitter Files:"

---

[38] https://www.bbc.com/news/world-us-canada-62688532.

[39] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Weaponization_Select_Subcommittee_Report_on_FTC_Harrassment_of_Twitter_3.7.2023.pdf

*We learned* Twitter, Facebook, Google, and other companies developed a formal system for taking in moderation 'requests' from every corner of government: the FBI, DHS, HHS, DOD, the Global Engagement Center at State, even the CIA. For every government agency scanning Twitter, there were perhaps 20 quasi-private entities doing the same, including Stanford's Election Integrity Project, Newsguard, the Global Disinformation Index, and others, many taxpayer-funded.

A focus of this fast-growing network is making lists of people whose opinions, beliefs, associations, or sympathies are deemed 'misinformation,' 'disinformation,' or 'malinformation.' The latter term is just a euphemism for 'true but inconvenient.'

### *YouTube's Treatment of Westall*

**1.    Westall's Lawful Platform Participation and Reliance (Pre-2020)**

365.    Westall was lawfully participating in the online Social Media marketplace as an independent journalist and commentator, using YouTube as the primary Platform to publish and distribute long-form video programming to the public.

366.    Westall's channel consisted of news, commentary, and interview-based programming on matters of public interest, including Government policy, public health, economics, and other related topics. Her content was presented as journalistic inquiry and debate, including interviews and discussions with credentialed experts.

367.    Prior to her deplatforming in 2020, Westall had invested substantial time, effort, and professional capital in building her YouTube channel's audience and credibility. By 2020, her main YouTube channel had amassed approximately 130,000 subscribers and served as a core distribution channel for her work.

368.    YouTube was not merely one outlet among many. It was the dominant Platform for video-based discovery, recommendation-driven audience growth, and creator monetization, and it functioned as an essential gateway to visibility in the modern digital media ecosystem. Westall relied on access to YouTube's platform infrastructure,

(including search placement, meritorious recommendations, subscriber notifications, and monetization systems) to maintain and grow her audience, develop business relationships, and sustain her media enterprise.

369.    Because Westall's audience growth depended on YouTube's network effects and algorithmic distribution systems, a Platform-wide termination carried predictable and severe consequences; *e.g.*, immediate loss of reach, interruption of growth momentum, loss of accumulated channel trust signals, and forced exclusion from the primary online marketplace for video-based journalism.

## 2.    Government-Aligned Enforcement and Initial Deplatforming (2020)

370.    Beginning in early 2020, YouTube materially altered its content-moderation practices in response to pressure from Government officials regarding COVID-19–related speech. As later admitted by Alphabet, Google's parent company, in written submissions to Congress prepared by its counsel King & Spalding (discussed above, and captured in Ex. A), Google and YouTube modified and enforced their policies based on pressure exerted by the Biden Administration and other federal actors to suppress disfavored content. Consistent with those admissions, YouTube announced that it would remove or restrict content that conflicted with guidance issued by the World Health Organization ("WHO") and other Government-affiliated public health authorities, regardless of whether such content was presented by credentialed experts or framed as journalistic inquiry, debate, or opinion.

371.    During this period, Westall's channel became subject to escalating enforcement actions tied to these newly imposed, Government-induced "medical misinformation" standards. YouTube removed multiple videos from her channel on the

grounds that the content conflicted with WHO guidance or official Government narratives, even though the videos consisted of interviews and discussions with board-certified medical doctors, PhD-level scientists, and other equally credentialed professionals YouTube relied on.

372.   Birds of a feather tend to flock together – the uncredible nature of the WHO paralleled the uncredible nature of YouTube. Not surprisingly, on January 22, 2026, the United States withdrew from the WHO. Per the U.S. Department of Health and Human Services, the withdrawal "decision was made due to the WHO's failures during the COVID-19 pandemic and its inability to demonstrate independence from political influence." An organization who got COVID-19 wrong and was politically influenced was the organization that guided YouTube's decisions to crush Westall.

373.   Representative examples include, but are not limited to:

- A May 6, 2020, interview titled *"Chloroquine Explained with Dr. John Campbell,"* removed for purported medical misinformation despite featuring a licensed physician explaining peer-reviewed research and clinical observations.

- A May 20, 2020, episode titled *"Real Issues Becoming Clear with Dr. Joe N. and Dr. Judy Mikovits,"* removed for conflicting with WHO guidance, notwithstanding that it consisted of expert commentary on emerging scientific data.

- An August 2, 2020, episode titled *"Plague of Corruption with Dr. Judy Mikovits,"* removed after publication despite the absence of any strike designation or identification of false statements.

374.   In addition to outright removals, YouTube imposed age restrictions and visibility limits on politically sensitive content unrelated to medical claims, including interviews addressing civil unrest, election integrity, and Government accountability. These actions further suppressed distribution while avoiding transparent policy justification.

375.    Notably, YouTube terminated Westall's participation in the YouTube Partner Program on March 30, 2020 (months before her channel was permanently removed), tortiously cutting off monetization despite her continued compliance with stated eligibility thresholds. This monetization termination coincided with the rollout of COVID-related enforcement policies and marked the beginning of progressive escalation against her channel and speech.

376.    Throughout this period, YouTube issued automated enforcement notices that cited deliberately ambiguous and generalized policy language without identifying specific statements, timestamps, or rule applications. Appeals submitted by Westall were denied through automated or summary responses, offering no meaningful explanation and no opportunity to cure or contextualize the content.

377.    On October 15, 2020, YouTube terminated Westall's primary channel in its entirety, citing "repeated or severe violations of our Community Guidelines." The termination occurred without advance warning, without identification of any specific violative content, and without an opportunity to remedy alleged deficiencies. At the time of termination, Westall's channel had approximately 130,000 subscribers and represented years of accumulated content, audience development, and professional investment.

378.    Following the termination, YouTube denied Westall's appeal for reinstatement without explanation. The Platform did not identify any specific video, policy provision, or conduct justifying permanent removal, nor did it dispute that the underlying content consisted of expert interviews and commentary on matters of public concern. As a result, Westall was immediately excluded from YouTube's platform, deprived of access to her audience, and cut off from monetization and professional visibility.

379.    These unlawful enforcement actions occurred contemporaneously with similar removals and suppressive measures taken against other independent journalists and conservative commentators who questioned or critiqued official COVID-19 narratives. As later confirmed through congressional investigations, Government disclosures, and admissions by Platform executives, these actions formed part of a broader pattern of Government-aligned pressure and coordination aimed at suppressing disfavored speech during this period.

380.    Westall's deplatforming marked the beginning of a prolonged exclusion from the dominant marketplace for video-based journalism. Because the courts later treated YouTube's conduct as immune from suit under Section 230(c)(1), Westall was denied any opportunity to obtain discovery, challenge the factual basis for her termination, or determine whether her removal was the product of Government inducement, privately unlawful conduct, or both. *See* n. 5, *supra*.

### 3.    Authority Suppression, Incomplete Restoration, and Disparate Platform Treatment

381.    Defendants' misconduct did not end with the initial removal of Westall's YouTube channel in 2020. Instead, Defendants imposed a sustained pattern of authority suppression, shifting enforcement rationales, delayed and non-transparent review, and incomplete restoration designed to deny Westall neutral Platform treatment and further prevent recovery of her professional standing, audience reach, and economic opportunity.

382.    On August 12, 2024, YouTube *sua sponte* reinstated Westall's channel after further review and expressly stated: "After taking another look, we can confirm that your channel does not violate our Community Guidelines," and "we've put your channel back on YouTube." This communication constituted an unequivocal admission that, as of that

date, YouTube determined Westall's channel did not violate its policies, and that the prior enforcement posture was not sustainable under YouTube's own stated standards.

383.    *Two days later,* on August 14, 2024, YouTube again removed Westall's channel, this time asserting "repeated violations of our harassment policy," without identifying any specific content, any alleged target, any timestamps, or any coherent explanation reconciling the removal with YouTube's admission two days earlier that her channel did not violate its Community Guidelines. The abrupt reversal, immediately following an express reinstatement, reflected shifting and pretextual (*i.e.,* bad faith) enforcement "rationales" rather than consistent application of neutral Platform rules.

384.    Westall promptly appealed the August 14, 2024, removal through YouTube's formal appeals process. Although YouTube ultimately rejected the appeal, the decision was effectively withheld for an extraordinary period of more than eleven months, thereby prolonging Westall's exclusion and depriving her of any timely or meaningful review. The final denial, dated July 25, 2025, was issued only after counsel-level intervention and nevertheless relied on a conclusory assertion of repeated "harassment," without identifying any specific statements, conduct, targets, or timestamps that could be tested, corrected, or meaningfully challenged. Even after escalation through counsel, YouTube refused to articulate any factual basis for conduct allegedly occurring "repeatedly" between August 12 and August 14, 2024 (a period during which Westall uploaded only four videos) or to reconcile that assertion with YouTube's prior admissions that Westall's channel did not violate its Community Guidelines.

385.    The sequence itself demonstrates disparate, deceptive, and non-neutral treatment. Between August 12 and August 14, 2024, Westall uploaded only a minimal

number of new videos, none of which plausibly support YouTube's claim that she had "repeatedly" violated a harassment policy within a two-day window, especially amidst YouTube's contemporaneous admission that the channel did not violate its Community Guidelines. Defendants' assertion of "repeated" harassment violations was facially incompatible with both the timing and YouTube's own reinstatement language, evidencing arbitrary enforcement untethered to any stable rule set.

386.    From July 25, 2025, until October 23, 2025, YouTube's public-facing page stated that Westall had been removed for "cyberbullying and harassment." Then, on October 23, 2025, YouTube abruptly changed the asserted basis yet again, now stating that Westall was removed for general "community guidelines violations." YouTube, again, provided no explanation for the repeated shifting rationale – from the 2020 "medical misinformation" posture (as reflected in repeated notices during 2020), to the later "cyberbullying and harassment" justification, and then back to generalized "community guidelines violations." This pattern of rotating "justifications" further evidences pretext and the absence of any consistent, good faith content-based rationale.

387.    The disparate treatment extended even beyond Westall's primary channel. YouTube also removed Westall's backup channels, including a first backup channel created on October 18, 2020, and removed on November 18, 2020, and a second backup channel created on July 2, 2023, and removed on August 16, 2024. The second backup channel was similarly removed following multiple "medical misinformation" strikes, reflecting continued reliance on the same COVID-era enforcement architecture even as Google/YouTube rotated public-facing rationales for other removals.

388.    On October 30, 2025, YouTube reinstated Westall's channel again, stating that upon further review the channel did not violate YouTube's policies (it never did). Yet even where Google/YouTube offered nominal reinstatement, they failed to provide full restoration of authority status and neutral treatment. Westall's reinstatements were not accompanied by a complete normalization of channel history, authority signals, internal trust classifications, recommendation eligibility, or other distribution treatment consistent with similarly-situated creators, thereby preserving the functional consequences of the original removal while allowing Google/YouTube to claim "reinstatement" in form. In effect, however, Westall's channel was restored in name only … it remains algorithmically constrained, authority-suppressed, and reputationally impaired, rendering the reinstatement illusory rather than remedial.

389.    This pattern (express reinstatement admissions followed by rapid removal, prolonged withholding of appeal outcomes, and repeated reshuffling of asserted justifications) constitutes authority suppression and incomplete restoration as an operational method, not an isolated error. It deprived Westall of stable access to the dominant Platform necessary to compete in her market, and it repeatedly imposed penalties that conveyed the false public signal that Westall was disfavored, untrustworthy, or sanctioned, irrespective of the actual merits or lawfulness of her work.

390.    By foreclosing discovery and insulating these enforcement decisions from meaningful judicial review through the misapplication of Section 230(c)(1) (discussed next), the Government prevented Westall from timely challenging the suppression of her authority, the shifting and pretextual enforcement rationales, and the disparate treatment imposed upon her channel. This insulation enabled prolonged delay, which magnified harm

by allowing authority degradation and market exclusion to persist through successive market cycles, while Google retained unilateral power to remove, reinstate, re-remove, and relabel the asserted justification for enforcement without judicial accountability.

391.    Taken together, Defendants' conduct reflects a sustained pattern of authority suppression, rotating and unsupported rationales, delayed and opaque review, and incomplete restoration. Although Westall was nominally reinstated, she was not restored in function. The systems that confer credibility, reach, and economic viability were repeatedly disabled or withheld in a manner inconsistent with neutral enforcement and consistent with ongoing censorship and anticompetitive injury.

**4.    Denial of Judicial Redress and Foreclosure of Discovery**

392.    After the 2020 termination and renewed removal of her YouTube channel, Westall sought judicial relief to challenge the legality of Google's conduct and to determine whether her deplatforming was the result of Government inducement, private unlawful action, or a combination of both. Westall was a named plaintiff in *Doe v. Google LLC*, filed in the United States District Court for the Northern District of California in October 2020. That action directly challenged Google's removal of her channel and the suppression of her content.

393.    At the pleading stage, however, the district court dismissed Westall's claims under an expansive and unconstitutional interpretation of Section 230(c)(1), treating Google's conduct as categorically immune from suit. The dismissal occurred before any discovery was permitted and without factual development concerning the origin, motivation, or coordination underlying the enforcement actions taken against Westall.

155

394.    As a result, Westall was denied any opportunity to obtain evidence regarding whether federal officials had pressured, encouraged, or jointly participated with Google in the enforcement decisions at issue; whether her content was classified, flagged, or escalated pursuant to Government-aligned narratives or directives; or whether similarly-situated speakers were treated differently based on viewpoint or subject matter. The federal court's application of Section 230(c)(1) operated not as an affirmative defense to liability, but as a procedural bar (an absolute threshold immunity) that extinguished adjudication itself (evidence of State-induced harms). *See* n. 5, *supra*.

395.    Critically, it was not Google that denied Westall a forum to adjudicate her claims. Rather, it was the judiciary's construction and application of Section 230(c)(1) that foreclosed access to the courts, barred discovery, and prevented any inquiry into the lawfulness of the challenged conduct. By unconstitutionally terminating the case at the threshold (in contravention of constitutionally guaranteed due process rights), the court foreclosed adjudication and ensured that the central factual question (whether Westall's removal was Government-induced or privately unlawful) could never be answered,[40] insulating the challenged censorship conduct from all judicial scrutiny.

396.    That deprivation was not isolated. As demonstrated by the California courts' repeated refusal to consider the misapplication and constitutionality of Section 230(c)(1) in materially similar cases, including *Fyk v. Facebook*, the forum has proven structurally incapable of adjudicating claims that challenge the judicial expansion of

---

[40] As to Government-induced versus private action, and in order to induce an inappropriate dismissal, we would be remiss if we did not mention that Google also lied in Westall's prior proceeding as to its involvement with Government in the CIC. "Lied" as evidenced by Ex. A, released by Alphabet's counsel months after Westall's prior case had been extinguished.

Section 230 as a form of absolute immunity. *See* **Exhibit C**, attached hereto and

incorporated fully herein by reference.[41] The Ninth Circuit's application of Section

---

[41] Exhibit C is attached hereto and incorporated fully herein by reference. Ex. C is a doctrinal case study documenting (chronologically) the past two-plus decades of judicial drift in California's federal court system in the application of §230(c)(1) from a narrow rule of substitution into a *de facto* grant of unfettered immunity untethered from statutory text and constitutional limits. The case study revolves around *Fyk v. Facebook*, No. 4:18-cv-05159-HSG (N.D. Cal.) because, throughout eight years of N.D. Cal. / Ninth Circuit litigation, the *Fyk* case hit on every angle of §230 jurisprudence that the Ninth Circuit and its bound District Courts have gotten wrong over the course of nearly three decades. Ex. C, in the spirit of full transparency, is one section of a massive constitutional challenge / collateral attack that will be launched in another jurisdiction in the months to come as it concerns *Fyk* pursuant to (a) the *Fyk* Ninth Circuit panel's urging Fyk to pursue an independent action elsewhere to set aside judgment; and (b) the *Fyk* N.D. Cal. court (Judge Gilliam, Jr.) advising Fyk to never come back to California unless SCOTUS intervened while also threatening to revoke undersigned counsel's *pro hac vice* status if Fyk dared come back. The structural drift illustrated by Ex. C largely originated and became entrenched within California courts and is evidenced by, for example, that jurisdiction's failure to adjudicate a properly raised (and DOJ–acknowledged) constitutional challenge in *Fyk v. Facebook*, a denial of process that itself constitutes an independent due process violation. This Court (and the Platform Defendants and the DOJ) is accordingly afforded an early view into the doctrinal and constitutional record that will form the foundation of *Fyk v. United States, et al.*, an impending independent constitutional challenge and collateral attack poised to become one of the most consequential cases in modern American jurisprudence, implicating Ninth Circuit structural infirmity, in turn implicating due process, equal protection, separation of powers, and their cascading effects on free speech, with extensive focus on the Ninth Circuit and its bound District Courts. *This case study is featured in this Complaint because the very first bit of maneuvering / gamesmanship the Platform Defendants will likely attempt here will be transfer to the N.D. Cal. It is quite important, therefore, that Westall gets ahead of that issue and immediately punctuates for this Court (vis-à-vis Ex. C) the pro-Tech bias/prejudice the Ninth Circuit and its District Courts exhibit pursuant to a Ninth Circuit policy choice that the Ninth Circuit and its District Courts "must" adhere to the policy of protecting Big Tech defendants from costly and protracted litigation. See, e.g., Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174-1175 (9th Cir. 2008) ("section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles"). The Ninth Circuit's litigation avoidance policy (not law) has consistently resulted in pro-Tech outcomes spanning nearly three decades, a growing public distrust for the Ninth Circuit and its District Courts as to §230 and overall, and a chilling effect on litigation as a whole. This Court must resist the Platforms' prospective effort to transfer this matter to a jurisdiction (N.D. Cal.) that is overtly biased/prejudiced in favor of Big Tech. Offering more on this subject without bogging this Complaint down too much with anticipatory material, we attach hereto as **Exhibit D** a

230(c)(1) now stands not only in direct conflict with the interpretations adopted by multiple sister circuits, but also in tension with its own precedent recognizing limits on immunity where Platforms engage in affirmative conduct.[42] If this case were in that forum, the same due process injury would occur by subjecting Westall's claims to a judicial framework that has already foreclosed (and routinely forecloses) discovery, factual development, and constitutional review. The Constitution does not require a litigant to relive a proven denial of due process in order to preserve venue.

397.    The dismissal of *Doe v. Google LLC*, therefore, transformed Westall's deplatforming from a discrete enforcement action into a durable and insulated constitutional injury. By blocking adjudication at the threshold through the systemic misapplication of Section 230(c)(1), the courts converted the underlying censorship (whether Government-induced or privately unlawful) into an ongoing, unreviewable harm sustained through joint participation and judicial insulation. Without discovery or adjudication, the censorship decisions were rendered effectively irreversible by the United States. The judicial foreclosure of review enabled both the Government and the Platform

---

March 3, 2026, Motion to Retransfer [D.E. 138] (sans all exhibits other than Ex. B) in *Webseed, Inc., et al. v. Dept. of State, et al.*, No. 3:25-cv-03020-AMO (N.D. Cal.) and fully incorporate same herein by reference.

[42] The Ninth Circuit's expansive "immunity" theory directly contradicts §230's text, congressional intent, and the constitutional guarantee of due process. It is now squarely at odds with decisions from, at the very least, the Third, Fourth, and Fifth Circuits. *See, e.g., Anderson v. TikTok, Inc.*, No. 22-3061, 2024 WL 3948248 (3d Cir. Aug. 27, 2024); *Henderson v. The Source for Public Data, L.P., et al.*, 53 F.4th 110 (4th Cir. 2022); *A.B. v. Salesforce, Inc.*, 123 F.4th 788 (5th Cir. 2024). The Judiciary's own case law is even conflicted. *See, e.g., Fyk v. Facebook cf. Enigma Software Group USA, LLC v. Malwarebytes, Inc., Dangaard v. Instagram, Diep v. Apple, Lemmon v. Snap, Inc.*, and *et cetera*.

to characterize the same conduct as immune from challenge, leaving Westall without any meaningful avenue for redress.

398.    This denial of due process compounded the harm caused by Westall's removal. It converted Platform enforcement into permanent market exclusion by preventing timely corrective relief, enabling ongoing suppression, and allowing secondary harms (such as reputational damage, impersonation, and economic loss) to proliferate unchecked. The (California) judicial misapplication of Section 230(c)(1) accordingly served as a critical link in the causal chain connecting Government-enabled censorship to Westall's continuing injuries.

399.    The denial of discovery and adjudication in Westall's prior action exemplifies the structural due process violation challenged in this Complaint. By insulating censorship decisions from judicial scrutiny at the pleading stage, courts deprived Westall of the procedural safeguards necessary to vindicate her constitutional and statutory rights, leaving her injuries unremedied and ongoing.

### 5.    Compounding Secondary Harms and Market Displacement

400.    The denial of judicial redress did not merely leave Westall without a forum to challenge her removal, it enabled a cascade of secondary harms that compounded over time and entrenched her exclusion from the digital media marketplace. Once Westall was deplatformed and barred from obtaining timely corrective relief, the initial enforcement action metastasized into broader and more durable injuries that extended well beyond the loss of a single channel.

401.    First, Westall suffered prolonged market exclusion from the dominant Platform for long-form video journalism.[43] YouTube occupies a uniquely central position in audience discovery, algorithmic amplification, advertising integration, and cross-Platform legitimacy. Removal from YouTube, therefore, functioned as exclusion from the primary marketplace for video-based news and analysis. During the critical 2020–2021 period, when online media consumption experienced unprecedented growth, Westall was unable to participate on equal terms, while institutional and Government-aligned media entities continued to operate without comparable constraint.

402.    Second, Westall experienced severe reputational harm arising directly from her removal and continued suppression. Deplatforming signaled to audiences, potential collaborators, and business partners that her content was disfavored, unreliable, or prohibited, notwithstanding its reliance on credentialed experts and matters of public concern. This reputational injury was magnified by the absence of any adjudicated finding of wrongdoing and by the courts' refusal to permit factual development that could have corrected or contextualized the enforcement actions taken against her.

403.    Third, Westall became vulnerable to impersonation, misattribution, and unauthorized re-uploads of her content. With her primary channel removed and later suppressed, third parties were able to exploit her identity and prior work without effective recourse. These impersonation and re-upload practices diluted her brand, diverted audience attention, and further impaired her ability to reestablish control over her professional identity and body of work.

---

[43] This "first" point, as well as the following four points, are illustrated by some of the materials contained in composite **Exhibit E**, attached hereto and fully incorporated herein by reference.

404.    Fourth, Westall sustained substantial and continuing economic harm. The loss of Platform access and algorithmic visibility directly impaired monetization opportunities, advertising revenue, sponsorships, partnerships, and ancillary business activities tied to audience reach and influence. These losses were not speculative or temporary, they resulted from the interruption of audience compounding, algorithmic trust, and momentum that are foundational to long-term growth in digital media markets and that cannot be retroactively restored once severed.

405.    Fifth, the harms suffered by Westall were not isolated or incidental, but occurred as part of a broader pattern of Government-induced displacement affecting similarly-situated independent journalists and commentators. As reflected in the records developed in related proceedings (*e.g., Cancer Step Outside the Box, LLC, et al. v. Dept. of State, et al.*, No. 3:25-cv-07399-AMO (N.D. Cal.); *Webseed, et al. v. Dept. of State, et al.*, No. 4:25-cv-03020-AMO (N.D. Cal.); *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023)), including the Ninth Circuit record in which Westall was a named party (*Doe*), independent creators who collectively reached audiences rivaling or exceeding those of mainstream media were removed or suppressed, while institutional and State-aligned outlets were permitted to grow and consolidate market share. Westall's exclusion, therefore, resulted from and contributed to an unconstitutional reordering of the digital media marketplace.

406.    Taken together, these secondary harms (set in motion by the Government and knowingly perpetuated through judicial insulation) transformed Westall's deplatforming into long-term exclusion from market participation, professional parity, and competitive opportunity. By inducing and encouraging Platform enforcement and then foreclosing judicial review through the misapplication of Section 230(c)(1), the

Government aided and abetted Google's unlawful suppression by ensuring that the resulting harms could not be tested, corrected, or enjoined. The denial of discovery and adjudication allowed the initial enforcement action to operate as a *de facto* permanent restraint, not as a contestable or reversible Platform decision, but as an insulated and enduring deprivation of rights.

407.    These compounding injuries are directly traceable to the same Government-enabled censorship regime and judicial insulation alleged throughout this Complaint. They represent foreseeable and ongoing consequences of a system in which dominant Platforms are encouraged to suppress disfavored speakers, while courts foreclose the procedural mechanisms necessary to challenge, correct, or remedy that suppression.

**6.    Incomplete Reinstatement, Continuing Suppression, and Uncured Injury**

408.    Although YouTube nominally reinstated Westall's channel recently, she was not restored to a neutral or baseline Platform status. Instead, the reinstatement preserved and carried forward the economic, reputational, and market effects of the original deplatforming through continued algorithmic suppression, authority denial, and distribution constraints. As a result, the injury inflicted in 2020 / 2024 was never cured; *i.e.*, the bulk (if not entirety) of the injuries complained of herein remain and, barring rectification by way of this litigation, are destined to continue.

409.    Following reinstatement, Westall's channel remained subject to hidden distribution limits (commonly referred to as "shadow-banning"), negative internal trust signals, and artificially reduced recommendation eligibility. These constraints materially impaired reach, visibility, and discoverability despite the absence of any policy violations and notwithstanding YouTube's express admissions that Westall's content did not (and

never did) violate Community Guidelines. Although Alphabet publicly represented to Congress that creators wrongly removed during the COVID-19 enforcement period would be reinstated, Westall's experience demonstrates that such representations were hollow in practice – creators could be reinstated in name while remaining suppressed in substance.

410.    The continuation of these controls confirms that reinstatement was formal rather than remedial. Defendants preserved the same exclusionary effects that resulted from the original removal, extending the duration of injury and preventing recovery of lost momentum, audience compounding, and market position. Each suppressed publication perpetuates the same harm initially inflicted, rendering the injury ongoing.

411.    This continued suppression defeats any contention that the challenged conduct has ceased or that the case is moot. Nominal reinstatement (without removal of residual enforcement signals, restoration of authority classifications, or normalization of distribution treatment) does not return Westall to equal footing or eliminate the effects of prior misconduct. The same mechanisms that suppressed Westall's content in 2020 and 20224 remain operative today, confirming that the injury persists notwithstanding Defendants' public assurances to the contrary.

412.    Moreover, the incomplete reinstatement reinforces the constitutional injury identified throughout this Complaint. By insulating Platform enforcement decisions from discovery and judicial review through misapplication of Section 230(c)(1), the Government ensured that suppression could continue without accountability, explanation, or remediation. Westall remains unable to determine the basis for ongoing limitations or to secure corrective relief absent this litigation.

413.    Accordingly, the continuing restrictions imposed on Westall's channel constitute a continuation of the original injury, not a separate or intervening event. The failure to fully restore Westall's Platform access, authority status, and distribution eligibility confirms that Defendants' conduct is ongoing and that declaratory and injunctive relief are necessary to cure the harm and prevent its recurrence.

### 7.    Economic Harm, Market Displacement, and Escalating Damages

414.    Defendants' combined conduct (whether through Government-induced censorship or through the judicial denial of any remedy for privately unlawful misconduct, for examples) caused Westall substantial and escalating economic harm that extends far beyond initial lost income. That harm includes, for examples, market displacement, destruction of growth trajectory, loss of compounding opportunity, and damages that continue to increase over time. These injuries were not confined to the initial moment of deplatforming in 2020, but have intensified as digital media markets evolved and as Westall's monetization readiness, audience sophistication, and commercial value materially increased.

415.    At the time of her initial removal in October 2020, Westall had already established a significant and rapidly growing audience on YouTube, with approximately 130,000 engaged subscribers. This growth placed her within a cohort of independent journalists and commentators whose collective audience reach exceeded that of mainstream media outlets across both online and traditional distribution channels. As reflected in the Ninth Circuit record in *Doe*, in which Westall was a named plaintiff, these creators were not marginal participants in the media ecosystem, but dominant market actors whose reach rivaled, and in some cases surpassed, that of institutional media.

416.    Following the 2020 deplatforming actions, Westall and similarly-situated independent creators were excluded from meaningful market participation, while institutional and Government-aligned media entities were permitted to continue expanding without comparable constraint. This exclusion did not result from neutral or uniformly applied enforcement of private Platform rules. Rather, it reflected a suppression regime that disproportionately burdened disfavored independent speakers while permitting the continued amplification and substitution of favored institutional voices, resulting in anticompetitive and unconstitutional market displacement. Westall was removed from a position of competitive parity at a critical inflection point, permanently altering her prospective growth trajectory and market position.

417.    Westall's economic injury has compounded over time because the value of independent authority media has increased substantially since 2020. Advertisers, sponsors, and audiences now place heightened value on trusted independent voices operating in high-credibility verticals such as finance, law, geopolitics, and public policy, categories that command premium advertising rates and sponsorship demand. Westall's content squarely occupies these highest-value categories. As a result, each period of continued suppression inflicted greater economic loss than earlier periods, increasing damages over time rather than merely extending them.

418.    Westall's damages extend beyond lost income and include material injury to advertiser trust and commercial viability caused by the association of her name and work with toxic, inappropriate, counterfeit, and/or unstable content environments during the

period of suppression.[44] Independent industry research conducted by *Integral Ad Science* ("IAS"), a leading global authority on digital advertising verification and brand safety, establishes that advertisers systematically avoid placing ads adjacent to content associated with impersonation, identity abuse, enforcement instability, or explicit material.[45] IAS studies demonstrate that such associations materially reduce brand trust, purchase intent, and campaign effectiveness, leading advertisers to exclude affected creators entirely rather than risk reputational exposure.

419.    Similarly, research published by the *Asia-Pacific Advertising Consumer* ("APAC") consortium confirms that advertisers are significantly more likely to withdraw or withhold spending on publishers whose content environments are subject to identity abuse, impersonation, or algorithmic instability, even where the publisher is not responsible for the unsafe content.[46] These findings mirror Westall's experience. During the period in which Defendants suppressed her legitimate content while allowing impersonation channels and explicit or defamatory material to populate search and discovery systems associated with her name, Westall was rendered commercially "brand

---

[44] Illustrated by composite **Exhibit E**, attached hereto and fully incorporated herein by reference.

[45] Integral Ad Science: "Advertising in the age of misinformation: How Consumer Perception of Misleading Content impacts Brand Favorability": HTTPS://INTEGRALADS.COM/INSIDER/ADVERTISING-AGE-MISINFORMATION-CONSUMER-RESEARCH  (73% of consumers say that they feel unfavorably toward brands that have been associated with misinformation, and 65% of consumers report that they are unlikely to purchase a product or service from a brand that advertises near misinformation).

[46] APAC: "Brand safety and suitability: Why context is your first line of defense": https://marketech-apac.com/brand-safety-and-suitability-why-context-is-your-first-line-of-defense ("More than 70% of consumers say they'd feel less favourable toward a brand whose ads appear near inappropriate content").

unsafe" through no fault of her own. As a result, sponsorship interest declined, partnership confidence eroded, and commercial conversion was impaired, producing market exclusion rather than mere revenue reduction.

420.    Although Westall rebuilt audience reach and distribution on alternative Platforms, those efforts do not mitigate her damages. YouTube remains the dominant Platform for video discoverability, monetization, and algorithmic amplification, with no functional substitute. Loss of access during the peak growth period severed compounding audience momentum, destroyed algorithmic trust, and eliminated first-mover advantages that cannot be retroactively restored. These losses represent permanent economic injury rather than temporary disruption.

421.    Following Westall's nominal reinstatement on or about October 30, 2025, Defendants continued to impose distribution caps and authority suppression that prevented recovery. Rather than restoring Westall to her pre-suppression market position, Defendants' incomplete reinstatement preserved the economic consequences of the original deplatforming while extending the duration of harm. Each suppressed upload represented lost impressions, lost monetization opportunities, lost sponsorship exposure, and diminished negotiating leverage, producing cumulative and accelerating damages.

422.    Objective performance metrics establish that Westall's continued economic harm is not attributable to market forces, audience disinterest, or content quality. Westall's content demonstrates strong audience engagement and demand across Platforms, including substantially higher view counts on competing services with smaller subscriber bases. This disparity confirms that the suppression of Westall's reach is Platform-specific and policy-driven, not market-driven.

167

423.    The economic harm to Westall was accompanied by foreseeable professional and personal consequences that further impaired her commercial capacity. Research published in *Frontiers in Psychology* reports that victims of sustained harassment or abuse are three to five times more likely to experience long-term anxiety and loss of professional confidence when the abuse originates from, or is protected by, a powerful entity such as Government or a multinational corporation, particularly when meaningful recourse is unavailable.[47] Westall's experience tracks that pattern – prolonged suppression, recurring enforcement actions, and denial of timely remedy impaired her ability to maintain professional momentum, sustain business development, and preserve the confidence of sponsors and partners.

424.    The Government's misapplication of Section 230(c)(1) already foreclosed discovery and insulated State/Platform enforcement decisions from review at the time the harm occurred. By preventing Westall from timely challenging the suppression and market exclusion, the Government allowed economic injury to persist unchecked through successive market cycles. The delay itself magnified damages by permitting suppression to continue during periods of extraordinary growth in digital media markets.

425.    Taken together, Westall's economic injuries include, but are not necessarily limited to, lost income, lost growth, loss of market position, destruction of compounding opportunity, advertiser exclusion, and escalating future earnings impairment. These harms are direct, foreseeable, and continuing consequences of Defendants' conduct. Absent

---

[47] Frontiers in Psychology: "Loss of Trust May Never Heal. Institutional Trust in Disaster Victims in a Long-Term Perspective: https://www.frontiersin.org/journals/psychology/articles/10.3389/fpsyg.2018.01204/full Foundational Study (Freyd/Smith) University of Oregon: "Institutional Betrayal and Institutional Courage": https://dynamic.uoregon.edu/jjf/institutionalbetrayal/

declaratory and injunctive relief restoring Westall to equal market footing and neutral Platform treatment, the damages will continue to compound.

### 8. Reputational Harm, Authority Destruction, Impersonation, and Platform-Enabled Identity Abuse

426.    In addition to direct economic loss and market displacement, Defendants' conduct inflicted severe and enduring reputational harm on Westall, including destruction of professional authority, brand dilution, public confusion, and false association with *explicit, defamatory, and illicit* material. These injuries were not incidental consequences of private moderation decisions, but foreseeable and proximate results of Defendants' suppression, enforcement failures, and continued algorithmic misconduct.

427.    Following the removal and suppression of Westall's legitimate YouTube channel, multiple unauthorized channels appeared on YouTube using Westall's name, likeness, and copyrighted material without authorization.[48] Representative impersonation channels included, among others:

- https://www.youtube.com/@SarahWestall-s4d
- https://www.youtube.com/@SarahWestall2
- https://www.youtube.com/@SarahWestallShow

428.    These channels presented themselves as affiliated with or representative of Westall while disseminating altered, incomplete, or misleading versions of her content, creating public confusion as to authorship, authenticity, and endorsement.

429.    Several of these impersonation channels appeared prominently in YouTube and Google recommended search results (notwithstanding supposed "Safe Search" mechanisms) during periods when Westall's authentic channel was removed or

---

[48] *See* Comp. Ex. E, *supra*.

algorithmically suppressed. At least two impersonator channels were monetized through YouTube's Partner Program and offered paid memberships, reflecting affirmative Platform enablement and *financial participation by Google* at the same time Westall herself was denied access to her audience and monetization tools. In practical terms, Google was compensating impersonation accounts while suppressing the authentic source. One such impersonation channel accumulated hundreds of subscribers and uploaded more than one hundred videos within a matter of months, with individual videos receiving tens of thousands of views. And Google was doing this notwithstanding Westall's advisements as to same.

430.    Westall repeatedly notified YouTube of these impersonation channels through formal reporting mechanisms, including copyright infringement and impersonation complaints. Despite receiving timely and specific notice, Google/YouTube declined to remove (chose not to remove) the infringing channels for extended periods. Instead, Google/YouTube made a conscious choice to continue hosting, recommending, and monetizing impersonation accounts, while Westall's authentic channel remained removed or suppressed. This was not passive inaction, but deliberate Platform conduct undertaken with full awareness of the resulting harm.

431.    Google's/YouTube's conduct went beyond mere hosting. At least two impersonation channels were affirmatively enrolled in YouTube's Partner Program, permitted to offer paid memberships, and algorithmically promoted, reflecting direct financial participation and continued Platform support after notice. By maintaining these accounts and sharing advertising revenue with them, Google/YouTube materially contributed to the ongoing misuse of Westall's identity and the continuation of the harm.

432.    This theory of liability does not substitute the Platform for the impersonator. It targets Google's/YouTube's own *knowing* distribution, monetization, and maintenance decisions after fair notice, conduct that is analytically distinct from publishing or speaking. A distributor that knowingly continues to disseminate unlawful or harmful material after receiving notice is not inherently treated as the speaker of that content, but is held accountable for its own distribution conduct. The same principle applies here. Treating such conduct as immune under Section 230(c)(1) contributes to the harm.

433.    To be clear, Westall does not seek to treat Google or YouTube as "the publisher or speaker" of content created by those impersonation accounts. Rather, Westall challenges the Platform's own independent conduct in *knowingly* maintaining, monetizing, and algorithmically supporting impersonation channels after receiving fair notice of identity misuse, copyright infringement, and consumer confusion. The liability asserted here arises from Google's/YouTube's affirmative operational and financial decisions to continue hosting, recommending, and profiting from those accounts, not from the underlying speech of third parties.

434.    This persistent judicial distortion of Section 230 is precisely what necessitated later corrective legislation such as FOSTA and SESTA, which were enacted only after courts repeatedly misapplied §230(c)(1) to shield knowing, affirmative misconduct rather than prevent improper speaker *substitution* (*i.e.,* "treatment"). The same error operates here. By construing §230(c)(1) to foreclose adjudication of Google's/YouTube's own post-notice conduct, courts transformed the statute into a Government shield for operational wrongdoing rather than a rule governing attribution of speech.

435.    As a direct result of Google's/YouTube's suppression of Westall's legitimate content and their refusal to remediate known Platform vulnerabilities, Google search results associated with Westall's name became contaminated with explicit and defamatory material. During periods of Westall's deplatforming and suppression, first-page Google search results for queries such as "Sarah Westall" and "Sarah Westall podcast" returned links bearing titles including "Porn Star Confessions" and "Woman Aggressively Offers Head," falsely associating Westall with pornographic and obscene content.[49]

436.    These false associations were not isolated anomalies, but foreseeable and predictable consequences of suppressing authoritative content while knowingly maintaining, promoting, and financially supporting counterfeit, exploitative, and explicit material. By removing Westall's legitimate work from recommendation and search systems while continuing to algorithmically elevate impersonation and harmful content, Google/YouTube permitted that material to anticompetitively occupy positions that would otherwise have been filled by Westall's authoritative work, thereby amplifying reputational injury through their *own conduct*.

437.    Westall reported these false associations to Google and submitted Digital Millennium Copyright Act ("DMCA") notices and related complaints through Google's designated legal channels, including communications directed to Google's copyright agent. Google refused to provide effective remediation, asserting that channel-level URLs were not actionable and limiting review to individual YouTube-hosted URLs, even where the

---

[49] *See* Comp. Ex. E, *supra*.

original content resided on Platforms outside Google's ecosystem. This position ensured that the reputational harm would persist despite fair notice and ongoing injury.

438.    Only after counsel pressed the issue pre-suit, placing Google on notice of imminent legal accountability, did YouTube reverse course and magically determine that the impersonation channels violated Platform policy. The offending accounts were then removed. This sequence is dispositive. It demonstrates that Google/YouTube were capable of identifying and enforcing policy violations all along, but chose not to do so until confronted with the prospect of meaningful legal consequence.

439.    This pattern confirms that remedial action was not the product of neutral trust-and-safety enforcement, but of external accountability pressure. Where accountability was absent, Google/YouTube declined to act; where accountability became imminent, Google/YouTube complied. The absence of judicial oversight (caused by the threshold dismissal of *Doe v. Google LLC* under a distorted application of Section 230(c)(1)) removed the very mechanism that would have compelled timely remediation and prevented harm from compounding.

440.    Because Westall was denied discovery, factual adjudication, and injunctive relief in *Doe*, Defendants were insulated from scrutiny during the critical period when the impersonation, monetization, and reputational contamination occurred. That insulation enabled the continued financial support of impersonation accounts, the persistence of defamatory search results, and the escalation of secondary harms. The resulting injuries were accordingly not merely the consequence of private misconduct, but of a judicially enabled accountability vacuum.

441.    In this way, the misapplication of Section 230(c)(1) operated as the root cause of the compounded harm Westall suffered, allowing private censorship, identity abuse, and reputational injury to persist unchecked, while simultaneously foreclosing the only mechanism capable of stopping it. The deprivation of judicial accountability did not merely fail to prevent harm, *it affirmatively enabled it*.

442.    The consequences of this judicially created accountability vacuum are no longer theoretical. They have manifested across Platforms in increasingly extreme and dangerous forms. In *Anderson v. TikTok*, for example, TikTok was alleged to have knowingly hosted, amplified, and affirmatively recommended the so-called "Blackout Challenge" to minors, content that resulted in the deaths of multiple children. Critically, the harm alleged in *Anderson* did not arise from TikTok merely failing to remove third-party speech or treating Tik Tock as the publisher of speaker of the Blackout Challenge content, but from the Platform's own contributing algorithmic conduct (choice) in knowingly hosting, promoting, and distributing known dangerous material. That conduct was able to persist precisely because courts had, for years, improperly expanded Section 230(c)(1) beyond a rule of substitution into a broad conduct immunizer, signaling to Platforms that even knowing amplification of harmful content would not be subject to meaningful judicial scrutiny.

443.    The lesson of *Anderson* is directly applicable here. Where courts eliminate accountability at the threshold (by foreclosing discovery, refusing factual development, and insulating Platform conduct from adjudication), Platforms rationally internalize that there is no consequence for continued harm. The resulting behavior is predictable – Platforms knowingly host, monetize, and even algorithmically promote harmful material

whenever it suits them, whether it involves identity abuse, reputational destruction, or physical danger to children. The fault in such cases does not rest solely with the Platform, but with a judiciary that has withdrawn itself from its constitutional role as a check and balance on unlawful private conduct.

444.    Westall's case reflects the same structural failure – the dismissal of *Doe v. Google LLC* under a distorted application of Section 230(c)(1) removed any incentive for timely remediation or inducing private behavioral changes, allowing impersonation, monetization, and reputational harm to compound unchecked. As in *Anderson*, the absence of judicial accountability functioned as an enabling condition (*i.e.,* causation), transforming what might have been a contestable enforcement dispute into a durable and escalating injury. In this way, the judiciary's misapplication of Section 230 is not merely adjacent to the harm suffered, it is a proximate causal force traceable entirely to the Federal Defendants that permitted the harm to persist and intensify.

445.    The reputational harm to Westall was further compounded by Google's/YouTube's refusal to restore her authority signals following reinstatement. Although Westall's YouTube channel was nominally reinstated on or about October 30, 2025, Google/YouTube failed to restore verification status, internal trust classifications, recommendation eligibility, and authority weighting. The incomplete restoration perpetuated false public signals that Westall remained disfavored, unreliable, or sanctioned.

446.    Following reinstatement, Google/YouTube again removed Westall's channel after approximately two days, citing newly asserted "harassment" justifications wholly unrelated to the original COVID-related enforcement rationale. As previously

mentioned, Westall promptly appealed this second removal. That appeal remained pending for approximately eleven months before being denied on or about July 25, 2025, without any substantive explanation or identification of specific statements or conduct. This prolonged delay and opaque denial reinforced the false public impression that Westall's work was illegitimate or prohibited, further eroding audience trust and professional credibility.

447.   As a direct result of impersonation, search contamination, and sustained authority destruction, Westall suffered further concrete and ongoing professional harm, including withdrawn sponsorships, hesitant collaborators, and diminished guest participation. Prospective partners encountering impersonation channels (recommended, monetized, and financially supported by Google), alongside explicit and defamatory search results associated with Westall's name, were led to question her legitimacy, authorship, and professional standing. These harms were not speculative, but flowed predictably from Google's/YouTube's continued suppression of Westall's authentic channel while *affirmatively enabling* counterfeit accounts to occupy her place in search and discovery systems.

448.   Empirical research confirms the severity of such harm. Like the studies published in *Frontiers in Psychology,* demonstrating that exposure to toxic, defamatory, or inappropriate content results in creators being three to five times more likely to experience long-term anxiety, loss of professional confidence, and reputational damage. These findings mirror Westall's experience, as her legitimate work was suppressed while impersonator and explicit material was intentionally elevated, or at least, intentionally distributed after fair notice.

449.    The reputational injury inflicted on Westall is ongoing. Google/YouTube have not removed the structural conditions (product design) that permitted impersonation, search contamination, and authority degradation. Despite notice and reinstatement, Google/YouTube have failed to normalize Westall's Platform and search presence,[50] or to remediate the algorithmic distortions they created in participation with the Government.

450.    Taken together, Westall's reputational damages include, but are not necessarily limited to, brand dilution, loss of professional authority, false public association with illicit content, impersonation, diminished trust signals, lost business relationships, and enduring harm to her standing as a credible journalist and analyst. These injuries are direct, foreseeable, and ongoing consequences of Defendants' conduct and remain redressable through monetary damages, declaratory and injunctive relief requiring remediation, restoration, and normalization of Westall's Platform and search presence.

### 9.    Emotional Distress, Personal Harm, and Irreparable Injury

451.    Defendants' conduct inflicted significant emotional and personal harm on Westall, which is distinct from, and in addition to, her economic and reputational injuries. The sudden removal from her primary professional Platform, the prolonged exclusion from the dominant marketplace for her work, and the absence of any meaningful avenue to challenge or even understand the basis for that removal imposed severe psychological and personal burdens.

452.    Westall experienced sustained stress, anxiety, and emotional distress arising from the abrupt destruction of a career she labored to build over many years. The loss of

---

[50] Again, the supposed Google "Safe Search" was entirely ineffective in relation to Westall; *i.e.*, a sham search protection.

professional identity, income stability, and future opportunity, combined with the knowledge that adjudication was foreclosed by judicial insulation rather than any proven misconduct, created a persistent sense of uncertainty and powerlessness. These effects were intensified by the opaque and arbitrary nature of the enforcement actions, which offered no explanation, no standards capable of being met, and no path to restoration through compliance.

453.    The prolonged duration of the injury compounded its severity. Westall was not subjected to a brief disruption, but to years of exclusion, suppression, and forced marginalization during a critical phase of her career. The inability to defend her reputation, participate fully in her profession, or plan for the future without fear of renewed suppression, imposed ongoing emotional strain that continues to the present day. Not to mention, the Google/YouTube-aided rebranding of Westall as a pornstar and/or purveyor of porn through impersonation channels.

454.    Even after nominal reinstatement, the persistence of hidden restrictions and incomplete restoration has prolonged this harm. Continued suppression communicates that Westall remains under penalty without cause, reinforcing emotional distress and undermining any sense of closure or relief. The ongoing nature of the injury prevents recovery and distinguishes this harm.

455.    These personal and emotional injuries are foreseeable consequences of Defendants' conduct and are directly traceable to the Government-enabled censorship regime challenged in this action. They are not speculative and cannot be adequately remedied by monetary damages alone. The continuing threat of suppression, combined

with the absence of transparency and accountability, constitutes irreparable harm supporting the need for declaratory and injunctive relief.

456.    The foregoing facts establish that Westall's injuries are not abstract, speculative, or historical, but concrete, particularized, and ongoing. They flow directly from the same Government-enabled censorship regime challenged throughout this Complaint and demonstrate how that regime operates in practice against an individual speaker. Westall's loss of Platform access, foreclosure of judicial redress, continued suppression following reinstatement, economic displacement, reputational injury, and emotional harm are all traceable to Defendants' conduct and would not have occurred absent the legal framework constructed and enforced by Government.

457.    These injuries are also redressable. Declaratory relief clarifying the limits of Section 230(c)(1), injunctive relief prohibiting Government-induced censorship and judicial insulation, and remedial relief requiring neutral restoration of Platform access would directly alleviate the ongoing harms Westall continues to suffer. Unlike claims premised solely on past conduct, Westall's injuries persist in the present and will continue into the future absent intervention by this Court, satisfying the requirements for standing and equitable relief.

458.    Westall's experience further confirms that the harms alleged in this action are not isolated or hypothetical, but systemic and recurring. Her case exemplifies how the challenged regime suppresses disfavored speakers, forecloses accountability, and entrenches ongoing injury through incomplete restoration and opaque enforcement.

*Smattering of Germane Legal Principles*

1.    **The 1st Amendment Prohibits Abridgment Of The Right To Freedom Of Speech And Press**

459.    The First Amendment prohibits the federal Government from "abridging the freedom of speech, or of the press." U.S. CONST. amend. I.

460.    The prohibition against the abridgement of Freedom of Speech and Freedom of Press applies to all branches of the Government, Government entities, and Government actors. *See, e.g.*, *Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017).

461.    The right to Freedom of Speech is robust, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), ensuring "that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S.Ct. 1730, 1735 (2017).

462.    And "as a general matter, social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), vacated on other grounds, 141 S. Ct. 1220 (2021).

463.    Further, the right to Freedom of Speech reaches all "field[s] of human interest," *Thomas v. Collins*, 323 U.S. 516, 531 (1945), and, "[]as a general matter, ... government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citation omitted). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

464.    "[D]ecisions [by governmental officials] to list particular publications as objectionable" constitute an unconstitutional "system of prior administrative restraints" without judicial oversight. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70–71 (1963).

465.    Governmental expression of opinions about particular Social Media posts publicly and transparently is generally legal. Doing so contributes to the national debate by subjecting those expressions to the marketplace of ideas and to criticism. But when the Government "blacklists" (vis-à-vis Government-backed instruments), especially behind closed doors where no one else knows or can criticize the blacklist, they unlawfully participate in shutting down debate. And that problem is compounded by Government equipping Big Tech with blacklist-oriented data and exerting extreme pressure / coercion on Big Tech to implement such tools in censorship of others (such as Westall).

466.    Further, while the Government generally has the authority to publicly express disagreement with private speech or the press, that does not imply the authority – overtly or covertly – to fund and promote censorship instruments that blacklist the press or Americans' speech (Westall).

467.    The Supreme Court has held that even "false statements, as a general rule" are not "beyond constitutional protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Thus, merely labeling disfavored speech as "disinformation," "misinformation," or "mal-information" does not strip it of First Amendment protection.

468.    "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id*. (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

469.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech ... it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential

for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id*. at 723.

470.    "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id*. at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

471.    SCOTUS continued in *Alvarez*:

The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of Speech and thought flows [sic] not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.

*Id*. at 728.

472.    The Press Clause also "comprehends every sort of publication which affords a vehicle of information and opinion," *Lovell v. Griffin*, 303 U.S. 444, 452 (1938), and the guarantee of Freedom of the Press does not change depending on the publication's characteristics or third-party ratings, for "freedom to publish means freedom for all and not for some." *Assoc. Press v. United States*, 326 U.S. 1, 20 (1945).

473.    Further, Freedom of the Press "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Id*.

474.    To that end, the constitutional protection of Freedom of the Press is exceedingly broad and while it undoubtedly protects against prior restraints on publication, it is not limited to "any particular way of abridging" the right, for "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government

by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean v. American Press Co.*, 297 U.S. 233, 249-250 (1936) (quoting 2 Cooley's Constitutional Limitations, 8th ed., p. 886).

475.    As such, SCOTUS has long afforded constitutional protection to the press to disseminate the news, for "liberty of circulating" is essential to a free press, and "without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex Parte Jackson*, 96 U.S. 727, 733 (1877)).

476.    The Government abridges Freedom of the Press by "penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Grosjean*, 297 U.S. at 251.

## 2.    Defendants May Not Directly Or Indirectly Abridge The 1st Amendment Rights Of Its Citizens

477.    The Government (and Government actors/instruments; *e.g.*, Google/YouTube) have no statutory authority to censor speech and the press. It follows that they also lack the power to attempt to censor speech and the press, and they lack the power to ask others to censor speech and the press.

478.    Westall need not establish that she was censored, suppressed, or silenced directly by Government action; she need only establish the Government abridged her First Amendment rights.

479.    The First Amendment itself establishes that principle: It bars any law or Government policy from "abridging" Freedom of Speech or Freedom of the Press. Thus, what matters in assessing whether the Defendants have violated the First Amendment is whether the Defendants' actions have had the consequence of abridging Freedom of

Speech or Freedom of the Press, not whether Defendants have acted directly, not whether a private partner has become a Government actor, and not whether Government has acted coercively or with undue pressure – for it is "axiomatic" that the Government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Although, as discussed above, the Government certainly has acted coercively and with undue pressure as to the private entities making up the rest of the named Defendants.

480.    Indeed, whereas the First Amendment bars the Government from "prohibiting" the free exercise of religion, it forbids the Government from even so much as "abridging" Freedom of Speech or Freedom Press. Const. Amend I. Accordingly, in a First Amendment claim, the constitutional question is simply whether the Government (and / or its actors) has been abridging (*i.e.*, diminishing) protected speech or the press.

481.    As detailed above and as further explained in the individual counts, the Defendants' actions abridge Westall's First Amendment rights.

482.    Courts can enjoin federal officials who censor speech and the press. *See Am. Sch. Of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (reversing the dismissal of a request for an injunction against the Postmaster General's alleged censorship of mail); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials").

483.    Further, "the history of past censorship provides strong evidence that the

threat of future censorship is not illusory or speculative," making declaratory and injunctive relief appropriate. *See Missouri v. Biden*, ----F.Supp.3d----, 2023 WL 4335270 *60 (W.D. LA July 4, 2023), rev'd in part, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), cert. granted in *Murthy v. Missouri*, 601 U.S. ----, --- S. Ct. ----, 2023 WL 6935337 (Mem).

484.    The Government (and / or its actors) also violate the First Amendment when they "deliberately set out to achieve the suppression of publications" through "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (even where private party is "free" to ignore Government's "advice" because its refusal would violate no law, it is still state action when the Government induces a private party to suppress speech).

485.    It is enough to show that the Government's funding, support, and collusion with private parties "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry." *Rosenberger*, 515 U.S. at 836.

486.    Additionally, the actions of private actors are imputed to the Government when **(a)** it provides "significant encouragement" to the private actors, *Blum v. Yaretsky*, 457 U.S. 991, 1004; **(b)** when the private actors operated as willful participants in joint activity with the Government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 992, 941 (1982); or **(c)** when private actors jointly engaged with Government actors to carry out constitutionally forbidden actions. *Dennis v. Sparks*, 449 U.S. 24 (1980).

487.    State action through joint engagement also occurs when the Government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v.*

*Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).

488.    Joint action may also be proven by showing that Government officials and private parties have acted in concert in effectuating a particular deprivation of constitutional rights. *See, e.g., Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

489.    Further, private acts may constitute joint State action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id.* (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

490.    Joint activity also occurs when the Government has "so far insinuated itself" into the private affairs of a non-Governmental entity that the line between public and private action is blurred. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). In such circumstances, the Government's entanglement with the management and control of private entities will impute private action to the Government. *Evans v. Newton*, 382 U.S. 296, 299 (1966).

491.    Likewise, the Government is responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). As recognized in *Trinity Lutheran v. Comer*, 582 U.S. 449, 450, 463 (2017), such coercive power includes "indirect coercion," such as a very minor monetary inducement.

492.    Thus, private action may be rendered State action in many ways including

where the Government finances and assists in the development of censorship technology, promoting censorship technology, and / or providing Government technology and resources to private actors to effectuate a censorship scheme. *See, e.g. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 606, 606-12, 615 (1989) ("Government did more than adopt a passive position toward the underlying private conduct").

493.    Upon information and belief, the Government has provided "significant encouragement" to NGOs and Big Tech (*e.g.*, Google/YouTube) to limit the circulation and / or distribution of Westall's news reporting and speech. Upon information and belief, this encouragement has directly resulted in the private companies (*e.g.*, Google/YouTube) downranking Westall's journalism in search results, and de-amplifying, deplatforming, de-boosting, demonetizing, suspending, shadow-banning, restricting, or limiting access, and / or posting warnings on her news reports and coverage. Such private conduct thus constitutes State action imputed to the Government.

494.    Through the efforts described above, the Government has also become entwined in the management and control of those entities that developed censorship technology – technology that work to limit the distribution of Westall's reporting. This further establishes that the private companies' censorship activities qualify as State action imputed to the Government.

495.    The private actors whose censorship technology the Government has funded, marketed, and promoted have operated as willful participants in joint activity with the Government to unconstitutionally censor the American press and Americans' speech. Their conduct is accordingly imputed to the Government as State action as well.

496.    Private actors (NGOs) coordinated with Big Tech, or otherwise participated

in the Government's efforts to censor American press outlets and speakers, operated as willful participants in joint (unconstitutional) activity with the Government. Their conduct thus also constitutes State action that is imputed to the Government.

497.    Even if the Government did not censor by means of contract and encouragement (they did), they violated the First Amendment by offering coordination. Even if the Government was not seeking censorship (they were), and even if the censorship was performed independently by private corporations (it was not), private corporate censorship cannot be effective unless it is coordinated across different Platforms. The Platforms need coordination to ensure they are all censoring the same sorts of materials and not just driving customers to competitors.[51] But the companies (Google/YouTube) themselves cannot coordinate without antitrust difficulties. So, they need Government coordination. By supplying such coordination, the Government is abridging Westall's Freedom of Speech and Freedom of the Press.

498.    "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F.Supp.3d 94, 115 (N.D.N.Y. 2018).

499.    Where (as here) the Government financed, encouraged, and rewarded / protected private actors for adopting the Government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting Government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

---

[51] There have been many examples of what is commonly called "deplatforming" or "depersoning," which is coordinated attack across all Platforms.

### 3.    Agencies Can Only Exercise Congressionally Delegated Authority

500.    [A]gency actions beyond delegated authority are ultra vires and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54, 65 (D.D.C. 2016).

> At common law, the ultra vires exception to sovereign immunity provides that where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. Such actions are ultra vires [*i.e.*, beyond] his authority and therefore may be made the object of specific relief. To invoke this exception, a plaintiff must do more than simply allege that the actions of the officer are illegal or unauthorized. Rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority. Under the common-law ultra vires doctrine, then, a strong merits argument is needed to overcome sovereign immunity – even at the pleading stage.

*Apter v. Dep't of Health & Human Services*, 80 F.4th 579, 587–88 (5th Cir. 2023) (cleaned up, citations omitted).

501.    Courts look to an agency's enabling statute to determine whether the agency has exceeded its authority, and enabling legislation is "generally not an 'open book to which the agency [may] add pages and change the plot line.'" *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

502.    Where there is "no clear expression of congressional intent" in an agency's enabling statute to convey broad authority, a court will not infer it. *See BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021).

503.    This tenet dates to the nation's founding. As Alexander Hamilton explained, in a constitutional order that assigns the lawmaking and appropriations powers to the

legislature, "no money can be expended, but for an object, to an extent, and out of a fund, which the laws have prescribed." Alexander Hamilton, Explanation, in The Works of Alexander Hamilton, Vol. 8, p.128 (Henry Cabot Lodge ed., 2d ed. 1903) (emphases in original).

504.    The Government's organic statute charges its Secretary of State, for example, with enumerated duties "respecting foreign affairs." 22 U.S.C. § 2656.

505.    According to DOS, for example, its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive." Congress appropriates funds to the DOS for "the administration of foreign affairs." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023.

506.    The statute which confers authority upon the DOS, for example, provides that:

> The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [sic] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to  negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.

22 U.S.C. § 2656 (emphasis added).

507.    The Government's disinformation tools were developed not merely to assist in gathering information, but as tools of warfare – information warfare – to shape the perceptions and opinions of others. These mechanisms of information warfare, which were developed in the context of national security, foreign relations, and to combat American

adversaries abroad, have been misappropriated and misdirected to be used at home against domestic political opponents and members of the American press with viewpoints conflicting with those of the Government. By targeting domestic political disagreement, the Government violated the organic statute, as well as the most fundamental principles upon which our Constitution was founded.

508.    Any Government scheme designed to fund, support, and encourage private companies for the purpose of censoring, degrading, or demonetizing American press outlets falls outside the statutory authority of the DOS and the Government as a whole. The statutory language also does not authorize the Government to encourage the private sector to adopt censorship technology that will suppress certain content and viewpoints of the American press. Nor could it consistent with the Government's enumerated powers and the First Amendment.

509.    Further, even if such a scheme were lawful – which it never could be – its funding would require a lawful appropriation by Congress. Sans such appropriation, the funding would violate the Anti-Deficiency Act, which prohibits federal agencies from obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Thus, the provision of Government funds and technology to outside entities to violate the First Amendment is doubly prohibited by law.

### 4.    Congress Cannot Delegate Authority Violative Of The Constitution

510.    Congress' authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S.

at 566; see also Const. art. I, § 8.

511.    "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176 (1803).

512.    Congress is prohibited from conferring on a federal agency power or authority that is contrary to the Constitution, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986), and Congressional enactments that exceed Congress's constitutional bounds are invalid. *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).

5.    **The Government's Funding, Development, Marketing, And Promotion Of Private Censorship Tools, Technologies, And Censorship Enterprises Is A Non-Final, Unlawful Agency / Instrument Action That Must Be Enjoined**

513.    Under the Administrative Procedure Act ("APA"), sovereign immunity is waived to non-monetary claims challenging non-final agency action as ultra vires.

514.    Government's censorship scheme (CIC) is ultra vires and must be enjoined.

515.    Litigants can use the APA to assert ultra vires claims against Government actors and overcome sovereign immunity that would otherwise protect those Government actors. *Apter*, 80 F.4th at 587.

516.    "Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Id*. at 589 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702)).

517.    "[A] non-statutory cause of action under the APA (that is, an ultra vires

192

claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id*. at 592 (citing *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014)).

518.    The 1976 amendment to 5 U.S.C. § 702 "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

519.    Section 702's waiver "applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA. There is no requirement of 'finality' for this type of waiver to apply." *Alabama-Coushatta Tribe*, 757 F.3d at 489.

520.    Per *Apter*:

> When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an ultra vires claim – section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.

*Apter*, 80 F.4th at 589–90 (cleaned up, citations omitted).

521.    Under the APA, "'agency action' includes the whole or a part of an agency ... relief." 5 U.S.C. § 551(13).

522.    "'[R]elief' means the whole or a part of an agency grant of money, assistance, license, authority, exemption, exception, privilege, or remedy." 5 U.S.C. § 551(4).

523.    Thus, the Government's funding, development, marketing, and promotion

of censorship tools, technologies, and censorship enterprises is "relief" under the APA, and accordingly constitutes "agency action."

524.     Westall's injuries are in the APA's "zone of interests."

525.     In keeping with Congress' evident intent when enacting the APA to make agency action presumptively reviewable, the zone-of-interests test is not especially demanding. *Apter*, 80 F.4th at 592; *Texas v. United States (DACA Case)*, 50 F.4th 498, 520-21 (5th Cir. 2022). The test is satisfied if the claims are arguably within the zone of interests to be protected by the statute. *Apter*, *supra*; DACA at 521. The Supreme Court has always conspicuously included the word arguably in the test to indicate that the benefit of any doubt goes to the plaintiff. *Apter*, *supra*; *DACA*, *supra*. Review is foreclosed only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. *Apter*, *supra*; *DACA*, *supra*.

526.     This challenge is within the APA's zone of interests. For Westall, the Government's illegal relief limits her ability to distribute and profit from her speech.

527.     Moreover, illegal relief is explicitly covered by the APA, and thus the Government's ultra vires relief explicitly falls within the APA's zone of interests, as do the injuries resulting from that ultra vires relief.

528.     Consequently, the Government lacks sovereign immunity to Westall's claims against the Government.

### 6.     Alternatively, The Government's Funding Of Private Censorship Entities Is Final Agency Action That Must Be Set Aside And Vacated

529.     The APA authorizes courts to hold unlawful and set aside final agency action found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law ... ." 5 U.S.C. § 706(2)(A)-(D). The Government Defendants' conduct violates each of these prohibitions.

530.    The "final agency action" requirement is a jurisdictional threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).

531.    Even agency advisory opinions can be deemed to have "consummated the Department's decisionmaking process." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022).

532.    Further, "the mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

533.    The Government's secretive scheme to suppress, derogate, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and / or promoting censorship tools, technology and censorship enterprises operating in the United States – specifically censorship-by-risk-rating technology and entities – constitutes final agency action under the APA.

534.    The Government's scheme as alleged herein constitutes "final agency action" because no further action is needed and it thus "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation

marks omitted).

535.    Further, the Government's scheme as alleged herein entails actions by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*.

536.    The Government's scheme alleged herein clearly constitutes "consummation" of the agency's decision-making process and is not tentative or interlocutory. *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

537.    Nothing in the governing statutes gives or purports to give the Government the power to fund or participate in this scheme. The Government's conduct thus exceeds any statutory authority and is unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

538.    Further, the Government's conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Westall, as set forth above. 5 U.S.C. § 706(2)(B).

539.    Moreover, under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

540.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

541.    The Government's censorship scheme is arbitrary and capricious because it has been entirely secretive and non-transparent. The Government has not even attempted to explain, let alone satisfactorily, how it serves the DOS' charge to, for example, manage

foreign affairs. Nor could it, as this scheme has regulated domestic media content and speech without any basis in law to do so.

542.    The Government's scheme is also arbitrary and capricious because it is being deployed to promote the federal Government's preferred viewpoints while suppressing dissent/criticism therefrom.

543.    For the foregoing reasons, the Government's conduct is arbitrary, capricious, and an abuse of discretion and must be set aside.

544.    In sum, the entire initiative (CIC) described above exceeds any conceivable statutory authority and is accordingly invalid under the APA. See 5 U.S.C. §§ 706(2)(A)-(D).

## BRIEF CONCLUSION

545.    For years, Defendants orchestrated and executed a censorship and deplatforming campaign that silenced lawful speech, stripped a working journalist of her livelihood, and distorted the public square, culminating in the termination, reversal, and sudden re-termination of Westall's YouTube channel despite YouTube's own admission that her channel "does not violate our Community Guidelines."

546.    The Government's sustained pressure on Alphabet to remove non-violative content converted private moderation into State action that unlawfully abridged Westall's freedoms of speech and of the press, and the Platforms' arbitrary enforcement, impersonation elevation, and search manipulation inflicted severe financial and reputational injury exceeding $7,000,000.00 and continuing to accrue.

547.    This case presents not only the ongoing deprivation of a single journalist's constitutional rights, but also a direct challenge to a broader censorship regime that

threatens political, scientific, and cultural discourse and constitutes one of the most significant (if not the most significant) modern attacks on free speech and a free press.

548.    Immediate, effective relief is essential to halt continued abridgment and to remedy its continuing effects: a declaration that the censorship scheme is unlawful; injunctions prohibiting its continuation; reinstatement and transparency measures to prevent further violations; prohibition on applying foreign speech restrictions to U.S. users absent consistency with U.S. law; and concrete obligations requiring simple, clear, specific policies and written, non-pretextual justifications for any restraint – on pain of forfeiting any Section 230 good-faith defense and facing appropriate sanctions for noncompliance.

549.    Westall respectfully asks this Court to grant damages against the private Defendants and injunctive and declaratory relief against all Defendants, vindicating core constitutional guarantees and restoring the integrity of the public square. *The law demands no less, and the public interest requires it now.*

## CAUSES OF ACTION

### COUNT I – Abridgement of Westall's Right to Freedom of Speech (First Amendment) (Re: All Defendants)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

550.    The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[52]

---

[52] For a nice synopsis of the ways in which the First Amendment protects speech and the ways in which it does not, see the following short article:

551.    Defendants abridged Westall's right to free speech by coercing, colluding with, and jointly participating in suppressing her lawful content and terminating her channels, including *via* pressured enforcement of COVID-19 and election-related policies and subsequent recharacterizations, resulting in censorship and deplatforming.

552.    Westall suffered blacklisting, reduced reach, reputational damage, and economic loss, for examples, as a direct and proximate result.

553.    Westall suffered and continues to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

---

https://www.acludc.org/en/news/five-ways-first-amendment-protects-your-speech-and-three-ways-it-does-not#:~:text=The%20First%20Amendment%20prohibits%20government,speech%20based%20on%20its%20viewpoint.

From this article, and as it concerns this lawsuit, the following points are most germane: **(a)** The First Amendment protects against the Government restricting speech based on the Government's disagreement with what is said; *i.e.*, this principle is called "viewpoint neutrality" – the Government cannot suppress someone's viewpoint because the Government maintains or favors another viewpoint. Put differently, the Government is not allowed to meddle with speech because the Government disagrees with what is said. **(b)** The Government cannot circumvent the preceding point by laundering viewpoint censorship through private entities that (or individuals who) might otherwise be able to suppress viewpoints with which the private entity or individual disagrees. **(c)** The Government includes all local, state, and federal agents / agencies.

Regarding viewpoint neutrality, whether the Government was right or wrong about COVID, vaccines, elections, or otherwise is irrelevant, because the Government is supposed to remain neutral. This Court should not be concerned about whether the Government was right or wrong, or whether Westall was right or wrong; but, rather, the focus should be on whether or not the Government imparted its view / will upon U.S. citizens.

WHEREFORE, Plaintiff, Sarah K. Westall, requests **(a)** immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT II – Abridgement of Westall's Right to Freedom of the Press (First Amendment) (Re: All Defendants)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

554.    The First Amendment to the United States Constitution prohibits Congress from making laws "abridging" the freedom of the press, U.S. CONST. amend. I. Any law or policy that "abridges" or reduces the sphere of constitutionally protected freedom of the press thus violates the First Amendment.

555.    Defendants abridged Westall's right to freedom of the press by suppressing her journalism and commentary through coordinated censorship and deplatforming and by elevating impersonators that diverted audience and monetization.

556.    The Defendants' conduct inflicted past injury, and continues to inflict present, ongoing, imminent, and continuing irreparable injury on Westall by, among other things, reducing the revenue, reach, readership, and circulation of her reporting and speech, and otherwise negatively impacting the operations of Westall.

557.    Westall has suffered ongoing harms including blacklisting, reduced circulation, reputational damage, and economic losses.

558.    Westall suffered and continues to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiff, Sarah K. Westall, requests **(a)** immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT III – Ultra Vires Non-Final Agency Action Beyond Statutory Authority (Re: Government)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

559.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1.

560.    As SCOTUS has clarified, "[t]he nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

561.    Nonetheless, within the confines of the nondelegation doctrine, Congress may seek assistance from another branch, but "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

562.    No federal statute authorizes the Government to engage in the conduct alleged herein.

563.    The Government's funding, development, marketing, and promotion of private censorship tools, technology, and censorship enterprises constitutes "relief" under the APA, and is, therefore, "agency action."

564.    It "strains credulity" to imagine the Government's organic statute authorizes a secretive scheme to fund the development of censorship tools, technology, and enterprises – or to promote, test, and market that technology and those censorship enterprises to the American private sector, including web browsers, Social Media companies, and NGOs. *Cf. Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. ___, 1 (2021) (slip op.).

565.    This conclusion is reinforced by the fact the Government's scheme is unprecedented in history. Indeed, its organic statute has never been interpreted to authorize the regulation of the American press, much less a multi-agency scheme to fund the development of censorship tools and technology designed to silence speech by Americans, in America, for Americans and then to promote, test, and market such technology to the private sector. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate ... we typically greet its announcement with a measure of skepticism.").

566.    Not only is this action unauthorized by Congress, but Congress expressly prohibited the funds, appropriated or otherwise, made available to agencies such as GEC from being used other than to counter "foreign" propaganda or disinformation.

567.    Congress likewise limited NED's (DOS' National Endowment for Democracy) use of grant funds to those activities consistent with its statutorily defined purposes, 22 U.S.C. § 4412. Importantly, by statute, the DOS' NED's purpose is solely to further democracy abroad. 22 U.S.C. § 4411.

568.    Moreover, Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause seeks "to assure that public funds will be spent according to the letter of the budgetary judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id*. at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

569.    "All funds belonging to the United States – received from whatever source, however obtained, and whether in the form of cash, intangible property, or physical assets – are public monies, subject to public control and accountability." *See generally*, Kate Stith, Congress' Power of the Purse, 97 YALE L.J. 1343, 1356 (1988). Executive agencies may spend funds on a program only if they can convince Congress to appropriate the money. *This applies not only to direct grants, but also to the vast diversion of Government technology, support, employee time, and promotion efforts.*

570.     Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury ... only if the law specifically states that an appropriation is made[.]" *Id*. at § 1301(d).

571.     The expenditure of public funds that were not lawfully appropriated for that purpose violates the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Federal employees who violate the Act are subject to sanctions, including removal from office, fines, imprisonment, or both. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990). "The misappropriation or disposition of public funds, or of any money or thing of value of the United States, or of any department or agency thereof, or any property made under contract for any department or agency thereof for an unauthorized use" constitutes a federal crime punishable by fines and imprisonment. *See* 18 U.S.C. § 641.

572.     By funding or even just promoting censorship tools and technology and censorship enterprises that seek to silence members of the American press and speech, the Government acted in an ultra vires manner.

573.     The Government further acted in an ultra vires manner by using misappropriated funds (through agencies such as GEC) to develop, promote, test, and/or market censorship tools and technology and censorship enterprises to the private sector, including web browsers and Social Media companies, seeking the silencing of disfavored elements of the American press.

574.    Also, it is highly unlikely that any NGO data concerning Westall enlisted by the Government came for free; rather, it is more likely than not that the Government misappropriated funds to derogate Americans and eliminate their voices.

575.    Because no Act of Congress "specifically states that an appropriation is made" to fund this censorship scheme, the Government's expenditure of public funds, as well as its expenditure of Government technology and resources, including human resources (through GEC, for example) is unconstitutional.

576.    Because the aforementioned actions are ultra vires, these actions must be declared invalid and enjoined.

577.    The Government funded, developed, promoted, and coordinated censorship technologies and efforts without statutory authorization or appropriations specifically permitting such censorship activities, acting ultra vires and in excess of constitutional bounds.

WHEREFORE, Plaintiff, Sarah K. Westall, requests **(a)** immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

**COUNT IV – Unlawful Final Agency Action in Violation of the Administrative Procedure Act (Re: Government)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

578.    The Government's conduct violates the APA because its conduct constitutes final agency action and is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

579.    The Government's conduct also violates the APA because its conduct constitutes final agency action and is "(B) contrary to constitutional right, power, privilege, or immunity" of Westall. 5 U.S.C. § 706(2)(B).

580.    Additionally, the Government's conduct violates the APA because its conduct constitutes final agency action and is "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

581.    Further, the Government's conduct violates the APA because its conduct constitutes final agency action and Government failed to observe the "procedure required by law ... ." 5 U.S.C. § 706(2)(D).

582.    In sum, the entire initiative described above violates the APA in every conceivable way and is therefore invalid. *See* 5 U.S.C. §§ 706(2)(A)-(D).

583.    The Government's censorship coordination and implementation constitute final agency action that is arbitrary and capricious, contrary to constitutional rights, in excess of statutory authority, and undertaken without required procedures, violating Title 5, United States Code, Section 706(2)(A)–(D).

WHEREFORE, Plaintiff, Sarah K. Westall, requests **(a)** immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining

206

to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT V – *Ultra Vires* Action Beyond Constitutional Bounds
### (Re: Government)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

584.    Congress's authority is "limited to those powers enumerated in the Constitution." The Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549 (1995); *see also* Const. art. I, § 8.

585.    Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See* James Wilson, State House Yard Speech (Oct. 6, 1787).

586.    Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution").

587.    The Government's censorship scheme violates Westall's First Amendment rights as detailed above.

588.    Therefore, even if the Government's censorship scheme was within the bounds of the statutory authority delegated by Congress – it is not – the Government's conduct would, and does, remain ultra vires in violation of any conceivable constitutional authority.

589.    For these reasons, the Government proceeded without any authority, much less delegated authority (which, in fact, Congress could never grant them), so their action is ultra vires and must be declared invalid and enjoined.

590.    Westall suffered and continues to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government's conduct. Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiff, Sarah K. Westall, request **(a)** immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

## COUNT VI – Abridgement Of Westall's Privacy Rights
## (Re: Government)

Plaintiff re-allege Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

591.     The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

592.     The Fourth Amendment, in whole or in part, is aimed at protecting the privacy of Americans.

593.     The Government is not allowed to unilaterally search out private information of Americans so as to persecute such Americans. And, yet, that is precisely what happened here.

594.     As discussed in the Common Allegations above, the Government solicited personal data of individuals from Big Tech companies. Once such private data was obtained by the Government, the Government turned around and provided same to various NGOs in order to generate a censorship "misinformation" / "disinformation" rubbish.

595.     Then, the Government pushed such rubbish onto Big Tech (here, Google/YouTube) in order for Big Tech to carry out the censorship of Westall.

596.     The Government had absolutely no right to demand of private entities (Big Tech) private data of Americans so as to then use such data to crush those Americans merely because those Americans disagreed with Government narratives / prerogatives (*e.g.*, COVID-19 vaccinations).

597.    The Government's private dirt digging (without any sort of warrant, as if a warrant would have been achievable anyway … it would not have) was violative of the Westall's Fourth Amendment rights.

598.    Westall faced blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and Social Media censorship, all as a direct result of the Defendants' unlawful conduct.

599.    Westall suffered and continues to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiff, Sarah K. Westall, requests **(a)** immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

## COUNT VII – Civil Conspiracy (Re: All Defendants)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

600.    The elements of a cause of action for civil conspiracy are: **(a)** a common design between two or more persons; **(b)** to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; **(c)** an overt act in furtherance of the conspiracy; and **(d)** resulting injury.

601.    What else to say at this point? This entire Complaint outlines Defendants' conspiracy to censor Westall. Every single element of a conspiracy cause of action is laid out in the Common Allegations *ad nauseum*. Common design between two or more persons – check (eradicate free speech, among other things). Concerted action of an unlawful purpose – check (the organization and premeditation amongst Defendants to carry out eradication of free speech was extensive). Dozens of overt acts carried out by Defendants to eradicate free speech are discussed above – check. And Westall was crushed (monetarily, reputationally, *et cetera*) as a result; *i.e.*, badly injured – check.

602.    As Judge Doughty properly pointed out in *Missouri v. Biden*, the nefarious censorship conduct at play does not need to rise to the level of "conspiracy" in order to maintain an action such as this action. For example, extreme coercion and joint participation is enough.

603.    But this case lays out far more information (history / background / context / *et cetera*) than *Missouri v. Biden* as to the overall CIC, in part to demonstrate that the conduct complained of herein goes above and beyond extreme coercion. *The CIC was*

*orchestrated and collaborated and premeditated amongst all Defendants, and all Defendants voluntarily undertook their part in carrying out the CIC and injuring Westall.*

604.    This case is hornbook civil conspiracy. Indeed, if the conduct complained of herein was not considered civil conspiracy, then the civil conspiracy cause of action might as well be erased from the hornbooks because there would be no such thing.

605.    Westall faced blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and Social Media censorship, all as a direct result of the Defendants' unlawful conduct.

606.    Westall suffered and continues to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiff, Sarah K. Westall, request **(a)** immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference, **(b)** attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

**Prayer For Injunctive Relief (Counts I-VII)**

607.    Plaintiff, Sarah K. Westall, requests immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct featured in Counts I-VII above (namely, the CIC), by way of injunctive order inclusive of the following declarations and / or enjoinders:

**(a)**    Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises constitutes ultra vires action lacking statutory authority and exceeding constitutional authority;

**(b)**    Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates Westall's rights to freedom of the press and freedom of speech under the First Amendment of the Constitution;

**(c)**    Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates the Appropriations Laws of the United States, specifically the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1342 and 1517 and the laws respecting misappropriation of public money, 18 U.S.C. § 641;

**(d)**    Government's conduct violates the Administrative Procedure Act and accordingly is unlawful and invalid;

**(e)**    Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, *see* Fed. R. Civ. P. 65(d)(2)) from further engaging in the unlawful conduct as alleged herein;

**(f)**    Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all

persons acting in concert or participation with them inclusive of Defendants, *see* Fed. R. Civ. P. 65(d)(2)), from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans, whether that be through the Government's extreme coercion / pressuring of private entities and / or the Government's conspiratorial efforts with private entities pertaining to same.

**(g)**    Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, *see* Fed. R. Civ. P. 65(d)(2)), from dirt-digging through American's private information in violation of the Fourth Amendment; *i.e.*, preliminarily and permanently enjoin the Government from laundering their Fourth Amendment privacy prohibitions to the private sector or otherwise.

**COUNT VIII – D.C. Consumer Protection Procedures Act (Re: Google/YouTube)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

608.    D.C.'s Consumer Protection Procedures Act ("CPPA"), codified in Chapter 39 of Title 28, prohibits unfair or deceptive trade practices.

609.    The CPPA establishes comprehensive protections against unfair or deceptive trade practices. The statute provides, in pertinent part, that "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Sta. §28-3904. This broad prohibition applies to various commercial activities, including

214

passing off goods or services as those of another and selling consumer goods in a condition or manner not consistent with warranties. *Id.*

610.    The CPPA defines "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." *Id.* at §28-3901.

611.    In construing the term "unfair or deceptive trade practice," the statute directs that "due consideration and weight shall be given to the interpretation by the Federal Trade Commission and the federal courts of the term 'unfair or deceptive act or practice,' as employed in section 5(a)" of the Federal Trade Commission Act. *Id.*

612.    The CPPA provides multiple enforcement mechanisms, including the ability of private parties (Westall) to bring actions, as "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." *Id.* at §28-3905.

613.    Unlike common law fraud, a CPPA claim does not require proof of scienter or reliance.

614.    The CPPA lists numerous specific prohibited practices in D.C. Code §28-3904, including misrepresenting material facts, representing that goods have benefits they do not have, and failing to state material facts

615.    As outlined *ad nauseam* in the Common Allegations, Google's/YouTube's mission was / is to conspire to stunt (actually, outright eliminate) Westall's trade; *i.e.*, "alter" / make "[un]available" the transference of consumer goods / services. Moreover, as alleged above, Google's/YouTube's wrongdoing affirmatively "provide[d] [false]

information" about Westall and her trade. Googe/YouTube materially misrepresented facts to Westall during the Platform's crippling of her livelihood and failed to state material facts to Westall each and every time she attempted to remedy the Platform's wrongdoing.

616.    Although the CPPA does not require as much, Westall was absolutely misled, deceived, and damaged by the myriad unfair trade practices described above inflicted upon her by Google/YouTube.

617.    Westall is the epitome of an aggrieved consumer who not only suffered injury-in-fact as a result of the Google/YouTube trade demolition delineated herein, but also continues to suffer such injury.

618.    Relief available to Westall under the CPPA includes treble damages or $1,500.00 per violation (whichever is greater), punitive damages, injunctive relief, costs, and reasonable attorney's fees.

619.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's CPPA violations.

620.    As a result of Google's/YouTube's CPPA violations, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** treble damages or $1,500.00 per violation of the CPPA (whichever is greater), **(b)** punitive damages, **(c)** injunctive relief in line with the Prayer set forth above, **(d)** costs, **(e)** attorneys' fees, and **(f)** any other relief as this Court deems equitable, just and proper.

**COUNT IX – D.C. Antitrust / Unfair Competition (Re: Google/YouTube)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

621.  D.C.'s antitrust statute, found in Chapter 45 of Title 28, declares, in pertinent part, that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal." D.C. Stat. §28-4502.

622.  This provision mirrors federal antitrust law and applies to anticompetitive conduct affecting commerce within D.C.

623.  The antitrust statute provides robust remedies for injured parties: "Any person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages, for appropriate injunctive or equitable relief, or for both." *Id.* at §28-4508.

624.  The court must award "threefold the total damage sustained by such person" and "the costs of suit including reasonable attorney's fees." *Id.*

625.  Again, the Common Allegations of this Complaint are replete in alleging Google/YouTube was bent on restraining Westall's trade/commerce. Moreover, the Common Allegations of this Complaint are replete in alleging Google/YouTube injured Westall's business by inflicting anticompetitive practices forbidden by D.C.'s antitrust statute.

626.  Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's D.C. antitrust / unfair competition statutory violations.

627.    As a result of Google's/YouTube's antitrust / unfair competition statutory violations, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** monetary damages (3x), **(b)** injunctive relief in line with the Prayer set forth above, **(c)** costs, **(d)** attorneys' fees, and **(e)** any other relief as this Court deems equitable, just and proper.

## COUNT X – Negligence (Re: Google / YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

628.    The elements of a negligence cause of action in D.C. are as follows: **(a)** the defendant must owe a duty of care to the plaintiff; **(b)** the defendant must breach that duty; **(c)** the defendant's breach must cause injury to the plaintiff; and **(d)** the plaintiff must suffer damages as a result of the injury.

629.    In D.C. negligence actions, the standard of care is typically that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances.

630.    The Defendants implicated by this Count owed Westall a general duty to act reasonably.

631.    The Platform-effectuated censorship was the antithesis of reasonable; *i.e.*, the Defendants implicated by this Court breached their general duty to act reasonably with

respect to Westall, and nobody with functioning dendrites and/or firing synapses under same or similar circumstances would have done to Westall what Google/YouTube has done to her (and continues to do).

632.    As to the proximate causation chain, the chain links closest to the harms suffered by Westall belong to Big Tech (as to carrying out censorship on Platforms). But for Big Tech's censorship, Westall would not have suffered the damages articulated throughout this Complaint (*e.g.*, monetary, reputational, *etc.*).

633.    Google/YouTube owed duties to exercise reasonable care in administering and enforcing Platform policies and in responding to impersonation notices; they breached those duties by wrongfully terminating Westall's channels, recharacterizing violations without notice specifics, and failing to remove impersonators after notice, proximately causing Westall's damages. And this recap of Google's/YouTube's negligent conduct is certainly not exhaustive per the above Common Allegations.

634.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's rampant and rank negligence.

635.    As a result of Google's/YouTube's negligent conduct, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date well in excess of $75,000.00, all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)**

any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT XI – Tortious Interference with Business Relationships/Economic Advantage (Re: Google/YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

636.    In the D.C., a tortious interference with business relations or economic advantage cause of action requires proof of four essential elements, with the key consideration being whether the defendant's interference was intentional and improper. The Restatement (Second) of Torts framework has consistently been applied within the D.C. court system to evaluate these claims, treating interference with prospective business advantage as mirroring the elements of interference with existing contracts.

637.    To establish a *prima facie* case of tortious interference with business relations, a plaintiff must prove four elements: **(a)** existence of a valid contractual or other business relationship; **(b)** the defendant's knowledge of the relationship; **(c)** intentional interference with that relationship by the defendant; and **(d)** resulting damages.

638.    As for the first element, a plaintiff need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction. The business expectancies protected under this tort need only be probable and include future contracts and lost opportunities to obtain customers.

639.    As for the third element, the actor desired to bring the interference about or if he knew that the interference was certain or substantially certain to occur as a result of his action. D.C. follows the Restatement approach, which formulates the claim in terms of whether the interference was improper or not, rather than in terms of whether there was a

specific privilege to act in the manner specified. The key consideration in determining whether recovery is available is the actor's motive for interfering.

640.    First, the Defendants implicated by this Count were certainly intentional / conscious in their desire to destroy Westall's economic advantage / business relationships; *i.e.* in their effort to destroy Westall's businesses.

641.    Second, a simple review of Westall's historical reach and historical finances demonstrates that only growth laid ahead for Westall. There was / is most certainly a reasonable probability the Westall would have entered into additional relationships but for Defendants' interference.

642.    Third, as for the Defendants implicated by this Count having engaged in an independently tortious or unlawful act that prevented the relationship from occurring, there are plenty of independent wrongs that led to the loss of business relations. There are independent torts that Defendants committed in meddling with Westall's growth potential; *e.g.*, negligence. There is also independent unlawful misconduct by Defendants; *e.g.*, abridgement of Westall's First Amendment rights.

643.    Defendants intentionally and improperly interfered with Westall's business relationships and expectancies by deplatforming and suppressing her content and elevating impersonators, causing lost revenue and opportunities.

644.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's brazen tortious interference.

645.    As a result of Google's/YouTube's tortious interference, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date well in excess of $75,000.00, all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)** any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT XII – Negligent Misrepresentation (Re: Google/YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

646.    In D.C., a negligent misrepresentation cause of action requires a plaintiff to prove three essential elements: **(a)** that the defendant made a false statement or omitted a fact that he had a duty to disclose; **(b)** that it involved a material issue; and **(c)** that the plaintiff reasonably relied upon the false statement or omission to his detriment.

647.    The first element requires establishing that the defendant had a duty to disclose the omitted fact or made a false statement. D.C. courts have found that parties may voluntarily assume a duty of care toward others, and one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.

648.    Here, Google/YouTube affirmatively represented that their Internet Computer Services are free to all, open to all, and utilizable by all. Moreover, Google/YouTube certainly had pecuniary interests in representations made to Westall.

649.    These hogwash representations callously made by Google/YouTube to Westall (*e.g.*, medically misleading posts morphing to harassing/bullying posts morphing

to posts violative of glossy "community standards") were plainly false as detailed at length throughout this Complaint. Moreover, these representations were plainly made by Google/YouTube so as to guide the formation of businesses (or not) through their interactive computer service.

650.    Westall (along with tens of thousands of others) justifiably relied on Google/YouTube in availing herself of the Platform's interactive computer services to form and grow here businesses. When Google/YouTube pulled the interactive computer services rug out from underneath Westall, Westall sustained (and continues to sustain) substantial damages (monetary and reputational).

651.    Moreover, Defendants made statements indicating reinstatement opportunities for terminated channels under changed policies while, in Westall's case, reinstating and re-terminating within days under a different rationale without specificity, upon which Westall reasonably relied to her detriment.

652.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's unabashed negligent misrepresentations.

653.    As a result of Google's/YouTube's negligent misrepresentations, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date (more than $75,000.00), all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)**

any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

## COUNT XIII – Negligent Design (Re: Google/YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

654.    In D.C., a negligent design cause of action requires a plaintiff to prove that the defendant manufacturer breached the applicable standard of care by creating an unreasonable danger through its product design. The standard of care is one of reasonableness in adopting a safe plan or design and in the use of safety devices, with liability imposed only for the creation of unreasonable danger.

655.    A plaintiff asserting a negligent design claim must establish that the defendant departed from the applicable standard of care. In design cases, as in other areas of tort law, negligent conduct falls below the standard established by law for the protection of others against unreasonably great risk of harm. D.C. courts have explained that the standard of care applied to the cause of action here is one of reasonableness in adopting a safe plan or design and in the use of safety devices.

656.    Part of a negligent design claim is proving that a safer alternative design was commercially feasible at the time of the product's manufacture. The plaintiff must demonstrate that the alternative design was "economically and technologically feasible" at the time of manufacture, though the plaintiff need not prove that the alternative design was commercially available at that time. This distinction between feasibility and availability is significant, as a manufacturer cannot escape liability merely because a safer design was not yet on the market if such a design was technologically and economically achievable.

657.     Here, the Common Allegations are replete with averments making clear that Big Tech altered their policies and algorithms at Government's behest in order to better effectuate the CIC with Westall.

658.     As for a safer alternative design? How about one free from Government coercion wherein/whereby a U.S. Citizen is not stripped of constitutionally guaranteed rights? Or how about a Google "safe search" that is actually safe, rather than one that (with Google/YouTube's explicit awareness) allows for an upstanding professional to be characterized as a pornstar and/or purveyor of porn through imposter channels (several of which were sponsored). Or how about a consumer appeal/reporting process that actually listens to the consumer rather than spits out robotic template responses? Such as a real-life appeal/reporting process that would have snuffed out imposter channels years ago. Or how about a product designed to foster informed medical consent / decision-making, rather than one bent on quashing same and killing people in the process? The list goes on.

659.     As far as economically available, Google/YouTube is richer than God.

660.     As far as technologically feasible, there is arguably no industry more sophisticated and capable than the U.S. Tech industry.

661.     As alleged above, Big Tech did not question the propriety of Government-coerced policy and algorithm changes or engage in any sort of independent thought regarding same; rather, as alleged above, at the Government's behest, Big Tech just pulled the trigger on such changes.

662.     Big Tech's new policies and algorithms implemented as a result of Government's "because we say so" were / are the epitome of dangerous, were dangerous at the time they left the designer, and such dangerousness harmed Westall – chief among

the dangers of Big Tech's designs was / is the point blank violation of the U.S. Constitution (the First Amendment, the Fourth Amendment, and to some extent the Fifth Amendment).

663.    When Google/YouTube altered the design of their products to further tighten down the censorship on Westall, she proximately sustained (and continues to sustain) substantial damages (monetary and reputational).

664.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's negligent product design.

665.    As a result of Google's/YouTube's negligent product design, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date (more than $75,000.00), all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)** any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

**COUNT XIV – Fraud (Re: Google/YouTube)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.[53]

666.    In the District of Columbia, a fraud cause of action requires a plaintiff to prove five essential elements: **(a)** a false representation, **(b)** in reference to a material fact, **(c)** made with knowledge of its falsity, **(d)** with the intent to deceive, and **(e)** action taken in reliance upon the representation.

667.    The representation contemplated in the first element can take the form of an affirmative misstatement or, in certain circumstances, nondisclosure or silence may constitute fraud.

668.    The third and fourth elements address the defendant's state of mind. The defendant must have made the false representation with knowledge of its falsity and with the intent to deceive the plaintiff. Knowledge of falsity may be satisfied by showing that statements were recklessly and positively made without knowledge of their truth. These scienter requirements distinguish fraud from negligent misrepresentation or innocent mistake.

669.    As for the reliance element, plaintiff's reliance must be reasonable. D.C. courts have recognized, however, that where there is a relation of natural trust and confidence, although not strictly a fiduciary relationship, the failure of the defrauded party

_____

[53] This and the negligent misrepresentation cause of action again are pleaded in the alternative, with the main difference between the two causes of action being intentionality. From all the premeditation and orchestration outlined in the Common Allegations (*i.e.*, there was nothing accidental about Big Tech's conduct here), we submit that fraud (laced with intention) is the more likely of the two causes of action, but we are allowed to plead in the alternative and negligent misrepresentation is accordingly pleaded in this Complaint in the alternative in an abundance of caution.

to exercise ordinary prudence or vigilance will not deprive it of redress. Courts have noted that negligence in trusting a misrepresentation will not excuse positive willful fraud.

670.    Fraud is never presumed and must be established by clear and convincing evidence that is not equally consistent with either honesty or deceit.

671.    *See* the averments set forth in the Count XII, above, which are incorporated fully herein.  With the kicker between this Count and Count XII being that the Common Allegations are loaded with clear and convincing evidence that the bulk of what Google/YouTube did to Westall (if not all of what Google/YouTube did to Westall) was intentional. Intentionally aimed at crushing her livelihood by eradicating her from the public square that is Social Media, all because Westall's material did not square with the Government's narratives and simply because the Government said so.

672.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's point-blank fraud.

673.    As a result of Google's/YouTube's fraud, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, request the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date (more than $75,000.00), all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)** any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

**COUNT XV – Promissory Estoppel (Re: Google/YouTube)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.[54]

674.    The elements of a promissory estoppel cause of action are as follows: **(a)** a promise which the promisor should reasonably expect to induce action or forbearance; **(b)** action or forbearance in reliance on the promise; **(c)** injustice resulting if the promise is not enforced.

675.    Here, Google/YouTube promised their interactive computer services to users (like Westall) were free, open to all, and utilizable by all.

676.    It is undeniable that Google/YouTube intended for the promisee (here, Westall) to rely on promises made; *i.e.*, Google/YouTube cannot somehow legitimately say that they did not foresee other users' reliance on their promises.

677.    A huge portion of Westall's businesses revolves around interactive computer services, in particularly Google/YouTube; thus, Westall's reliance on the promises of Google/YouTube cannot be classified as anything other than "substantial."

678.    And the damages sustained by Westall in relation to Google/YouTube pulling the interactive computer services rug out from underneath Westall notwithstanding promises to the contrary are "substantial."

679.    In the end, it is evident that Google/YouTube promises were lies and that they knew that their promises were false / hollow promises all along.

---

[54] Promissory estoppel is the equitable cause of action that is pleaded in the alternative to fraud and negligent misrepresentation.

680.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's broken promises.

681.    As a result of Google's/YouTube's broken promises, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** Plaintiff's lost monies to date (more than $75,000.00), all lost monies Plaintiff stands to lose moving forward, and all associated awardable accrued interest on these monies, **(b)** any awardable attorneys' fees, **(c)** costs incurred bringing this action, and **(d)** for such other relief as this Court deems equitable, just and proper.

### COUNT XVI – Violation of Section 540.08 of the Florida Statutes
### (Misappropriation of Likeness / Invasion of Privacy) (Re: Google/YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

682.    D.C. recognizes a common law tort of misappropriation of name or likeness as one of four invasion of privacy torts.

683.    D.C. has adopted the tort of misappropriation of name or likeness as defined in the Restatement (Second) of Torts § 652C. Under this tort, one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.

684.    This protection is directed to the use of a person's identity as represented by one's name or likeness, and the defendant must have appropriated to his own use or

benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness.

685.   D.C. courts have recognized that invasion of privacy is not one tort, but a complex of four distinct torts: intrusion upon one's solitude or seclusion, public disclosure of private facts, publicity that places one in a false light in the public eye, and appropriating one's name or likeness for another's benefit. The misappropriation tort is the fourth category and closely resembles a right of publicity claim.

686.   The value of a person's name or likeness is not appropriated by mere mention of the plaintiff's name or likeness for legitimate purposes. Additionally, incidental use of name or likeness or publication for a purpose other than taking advantage of a person's reputation or the value associated with his name will not result in actionable appropriation.

687.   In D.C., relief for misappropriation of likeness and/or invasion of privacy is available through common law tort claims, with remedies including compensatory damages, punitive damages in certain circumstances, and injunctive relief.

688.   Here, this Complaint explains in detail that Google/YouTube promoted and made money off of ("sponsored") imposter Westall channels. As stated numerous times already, the imposter channels were nasty in nature – casting Westall as a pornstar or purveyor of porn. As stated numerous times already, Google/YouTube was fully aware of the imposter channels at all material times, as Westall reported same to the Platform. As stated numerous times already, Google/YouTube refused to take any action as to the imposter channels until recently when undersigned counsel's correspondence with Platform counsel began.

689.    Accordingly, Google/YouTube *prima facie* misappropriated Westall's name, likeness, and image, and, part and parcel, invaded her privacy rights.

690.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's misappropriations and privacy invasions.

691.    As a result of Google's/YouTube's misappropriations and privacy invasions, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** monetary damages (compensatory and punitive), **(b)** injunctive relief in line with the Prayer set forth above, **(c)** costs, **(d)** any awardable attorneys' fees, and **(e)** any other relief as this Court deems equitable, just and proper.

## COUNT XVII – Defamation (Libel) (Re: Google/YouTube)

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

692.    In D.C., a defamation cause of action requires the plaintiff to prove four essential elements: **(a)** that the defendant made a false and defamatory statement concerning the plaintiff; **(b)** that the defendant published the statement without privilege to a third party; **(c)** that the defendant's fault in publishing the statement amounted to at least negligence; and **(d)** either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

693.     The first element requires proof that the defendant made a statement that is both false and defamatory. In D.C., a statement is defamatory if it tends to injure the plaintiff in her trade, profession or community standing or lower him in the estimation of the community. The plaintiff bears the burden of establishing the falsity of the statement by a preponderance of the evidence. This allocation of the burden of proof reflects the constitutional requirement that plaintiffs prove falsity rather than defendants proving truth.

694.     The second element mandates that the defendant published the defamatory statement without privilege to a third party. A cause of action for defamation requires proof of publication to a third party, meaning that no actionable claim arises simply by publication of the statement to the plaintiff alone, who is the object of the defamatory statement. The original publisher of a defamatory statement may be liable for republication if the republication is reasonably foreseeable.

695.     The third element concerns the defendant's fault in publishing the statement. For private figure plaintiffs, the defendant's fault must amount to at least negligence. When the plaintiff is a public figure, however, the fault component is heightened, requiring the plaintiff to prove by clear and convincing evidence that the defendant published the defamatory statement with actual malice, meaning either subjective knowledge of the statement's falsity or reckless disregard for whether the statement was false. This heightened standard derives from First Amendment protections established by the United States Supreme Court.

696.     The fourth element provides two alternative paths to recovery. The plaintiff must prove either that the statement was actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm. Certain categories of

defamatory statements are considered actionable per se, meaning they are presumed to cause harm without requiring proof of actual damages.

697.    Unlike some jurisdictions that apply a heightened pleading rule to defamation claims, D.C. focuses its inquiry on whether the factual allegations in the complaint are sufficient to permit the opposing party to form responsive pleadings. D.C. courts do not require special pleading beyond the standard notice pleading requirements, though the complaint must contain sufficient factual detail to support the defamation claim.

698.    As for the first element, the Compliant makes clear Google/YouTube knowingly promoted and made money off of ("sponsored") imposter channels painting Westall as a pornstar and/or purveyor of porn. This pronouncement/advertisement by Google/YouTube was false and defamatory, and such plainly injured Westall in her trade, profession or community standing or lowered her in the estimation of the community.

699.    As for the second element, Google/YouTube knowingly broadcasted the pronouncement of "Westall the pornstar" not just to *a* third-party, but to the world.

700.    As for Google's/YouTube's fault in publishing the defamatory imposter Westall channels, again, Google/YouTube *knowingly* did so and even monetized such. Again, Westall reported the imposter channels to Google/YouTube and the Platform did nothing to eradicate same but instead took affirmative action to augment/promote same.

701.    As for damage, *plainly* … Westall is an upstanding journalist, not a pornstar. Google's/YouTube's affirmatively broadcasting her as a pornstar or purveyor of porn caused immense professional and reputational harm.

702.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's known defamation.

703.    As a result of Google's/YouTube's defamation, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** monetary damages (compensatory and punitive), **(b)** costs, **(c)** any awardable attorneys' fees, and **(d)** any other relief as this Court deems equitable, just and proper.

**COUNT XVIII – Practicing Medicine Without A License (Re: Google/YouTube)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

704.    D.C. has statutory provisions addressing the unlicensed practice of medicine, including both licensing requirements and penalties for violations. D.C. establishes a comprehensive regulatory framework that requires licensure to practice medicine and provides grounds for disciplinary action.

705.    More specifically, D.C. requires a license to practice medicine within its jurisdiction. D.C. Code Ann. § 3-1205.01(a)(1) mandates that "a license issued pursuant to this chapter is required to practice … medicine … in the District, except as otherwise provided in this chapter. D.C. Stat. §3-1205.01.

706.    The statute defines "practice of medicine" broadly to include "suggesting, recommending, prescribing, or administering, with or without compensation, any form of treatment, operation, drug, medicine, manipulation, electricity, or any physical, mechanical, or healing treatment by other means, for the prevention, diagnosis, correction,

235

or treatment of a physical or mental disease, ailment, injury, condition, or defect of any person." *Id.* at §3-1201.02.

707.    This definition also encompasses "advertising or representing in any manner that one is authorized to practice medicine" in connection with treating human disease unless the person holds a valid license. *Id.*

708.    D.C. courts have recognized that unlicensed practice constitutes a violation subject to prosecution. More specifically, D.C. courts have held that each act of medical practice without license may be prosecuted as separate offense, noting that a single act may be practicing medicine for purposes of the statute.

709.    Moreover, D.C. courts have affirmed that practicing medicine in D.C. without a license is subject to criminal prosecution.

710.    The licensing requirement in D.C. applies broadly to anyone engaging in medical practice. For example, D.C. courts have determined that an individual working as a medical director for an insurance company was practicing medicine without a license, emphasizing that the statutory definition must be properly understood to determine whether licensure is required.

711.    Here, Google/YouTube played the role of medical practitioners by deciding which camp (Government vs. Westall) was correct about COVID-19 (as to the ailment itself, the diagnosis of same, the treatment of same, and *et cetera*).

712.    Google/YouTube do not possess medical licenses. The Platform's decision to fully promote vaccination (and eradicate those, like Westall, who posted critiques pertaining to COVID) was tantamount to playing the role of a doctor – deciding how an ailment was / is to be treated.

713.    The Platform's fully embracing and promoting the Government's vaccination prerogative (and eradicating those of a different viewpoint, like Westall) violates D.C.'s medical practice statutes enumerated above.

714.    The instances of the Platform's aforementioned conduct (playing the role of doctor in deciding whose medical prerogative was best) are countless, and, yet, every single instance of such crippled Westall's livelihood and reputation and constitutes a crime (with sentencing and fines available).

715.    Westall has no other adequate remedy at law to address the injuries suffered as a result of Google's/YouTube's practicing medicine without a license.

716.    As a result of Google's/YouTube's practicing medicine without a license, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against Defendants, Google and YouTube, individually and severally (although, corporately speaking, they are the same), for liability and for damages including, but not limited to, **(a)** the imposition of a reasonable fine per instance of the Platform's practicing medicine without a license in eradicating those (like Plaintiff) of a COVID-19 anti-vaccination viewpoint, **(b)** jail time, **(c)** any awardable attorneys' fees, **(d)** costs incurred bringing this action, and **(e)** for such other relief as this Court deems equitable, just and proper.

**COUNT XIX – Treason / Sedition (Re: Government Defendants)**

Plaintiff re-alleges Paragraphs 1 through 549 as if fully set forth herein, and further alleges as follows.

717.    Treason is defined as "the offense of attempting to overthrow the government of the state to which one owes allegiance, either by making war against the state *or by materially supporting its enemies*." Garner, Bryan A., *Black's Law Dictionary*, 720 (2d pocket ed., 2001) (emphasis added). Put differently, treason involves betraying one's country by giving aid or comfort to its enemies or acting against the nation's interests.

718.    "Treason against the United States, shall consist only in levying war against them, *or in adhering to their enemies, giving them aid and comfort*. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court." Art. III, § 3 (emphasis added).

719.    Here, the CIC aimed at undermining the United States Constitution (namely free speech / press under First Amendment and, to some extent, due process under the Fifth Amendment, in addition the Fourth Amendment) spearheaded by the Government was not at all in the interests of the United States; but, rather, was in the interests of the New World Order (made up of several foreigners who do not have the well-being of the United States in mind but rather wish to see the United States fail).

720.    The Government adhered to the objectives (censorship) of enemies lurking within the United Kingdom, for example. The Government gave aid to the objectives (censorship) of enemies lurking within the United Kingdom. And we would comfortably wager that it was / is not just the United Kingdom (as enemy of the State in relation to censorship at the very least), but also other countries throughout the world.

721.    The New World Order is not the U.S. Government, it is made up of several governments. The Government's giving aid and comfort to the New World Order, in the CIC bent on harming Americans and imploding the Constitution, is the definition of treason.

722.    Per Title 18, United States Code, Section 2381:

Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States.

723.    And the treasonous acts of the Government crushed Westall's livelihood and reputation.

724.    Westall has no other adequate remedy at law to address the injuries suffered as a result of the Government's treason (sedition at the very least).

725.    As a result of the Government's treason / sedition, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Sarah K. Westall, requests the entry of judgment against the Government (and all implicated officials / agents therein), as follows: **(a)** imprisonment of not less than five years (death is a bit much, so Plaintiff will forego that request); **(b)** fines of not less than $10,000.00; **(c)** restriction on holding office in the United States ever again; and **(d)** for such other relief as this Court deems equitable, just and proper.

## Jury Demand

726.    Plaintiff, Sarah K. Westall, demands a trial by jury on all issues so triable as a matter of right.

Dated:  March 4, 2026.

Respectfully Submitted,

**GREYBER LAW, PLLC**

*/s/* Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
D.C. Bar No. 1031923
D.D.C. Admitted
8903 Glades Rd., Ste. A8, #111
Boca Raton, Florida  33434
(561) 702-7673
(833) 809-0137 (f)
jgreyber@greyberlaw.com
*Attorney for Plaintiff*